1    ROBERT J. HANNA, Bar No. 66105
     robert.hanna@bbklaw.com
2    MATTHEW L. GREEN, Bar No. 227904
     matthew.green@bbklaw.com
3    WHITNEY R. BLACKHURST, Bar No. 295239
     whitney.blackhurst@bbklaw.com
4    BEST BEST & KRIEGER LLP
     655 West Broadway, 15th Floor
5    San Diego, California 92101
     Telephone:  (619) 525-1300
6    Facsimile:  (619) 233-6118

7    Attorneys for Defendant
     OMNI HOTELS MANAGEMENT
8    CORPORATION

9               UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11

12   ALLEN HARVEY ABOLAFIA,              Case No.  19-cv-01923-W-KSC
                                         Judge: Hon. Thomas J. Whelan
13            Plaintiff,
                                         DECLARATION OF MATTHEW L.
14        v.                             GREEN IN OPPOSITION TO
                                         PLAINTIFF ALLEN HARVEY
15   OMNI HOTELS MANAGEMENT              ABOLAFIA'S MOTION FOR
     CORPORATION; and DOES 1 TO          SUMMARY JUDGMENT
16   20, inclusive,
                                         Date:    July 20, 2020
17            Defendants.                Dept.:   Courtroom 3C (3rd Floor)

18

19

20

21

22

23

24

25

26

27

28

DECL. OF MATTHEW L. GREEN IN OPP'N TO
MOT. FOR SUMM. J.
10-CV-01923-w-ksc

I, Matthew L. Green, declare as follows:

1.     I have personal knowledge of the following facts and if called to testify, I would and could testify competently thereto.

2.     I am an attorney at law duly licensed to practice before all courts in the State of California. I am an attorney at Best Best & Krieger LLP, attorneys of record for Defendant Omni Hotels Management Corporation ("Omni") in the above-captioned action. As one of Omni's attorneys in this action, I am familiar with the proceedings therein and the documents and records relating thereto maintained in my office in connection therewith.

3.     On or about August 9, 2019, Omni served Special Interrogatories (Set One) on Plaintiff Allen Harvey Abolafia ("Plaintiff"), verified response to which were served by Plaintiff on or about September 5, 2019. A true and correct copy of excerpts of Plaintiff's Responses to Special Interrogatories Propounded by Omni is attached as Exhibit "A" hereto.

4.     On or about January 17, 2020, Plaintiff served Request for Admissions on Omni (Set No. One), verified responses to which were served by Omni on or about March 13, 2020. A true and correct copy of excerpts of Omni's Response to Plaintiff's Request for Admissions (Set One) is attached as Exhibit "B" hereto.

5.     On February 19, 2020, I took the deposition of Plaintiff in the above-captioned action. Attached as Exhibit "C" hereto is a true and correct copy of excerpts of the transcript of Plaintiff's deposition, including Exhibits "2" through "6", Exhibits "8" through "11", and Pages A-9 and A-14 of Exhibit "13" thereto.

6.     In its original Answer, as its ninth affirmative defense, Omni alleged that "[a]ny damages Plaintiff may have sustained were the result, in whole or in part, of conduct by other parties for whom Omni is not legally responsible." (Doc. 1-2, Ex. C at 3:19-20.) Plaintiff filed a motion for judgment on the pleadings challenging the sufficiency of Omni's affirmative defenses, including the foregoing third party defense. (Docs. 7, 8.) After meeting and conferring regarding the motion, and

1  pursuant to the joint motion of the parties, the hearing on the motion for judgment on

2  the pleadings was vacated, and the Court granted Omni leave to file a First Amended

3  Answer, which Omni filed on April 27, 2020. (Docs. 9-10, 12.)

4        7.     Omni amended the third party defense, now identified as its fourth

5  affirmative defense, to allege that "insofar as Plaintiff alleges his damages resulted

6  from the negligent design or construction of the arched concrete bridge located on

7  the golf cart path between the sixth hole and the tee box for the seventh hole of the

8  Legends Course, said bridge was designed and constructed by Hoagland and Sons

9  Concrete, not Omni." (Doc. 12 at 7:24-28.)

10        8.     During the parties' meet and confer regarding the motion for judgment

11  on the pleadings, I informed Plaintiff's counsel by email on March 20, 2020, that the

12  third party defense was "only alleged insofar as Plaintiff may claim the bridge was

13  negligently designed or constructed[,]" but that Omni would remove the defense "if

14  [Plaintiff] is not alleging negligent design or construction of the bridge[.]" Having

15  received no response to Omni's offer, and in order to preserve its third party defense,

16  the defense was included in the First Amended Answer. Despite the foregoing

17  exchange, Plaintiff now moves for summary judgment on the third party defense on

18  the ground that Omni fails to allege sufficient facts to support the defense, among

19  other grounds. (Doc. 13-1 at 8:9-23.)

20        9.     On or about June 12, 2020, four days before filing his motion for

21  summary judgment, Plaintiff served a Notice of Deposition of Person(s) Most

22  Knowledgeable ("PMK(s)") at Hoagland & Sons Concrete ("Hoagland") for July 22,

23  2020, a true and correct copy of which is attached as Exhibit "D" hereto. The topics

24  on which Hoagland's PMK(s) will be deposed specifically include the design and

25  construction of the bridge located between the sixth hole and seventh tee box on the

26  Legends Course at the Club at La Costa. Because Omni's third party defense is

27  largely dependent on the what evidence may be discovered at the deposition of

28  Hoagland's PMK(s), and such evidence may demonstrate that Plaintiff is not entitled

1   to judgment as a matter of law on said defense, Omni requests that the Court defer or

2   deny the motion under Federal Rule of Civil Procedure 56(d) in order to allow for

3   the deposition to be completed.

4        I declare under penalty of perjury that the foregoing is true and correct.

5        Executed this 6th day of July, 2020, at San Diego, California.

6

7

8        _____

9        MATTHEW L. GREEN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1  **ROBERT J. PECORA, SBN 106167**
   **7855 Ivanhoe Avenue, Suite 408**
2  **La Jolla, California 92037**
   **Telephone:    (858) 454-4014**
3  **Facsimile:     (858) 454-3548**

4
   Attorney for Plaintiff: ALLEN HARVEY ABOLAFIA
5

6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9      **FOR THE COUNTY OF SAN DIEGO – NORTH COUNTY REGIONAL CENTER**

10
    ALLEN HARVEY ABOLAFIA,                    )  Case No.: 37-2019-00016847-CU-PO-NC
11                                            )
                                              )
12          Plaintiff,                        )  **PLAINTIFF, ALLEN HARVEY**
                                              )  **ABOLAFIA'S RESPONSES TO SPECIAL**
13          vs.                               )  **INTERROGATORIES PROPOUNDED BY**
                                              )  **DEFENDANT, OMNI HOTELS**
14  OMNI HOTELS MANAGEMENT                    )  **MANAGEMENT CORPORATION**
    CORPORATION and DOES 1 to 20, inclusive;  )
15                                            )  **(SET NO. ONE)**
            Defendants.                       )
16                                            )  Judge:  Hon. Earl H. Maas III
                                              )  Dept: N-28
17                                            )  Phone: (760) 201-8704
                                              )  Complaint Filed: April 2, 2019
18  _____  )

19  PROPOUNDING PARTY:    **DEFENDANT:**    **OMNI HOTELS MANAGEMENT**
                                            **CORPORATION**
20
21  RESPONDING PARTY:    **PLAINTIFF:**    **ALLEN HARVEY ABOLAFIA**

22  SET NO.:                              **ONE (SPECIAL INTERROGATORIES)**

23       TO: DEFENDANT, OMNI HOTELS MANAGEMENT CORPORATION, AND ALL THE

24  NAMED DEFENDANTS, and their attorneys of record:

25       Plaintiff, ALLEN HARVEY ABOLAFIA, responds to the Special Interrogatories

26  (Set One) of DEFENDANT, OMNI HOTELS MANAGEMENT CORPORATION, as follows:
27

28                                  - 1 -

---

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose, and in relation to this action.  Each answer is given subject to all appropriate objections including, but not limited to objections concerning competency, relevancy, materiality, propriety, and admissibility, which would require the exclusion of any statement contained herein if the interrogator were asked of, or any statement contained herein were made by a witness present and testifying in court.  All such objections and grounds therefore are reserved and may be interposed at the time of the trial.

The party on whose behalf these answers are given has not completed his investigation of the facts relating to this action, has not completed his discovery in this action, and has not completed his preparation for trial.  Consequently, the following answers are given without prejudice to the answering party's right to produce at the time of trial, subsequently discovered evidence relating to the proof of facts subsequently discovered to be material.

Except for facts explicitly admitted herein, no admission of any nature whatsoever is to be implied or inferred.  The fact that any interrogatory herein has been answered should not be taken as an admission, or a concession of the existence of any facts set forth or assumed by such interrogatory, or that such answer constitutes evidence of any fact thus set forth or assumed.

All answers must be construed as given on the basis of present recollection.  In a good faith effort to respond to defendant's interrogatories, plaintiff responds as set forth below.

**SPECIAL INTERROGATORIES**

**SPECIAL INTERROGATORY NO. 1**

State all facts upon which YOU base YOUR allegation in the COMPLAINT that "Plaintiff…was injured when Defendants, and each of them, so carelessly and negligently inspected, repaired, maintained, owned, controlled, and marked the premises in such a manner that Plaintiff stepped into an unmarked construction hole adjacent to and hidden by a cement curb, all of which

- 2 -

PLAINTIFF, ALLEN HARVEY ABOLAFIA'S RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT, OMNI HOTELS MANAGEMENT CORPORATION (SET NO. ONE)

A-3

1  proximately caused Plaintiff to trip and fall forward with his heal stuck in the hole, and caused a

2  serious injury to Plaintiff.  ("YOU" and "YOUR" include you, your agents, your employees, your

3  insurance companies, their agents, their employees, your attorneys, your accountants, your

4  investigators, and anyone else acting on your behalf; and "COMPLAINT" means the Complaint filed

5  in the above-captioned action on or about April 2, 2019.)

6

7  **RESPONSE TO SPECIAL INTERROGATORY NO. 1**

8  **All the facts upon which I base MY allegation in the COMPLAINT that** "Plaintiff…was

9  injured when Defendants, and each of them, so carelessly and negligently inspected, repaired,

10  maintained, owned, controlled, and marked the premises in such a manner that Plaintiff stepped into an

11  unmarked construction hole adjacent to and hidden by a cement curb, all of which proximately caused

12  Plaintiff to trip and fall forward with his heal stuck in the hole, and caused a serious injury to Plaintiff.

13  ("YOU" and "YOUR" include you, your agents, your employees, your insurance companies, their

14  agents, their employees, your attorneys, your accountants, your investigators, and anyone else acting on

15  your behalf; and "COMPLAINT" means the Complaint filed in the above-captioned action on or about

16

17  April 2, 2019.) **are as follows:**

18  **On AUGUST 29, 2018, at approximately 10:00 a.m., OMNI HOTELS**

19  **MANAGEMENT CORPORATION left a deep hole hidden from view by the cement golf cart**

20  **path curb at the 7th hole.  When I, Plaintiff, ALLEN ABOLAFIA exited the golf cart I was**

21  **driving at the 7th hole and began to walk towards the 7th tee box, I stepped over the curb and**

22  **into the hole with my left foot which became jammed into an area below the curb causing me**

23  **to fall forward with my left foot heal stuck in the hole.**

24

25  **The result of my jamming my left heel into the hole and the area beneath the curb was:**

26  **1. a rupture of my left Achilles tendon; and 2. a closed nondisplaced avulsion fracture of**

27  **tuberosity of left calcaneus.**

28  - 3 -

It is apparent that the hole into which I stepped into was created as a part of the construction of the bridge leading from the 6th hole/snack bar area to the 7th hole tee box and/or as a part of a repair of the irrigation system.  In any event the unmarked hole which created by the Defendant OMNI HOTELS MANAGEMENT CORPORATION as the owner of the property obviated the notice requirement.

As the landlord and owner, the Defendant OMNI HOTELS MANAGEMENT CORPORATION had a nondelegable duty to put and maintain the golf cart path and the area immediately adjacent to the curb in a reasonably safe condition which included:

       1. a warning of the dirt hole;

       2. a blockade of the hole; and

       3. remedy the condition by making the grassy area reasonably level adjacent to the golf cart curb and near the tee box for the 7th hole.

**SPECIAL INTERROGATORY NO. 2**

IDENTIFY all PERSONS with knowledge of any of the facts identified in YOUR response to Special Interrogatory No. 1.  ("IDENTIFY" means to describe with sufficient particularity, including, but not limited to, providing the PERSON's last known name, address, and telephone number, and "PERSON" includes a natural person, firm, association, organization, partnership, business, trust, limited liability company, corporation, or public entity.)

**RESPONSE TO SPECIAL INTERROGATORY NO. 2**

All PERSONS with knowledge of any of the facts identified in MY response to Special Interrogatory No. 1 ("IDENTIFY" means to describe with sufficient particularity, including, but not limited to, providing the PERSON's last known name, address, and telephone number, and

- 4 -

PLAINTIFF, ALLEN HARVEY ABOLAFIA'S RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT, OMNI HOTELS MANAGEMENT CORPORATION (SET NO. ONE)

A-5

c.) 08/29/18

d.) $230.00: $35.00; $195.00.

a.) <u>Name of health care provider</u>:
Valley Radiology Consultants: Samuel Joseph Luchsinger, D.O.
613 West Valley Parkway, Suite 330
Escondido, CA 92025
(760) 520-8513

b.) <u>Consultation type</u>: Injury-related consultations, examinations, treatments and

procedures including an MRI of the left ankle without contrast.

c.) 08/29/18.

d.) $758.00.

a.) <u>Name of health care provider</u>:
Scripps Clinic Torrey Pines: Michael Joseph Botti, M.D.
P.O. Box 235498
Encinitas, CA 92023-5498
(760) 633-7175

b.) <u>Consultation type</u>: Subsequent injury-related consultations, examinations,

treatments, procedures for rupture of left Achilles tendon and closed nondisplaced

avulsion fracture of tuberosity of left calcaneus.  Short left leg cast.

c.) 08/29/18

d.) $755.00: $220.00; $102.00; $433.00

See Exhibits A - H in Plaintiff, ALLEN HARVEY ABOLAFIA's Response to Request for

Production (Set One).  Discovery is continuing.


**SPECIAL INTERROGATORY NO. 5**

State the amount of damages YOU are seeking by way of the COMPLAINT.

- 8 -

PLAINTIFF, ALLEN HARVEY ABOLAFIA'S RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED
BY DEFENDANT, OMNI HOTELS MANAGEMENT CORPORATION (SET NO. ONE)

A-6

1    **RESPONSE TO SPECIAL INTERROGATORY NO. 5**

2        **The amount of damages I am seeking by way of the COMPLAINT are as follows: I,**

3    **Plaintiff, ALLEN ABOLAFIA have authorized my attorney to settle all claims against the**

4    **OMNI HOTELS MANAGEMENT CORPORATION for the sum of $500,000.**

5

6    DATED: September 4, 2019

7

8                              Robert J. Pecora
                               Attorney for Plaintiff,

9                                ALLEN HARVEY ABOLAFIA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF, ALLEN HARVEY ABOLAFIA'S RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED
BY DEFENDANT, OMNI HOTELS MANAGEMENT CORPORATION (SET NO. ONE)

VERIFICATION

I, ALLEN HARVEY ABOLAFIA, am a Plaintiff in the above captioned matter.  I have read the foregoing ANSWERS AND/OR OBJECTIONS TO SPECIAL INTERROGATORIES (SET ONE) PROPOUNDED BY DEFENDANT, OMNI HOTELS MANAGEMENT CORPORATION; and know the contents thereof; and I certify that the same is true of my knowledge, except as to those matters which are stated upon my information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: 9.4.19 _____     _____

ALLEN HARVEY ABOLAFIA, Plaintiff

# EXHIBIT B

1   ROBERT J. HANNA, Bar No. 66105
    robert.hanna@bbklaw.com
2   MATTHEW L. GREEN, Bar No. 227904
    matthew.green@bbklaw.com
3   WHITNEY R. BLACKHURST, Bar No. 295239
    whitney.blackhurst@bbklaw.com
4   BEST BEST & KRIEGER LLP
    655 West Broadway, 15th Floor
5   San Diego, California 92101
    Telephone: (619) 525-1300
6   Facsimile: (619) 233-6118

7   Attorneys for Defendant
    OMNI HOTELS MANAGEMENT
8   CORPORATION

9               UNITED STATES DISTRICT COURT

10             SOUTHERN DISTRICT OF CALIFORNIA

11

12  ALLEN HARVEY ABOLAFIA,          | Case No.  19-cv-01923-W-KSC
                                    | Judge: Hon. Thomas J. Whelan
13            Plaintiff,            |
                                    | DEFENDANT OMNI HOTELS
14       v.                         | MANAGEMENT CORPORATION'S
                                    | RESPONSE TO PLAINTIFF ALLEN
15  OMNI HOTELS MANAGEMENT          | HARVEY ABOLAFIA'S REQUEST
    CORPORATION; and DOES 1 TO      | FOR ADMISSIONS (SET ONE)
16  20, inclusive,                  |
                                    |
17            Defendants.           |

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S RESPONSE TO PLAINTIFF'S
REQUEST FOR ADMISSIONS (SET ONE)
19-cv-01923-W-KSC

61746.00003\32665656.1

B-2

1  PROPOUNDING PARTY:     Plaintiff ALLEN HARVEY ABOLAFIA

2  RESPONDING PARTY:      Defendant  OMNI  HOTELS  MANAGEMENT

3                         CORPORATION

4  SET NUMBER:            ONE

5      Defendant Omni Hotels Management Corporation ("Responding Party")

6  responds as follows to Plaintiff Allen Harvey Abolafia's ("Propounding Party")

7  Request For Admissions (Set One).

8                    **PRELIMINARY STATEMENT**

9      Responding Party is presently pursuing its investigation of the facts and law

10 related to this case and has not completed its discovery in preparation for trial.

11 Responding Party's objections and responses set forth herein are based on the

12 knowledge, information, and belief of Responding Party at this time, as well as the

13 documents in Responding Party's possession, custody, or control. Therefore, the

14 objections and responses set forth herein are given without prejudice to Responding

15 Party's right to produce evidence of subsequently discovered facts or to add,

16 modify, or otherwise change or amend the responses herein or rely on additional

17 evidence at trial or in connection with any pretrial proceedings. Responding Party

18 expressly reserves the right to amend or supplement these objections and responses

19 as discovery in the case progresses, as new facts develop, and as new information is

20 obtained.

21           **RESPONSES TO REQUESTS FOR ADMISSION**

22 **REQUEST FOR ADMISSION NO. 1:**

23     Admit that Plaintiff ALLEN HARVEY ABOLAFIA was at the SUBJECT

24 PREMISES and at the LOCATION OF THE INCIDENT.

25 **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

26     Objection. This request for admission is compound. Further, this request for

27 admission is vague and ambiguous and overbroad as to time and scope. In addition,

28 the definition of "subject premises" is vague and ambiguous and overbroad.

1  Notwithstanding these objections and without waiving these objections,
2  Responding Party responds as follows: Admit that Propounding Party was at the
3  location of the incident on August 29, 2018. Except as expressly admitted,
4  Responding Party denies this request.

5  **REQUEST FOR ADMISSION NO. 2:**

6  Admit that YOU owned the SUBJECT PREMISES on the date of the
7  INCIDENT.

8  **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

9  Objection. The definition of "subject premises" is vague and ambiguous and
10 overbroad. Further, the definition of "incident" is vague and ambiguous and
11 overbroad. Notwithstanding these objections and without waiving these objections,
12 Responding Party responds as follows: Admit that the location of the incident was
13 owned by Responding Party as of August 29, 2018. Except as expressly admitted,
14 Responding Party denies this request.

15 **REQUEST FOR ADMISSION NO. 3:**

16 Admit that YOU failed to inspect the LOCATION OF THE INCIDENT prior
17 to the INCIDENT.

18 **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

19 Objection. This request for admission is vague and ambiguous and overbroad
20 as to time and scope. In addition, the definition of "incident," and the term
21 "inspect," are vague and ambiguous and overbroad. Notwithstanding these
22 objections and without waiving these objections, Responding Party responds as
23 follows: Deny.

24 **REQUEST FOR ADMISSION NO. 4:**

25 Admit that YOU failed to inspect the LOCATION OF THE INCIDENT
26 immediately following the INCIDENT.

27 / / /

28 / / /

DEFENDANT'S RESPONSE TO PLAINTIFF'S
REQUEST FOR ADMISSIONS (SET ONE)
19-cv-01923-W-KSC

61746.00003\32665656.1

B-4

1  **REQUEST FOR ADMISSION NO. 11:**

2       Admit that the plans for the bridge at or near the LOCATION OF THE

3  INCIDENT included a handrail.

4  **RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

5       Objection. This request for admission is vague and ambiguous and overbroad

6  as to time and scope. Notwithstanding these objections and without waiving these

7  objections, Responding Party responds as follows: Deny.

8

9  Dated: March 13, 2020            BEST BEST & KRIEGER LLP

10

11                    By: _W. Bl_____

                     ROBERT J. HANNA

12                       MATTHEW L. GREEN

                     WHITNEY R. BLACKHURST

13                       Attorneys for Defendant

                     OMNI HOTELS MANAGEMENT

14                       CORPORATION

15

16

17

18

19

20

21

22

23

24

25

26

27

28

61746.00003\32665656.1

B-5

**VERIFICATION**

I, Dustin Irwin, declare:

I am the Club Director at Omni La Costa Resort & Spa, which is operated by Omni Hotels Management Corporation, a party to this action, and I am authorized to make this verification for and on its behalf, and I make this verification for that reason. I have read the foregoing DEFENDANT OMNI HOTELS MANAGEMENT CORPORATION'S RESPONSE TO PLAINTIFF ALLEN HARVEY ABOLAFIA'S REQUEST FOR ADMISSIONS (SET ONE) and know its contents. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at San Diego County, California on March 13, 2020.

DEFENDANT'S RESPONSE TO PLAINTIFF'S
REQUEST FOR ADMISSIONS (SET ONE)
19-cv-01923-W-KSC

61746.00003\32665656.1

B-6

# EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLEN HARVEY ABOLAFIA, | ) Case No. |
| | ) 19-cv-01923 W-KSC |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OMNI HOTELS MANAGEMENT | ) |
| CORPORATION; and DOES 1 TO | ) |
| 20, inclusive, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

DEPOSITION OF ALLEN HARVEY ABOLAFIA

La Jolla, California

February 19, 2020

REPORTED BY:  BOBBIE HIBBLER, CSR NO. 12475

Allen Abolafia, 2/19/2020

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   ALLEN HARVEY ABOLAFIA,        ) Case No.
                                   ) 19-cv-01923 W-KSC
 5                                 )
          Plaintiff,               )
 6                                 )
        v.                         )
 7                                 )
     OMNI HOTELS MANAGEMENT         )
 8   CORPORATION; and DOES 1 TO    )
     20, inclusive,                )
 9                                 )
                                   )
10        Defendants.              )
     _____)
11
12
13
14             DEPOSITION OF ALLEN HARVEY
15   ABOLAFIA, taken by the Defendants, commencing at
16   the hour of 10:15 a.m. on Wednesday, February 19,
17   2020, at 7855 Ivanhoe Avenue, Suite 408, La Jolla,
18   California, before Bobbie Hibbler, Certified
19   Shorthand Reporter in and for the State of
20   California.
21
22
23
24
25
```

**2**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

```
1    APPEARANCES
2    For the Plaintiff:
         LAW OFFICE OF ROBERT PECORA
3        BY: ROBERT PECORA, ESQ.
         7855 Ivanhoe Avenue
4        Suite 408
         La Jolla, California 92037
5        858-454-4014
6
7    For the Defendants:
         BEST, BEST & KRIEGER, LLP
8        BY: MATTHEW GREEN, ESQ.
         655 West Broadway
9        Suite 15th Floor
         San Diego, California 92101
10       619-525-1300
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

Allen Abolafia, 2/19/2020

```
1                    EXAMINATION INDEX
2
3    ALLEN HARVEY ABOLAFIA
          BY MR. GREEN . . . . . . . . . . . .  6
4
5
6
7
8                     EXHIBIT INDEX
9    EXHIBIT              DESCRIPTION              PAGE
10    1    AMENDED NOTICE OF DEPOSITION OF        15
          ALLEN HARVEY ABOLAFIA
11
      2    LETTER TO MR. ABOLAFIA                 17
12
      3    SIGNATURE MEMBERSHIP PLAN             20
13
      4    SIGNATURE SPORT MEMBERSHIP APPLICATION 23
14
      5    2006 AMENDED AND RESTATED RULES AND    29
15        REGULATIONS
16    6    PHOTOGRAPHS                           37
17    7    PHOTOGRAPH                            39
18    8    LA COSTA GOLF INVOICES                40
19    9    RECEIPT FROM LA COSTA GOLF            41
20    10   COMPUTER PRINTOUT FROM LA COSTA       48
21    11   OMNI HOTELS & RESORTS INCIDENT REPORT 75
22    12   PHOTOGRAPH                            78
23    13   PHOTOS OF LOCATION/PHOTOS OF LOCATION 80
          FIXED
24
      14   MEDICAL RECORD                       114
25
```

4

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

```
 1                    EXHIBIT INDEX
 2                     (CONTINUED)
 3    EXHIBIT              DESCRIPTION              PAGE
 4     15    MEDICAL RECORD FROM
             SCRIPPS ENCINITAS                      117
 5
       16    MEDICAL RECORD FROM
 6           SCRIPPS ENCINITAS                      127
 7     17    LETTER DATED JANUARY 4, 2019           141
 8     18    VERIFICATION PAGES                     147
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    COURT REPORTER'S CERTIFICATE.................155
```

**5**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

```
 1                ALLEN HARVEY ABOLAFIA,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                   EXAMINATION
 5   BY MR. GREEN:
 6       Q.   Mr. Abolafia, could you state and spell
 7   your full name for the record?
 8       A.   It's Allen H. Abolafia.
 9       Q.   And could you spell Abolafia?
10       A.   A-B-O-L-A-F-I-A.
11       Q.   And what does the H stand for?
12       A.   Harvey.
13       Q.   Okay.  Have you ever had your deposition
14   taken before?
15       A.   Yes.
16       Q.   How many times?
17       A.   Probably once or twice.
18       Q.   When was the last one?
19       A.   Probably about 12 years ago.  I'm just
20   guessing.
21       Q.   It's fine.  It's an estimate 12 years
22   ago?
23       A.   Yes.
24       Q.   Do you recall what the nature of the
25   proceeding was you were deposed in?
```

**6**

Allen Abolafia, 2/19/2020

1    **Q.   Retire?**

2    A.   Retired.  Actually I went on disability

3  also.

4    **Q.   Okay.  What were you on disability for?**

5    A.   I have some major heart disease.

6    **Q.   We can talk about that a little bit.**

7    A.   Okay.

8    **Q.   Anything else in your employment**

9  **history?**

10    A.   That's pretty much it.

11    **Q.   Have you been retired since 2006?**

12    A.   Yes.

13    **Q.   Okay.  How long you been playing golf**

14  **for?**

15    A.   I've played golf since I was probably a

16  kid, but I played once a year.  I didn't start

17  really playing golf until I was in my early 50s.

18    **Q.   How many years ago was that?**

19    A.   Fifteen.

20    **Q.   Just a couple; right?**

21    A.   Fifteen.

22    **Q.   So you say you really started playing 15**

23  **years ago, so roughly 2005?**

24    A.   Yeah.  2005, 2006.

25    **Q.   Okay.  And at that time how often were**

14

C-8

Allen Abolafia, 2/19/2020

1    you playing golf?

2        A.   After the fact or --

3        Q.   2005 or 2006.

4        A.   I was playing two times a week.

5        Q.   How long did that last you were playing

6    two times a week?

7        A.   Up until now.

8        Q.   You're still playing generally two times

9    a week?

10       A.   Two to three times, yes.

11       Q.   Okay.  I'm going to mark as Exhibit 1

12   and ask you if you have seen this before?

13       A.   I haven't seen it.

14           (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

15   WAS MARKED AS EXHIBIT NO. 1 TO THE TESTIMONY OF

16   THE WITNESS AND IS ATTACHED HERETO.)

17   BY MR. GREEN:

18       Q.   It's fine.  It's just your deposition

19   notice and what compelled you to appear today.

20       A.   Okay.

21       Q.   You can put it to the side.

22           When is the first time you played golf

23   at La Costa?

24       A.   Again, estimate I think 2007.

25       Q.   At some point you became a member of the

**15**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1    golf club --
2        A.    Right.
3        Q.    Just let me finish so we don't talk over
4    each other.   It's for her benefit.
5        A.    That's fine.
6        Q.    2007 you said?
7        A.    Yes.
8        Q.    Had you been a member of any other golf
9    club prior to La Costa?
10       A.    Yes.
11       Q.    Where?
12       A.    In Vegas.
13       Q.    In Vegas?
14       A.    Uh-huh (affirmative response).
15       Q.    More than one?
16       A.    Yes.
17       Q.    Half dozen?
18       A.    Half dozen.
19       Q.    Okay.   What is the reason you became a
20   member of La Costa?
21       A.    It's a great club, excellent club.   But
22   I like the people there.   It had 36 holes.   And I
23   had a home overlooking the golf course.
24       Q.    So the first time you played there was
25   2007.   Do you recall when you became a member of

**16**

Allen Abolafia, 2/19/2020

1    La Costa?

2        A.    I think right afterwards I got -- I went

3    to sales and they gave me a free round to try to

4    entice me to buy it.  And I think I joined the

5    same day actually.

6        Q.    Do you remember how many times you had

7    played the course before you became a member?

8        A.    I think just once.

9        Q.    Was that your free round that you got?

10       A.    Yes.

11       Q.    I am going to mark next in order Exhibit

12   2.  If you could take a look at this and just let

13   me know if you have seen this document before?

14       A.    I have not seen this document.

15            (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

16   WAS MARKED AS EXHIBIT NO. 2 TO THE TESTIMONY OF

17   THE WITNESS AND IS ATTACHED HERETO.)

18   BY MR. GREEN:

19       Q.    If you turn to the third page, it's a

20   four-page document and tell me if any of the

21   information on there looks familiar to you?  This

22   is starting "As we enter the New Year, I would

23   like to update with a you membership pricing dues

24   and fees 2007."  Do you see that?

25       A.    Yes.

**17**

Peterson Reporting Video & Litigation Services

C-11

Allen Abolafia, 2/19/2020

1       Q.   Does any of that look familiar to you

2   that you have seen before?

3       A.   This looks familiar to me.

4       Q.   Okay.  Do you think it's something you

5   would have seen at the time you applied to be a

6   member in 2007 if you recall?

7            MR. PECORA:  And only if you recall.  If

8   you recall seeing this specific document or this

9   specific information, tell him.

10      A.   I got to be honest I don't recall seeing

11  this.

12  BY MR. GREEN:

13      Q.   And if you don't --

14      A.   I don't recall seeing it.

15      Q.   Okay.  Do you know what type of

16  membership it is that you had at La Costa?

17      A.   I don't.

18      Q.   Okay.  So if I asked you if you had the

19  Signature Sport Membership with a 15,000 deposit,

20  would you know if you had that or not?

21      A.   I don't know what the membership was

22  called.  Originally I had where I paid 25,000 to

23  join, and then they upgraded me to 50,000.  And

24  what she did to entice me to do it was to give me

25  free locker, free cart.  And I'm trying to

**18**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1   remember.  That's all I can remember.

2        Q.   So your recollection is back in 2007

3   when you became a member that your deposit was

4   50,000?

5        A.   Yes.  Originally I paid 25,000 and then

6   increased it another 25,000.

7        Q.   At the same time or subsequently?

8        A.   Subsequently later.

9        Q.   You said with that type of membership

10  you got a free locker; correct?

11       A.   Free locker, free -- I didn't have to

12  pay for the bags and I didn't have to pay for the

13  cart.

14       Q.   Was this for lifetime?

15       A.   Yes.

16       Q.   Okay.  Do you pay green fees as part of

17  that membership?

18       A.   No.

19       Q.   Is there any other additional fees that

20  you have to pay --

21       A.   There are no additional fees.  I'm

22  sorry.

23       Q.   No problem.  Are there any other

24  additional fees that you pay on top of that when

25  you want to golf at La Costa?

**19**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1      A.    No.

2      Q.    So under that membership everything is

3   covered essentially?

4      A.    Yes.

5      Q.    Okay.  I'm going to mark next in order a

6   document entitled Signature Membership Plan with a

7   date of March 2006 and ask you to take a look at

8   it.  My question for you is have you seen this

9   document before?

10      A.    I don't recall if I have seen this

11   document.  But there are a lot of things in here

12   that was told to me.

13          MR. PECORA:  He doesn't want to know

14   anything that I have told you about, and I believe

15   you don't want to discuss with him my showing him

16   the document.

17          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

18   WAS MARKED AS EXHIBIT NO. 3 TO THE TESTIMONY OF

19   THE WITNESS AND IS ATTACHED HERETO.)

20   BY MR. GREEN:

21      Q.    That's correct.

22          My only question for you right now is

23   have you seen it before, if you recall?

24      A.    Okay.  I don't recall.

25      Q.    Okay.  I want you to go back to January

**20**

Allen Abolafia, 2/19/2020

1      Q.   Okay.   Are those extra terms the locker,
2  the golf cart, the bag, for example?
3      A.   Yes.
4      Q.   Which were things to your knowledge that
5  she was throwing in in addition to entice you to
6  upgrade your membership?
7      A.   Yes.
8      Q.   Do you recall seeing any other documents
9  that day?
10     A.   I don't recall.
11     Q.   So you may have received them but you
12  just don't remember sitting here today whether you
13  did or you didn't?
14     A.   I don't remember.
15     Q.   Okay.   You can put that aside.   I will
16  mark next in order this is Exhibit No. 4.   If you
17  could take a look at Exhibit No. 4 and tell me if
18  you have seen this document before today?
19     A.   I'm going to say I don't remember.   But
20  there are some things in here that were correct in
21  stating.   The only thing that I'm confused about
22  is -- again, I might have been wrong and I might
23  have added 35,000.   It might have been initial
24  15,000 and then 35,000.   But it was a total of
25  50,000.   And the other thing is that this

**22**

Allen Abolafia, 2/19/2020

1    signature is not mine.

2             (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

3    WAS MARKED AS EXHIBIT NO. 4 TO THE TESTIMONY OF

4    THE WITNESS AND IS ATTACHED HERETO.)

5    BY MR. GREEN:

6         Q.   Let's start at the first page.  It says

7    017088.  Is that a membership number that you

8    have?  On the first page, very front page.

9         A.   No.  That is not my membership number.

10        Q.   Do you have any idea what that number

11   is?

12        A.   Yes.

13        Q.   What is it?

14        A.   It's -- my membership number is 071000.

15        Q.   Okay.  I asked a bad question.  Do you

16   know what this number 017088 is?

17        A.   I have no idea.

18        Q.   Okay.

19             MR. PECORA:  Could we stop for just a

20   moment.  I stepped out of the room to get a pen.

21   What was your number?

22             THE WITNESS:  071000.

23             MR. PECORA:  I'm sorry, excuse me.

24             MR. GREEN:  No problem.

25   BY MR. GREEN:

23

Allen Abolafia, 2/19/2020

1    A.    Yes.

2    Q.    Is that a club in Las Vegas?

3    A.    Yes.

4    Q.    Are you still a member of Spanish

5    Trails?

6    A.    No.

7    Q.    If we turn to the last page, and you

8    mention this two minutes ago, it identifies a

9    membership deposit of $15,000.   Do you see that?

10   A.    Yes.

11   Q.    Does that refresh your recollection as

12   to what at least the initial deposit was?

13   A.    Yes.

14   Q.    Okay.   Applicant signature, do you see

15   that?

16   A.    Yes.

17   Q.    Is that your signature?

18   A.    No.

19   Q.    Do you know whose signature that is?

20   A.    I have no idea.   It looks like -- can I

21   answer this question?   It looks like somebody was

22   trying to duplicate my signature because my F's go

23   down, and this one goes up.   It's kind of -- but

24   it's not my signature.   Now the girl that signed

25   it, that was my sales girl.

**25**

Allen Abolafia, 2/19/2020

1      Q.    Under authorized representative?

2      A.    Yes.

3      Q.    Okay.   And the date here is January 25,

4   2007.   Does that refresh your recollection as to

5   when you applied for membership at La Costa?

6      A.    Yes.

7      Q.    So I understand your testimony today is

8   this is not your signature on this document;

9   correct?

10     A.    You know, I don't want to say that.   It

11  doesn't look like my signature.   It's not even

12  close to my signature.

13     Q.    Let me ask you, do you recall signing

14  anything when you applied for a membership?

15     A.    Yes.

16     Q.    Was it a document entitled application?

17     A.    Yes.

18     Q.    So here this signature, your testimony

19  today is that it doesn't look like your signature.

20  Does that mean that it -- could it be your

21  signature at that time?

22     A.    I don't know how to answer that.

23         MR. PECORA:   If you have -- you know,

24  honestly speaking it could be your signature and

25  it could not be your signature.   It could be both.

**26**

Allen Abolafia, 2/19/2020

1      Q.   So you may have seen this document

2   before but, as you sit here today you don't

3   remember?

4      A.   I don't remember.

5      Q.   Do you have an understanding as to

6   whether the golf club has rules and regulations?

7      A.   Absolutely.

8      Q.   And I assume you would have had that

9   understanding on January 25, 2007 when you applied

10  to be a member; correct?

11     A.   Yes.

12     Q.   And would you agree with me that as part

13  of being a member of La Costa you would be subject

14  to those rules and regulations?

15     A.   Yes.

16     Q.   Okay.  Do you have any understanding --

17  I think you would also agree with me that rules

18  and regulations may also be changed or be amended

19  over time; correct?

20          MR. PECORA:  Calls for a legal

21  conclusion.  Go ahead and answer the question if

22  you can.

23     A.   Yes.  But not without notification.

24  BY MR. GREEN:

25     Q.   Fair enough.  And with that notice,

**30**

Allen Abolafia, 2/19/2020

1    would you agree with me that you would be subject

2    to amended rules and regulations?

3         A.   As long as I agree upon them, yes.

4         Q.   Okay.  As you sit here today do you

5    recall ever receiving a physical copy of the rules

6    and regulations from La Costa?

7         A.   I don't recall that.

8         Q.   Do you recall ever asking the club for a

9    copy of the rules and regulations?

10        A.   I don't remember that.  And I probably

11   wouldn't have.

12        Q.   Why do you say you probably wouldn't

13   have?

14        A.   Because I have been a member of many

15   clubs and most clubs are very similar.

16        Q.   Okay.  So I think you testified earlier

17   once you became a member in 2007 you golfed

18   roughly two or three times a week?

19        A.   Yes.

20        Q.   Okay.

21        A.   Let me clarify if you don't mind.

22        Q.   Yes.

23        A.   Because I went back and forth, I can't

24   say every week.  When I was in town, yes.

25        Q.   What's the process when you would -- for

**31**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1      Q.   Yes, please.

2      A.   So there's a lot of guys that have been

3   members of the club for a long time and they have

4   standard tee times.  And they have a group, even

5   though they're members of the -- like, for

6   example, on Saturday they have men's days.  But

7   men's day isn't one group.  There could be 20

8   groups within that men's day.  So what I would do

9   is I would send a text message to the guy who led

10  the group like Jerry Noskowitz.  So Jerry has his

11  own game and he sends me a text message are you in

12  this week.  And I would say yes, and then I would

13  just show up.

14     Q.   I see.  That's generally how it works

15  even -- is that how it still works today?

16     A.   Yes.

17     Q.   So between January 2007 through let's

18  say January 2017, do you have any idea how many

19  times you played at La Costa on either course?

20     A.   Total?

21     Q.   Total for that 10-year period.

22     A.   Five hundred rounds.  Just a guess.

23     Q.   Sure.

24          MR. PECORA:  Let me explain the

25  difference between a guess and an estimate.  A

Allen Abolafia, 2/19/2020

1   guess is when you have no idea an estimate.

2           THE WITNESS:   I have no idea.

3           MR. PECORA:   An estimate is when you

4   think you played twice a week for 52 weeks a year,

5   that's a hundred and you multiply that times five

6   years.   That's an estimate.

7       A.   I have no idea.   But I'm going to say

8   500 times.

9   BY MR. GREEN:

10      Q.   Between playing -- the south center

11  course is called Legends; correct?

12      A.   Yes.

13      Q.   What's the northern course called?

14      A.   Uh --

15           MR. PECORA:   Champions.

16      A.   Champions.

17  BY MR. GREEN:

18      Q.   As far as whether you played between the

19  two courses generally, is it 50/50 or is it --

20      A.   50/50.

21      Q.   Is there a course you prefer over the

22  two?

23      A.   No.

24      Q.   As you approach the seventh hole on the

25  Legends course, do you recall they're formerly

**34**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1  being a wooden bridge there?

2      A.   I didn't recall what the bridge was.

3  But now that you're saying it, yes.

4      Q.   So you recall there's a wooden bridge.

5  Do you recall -- this is on the golf cart path;

6  correct?

7          MR. PECORA:   Can we have an

8  understanding that you're talking about the wooden

9  bridge just before the seven tee box?

10          MR. GREEN:   Yes.   Thank you for being

11  more specific, yes.

12      A.   Yes.

13  BY MR. GREEN:

14      Q.   It was on the golf cart path; correct?

15      A.   Yes.

16      Q.   Do you recall that bridge washing out at

17  some point?

18      A.   Yes.

19      Q.   Do you recall approximately when that

20  occurred?

21      A.   You know, I thought it was about 2017 or

22  2018.

23      Q.   Okay.

24      A.   Probably close to 2018.

25      Q.   Do you recall how long after that

35

Allen Abolafia, 2/19/2020

1    guest.

2         Q.   So you join the group and just go golf

3    with them without checking in?

4         A.   Yes.

5         Q.   There's two invoices here.  One says

6    Member Guest Legends August 29th, $85 is the first

7    page.  The second one is Member Round Legends,

8    August 29, 2018 with zero charge.  So I'm assuming

9    the second page covers your round of golf which

10   you get for free because you're a member?

11        A.   Yes.

12        Q.   And on this particular day, August 29,

13   2018, you would have brought a guest with you; is

14   that correct?

15        A.   Yes.

16        Q.   The $85 is his or her green fee?

17        A.   Yes.

18        Q.   The date of the -- hold on one second.

19   I will show you next order Exhibit 9.  Have you

20   ever seen this document before?

21        A.   Yes.

22             (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

23   WAS MARKED AS EXHIBIT NO. 9 TO THE TESTIMONY OF

24   THE WITNESS AND IS ATTACHED HERETO.)

25   BY MR. GREEN:

**41**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1       Q.   And what is this document?

2       A.   This is a receipt.

3       Q.   Do you know what it's a receipt for?

4       A.   It's a receipt for a guest.   Guest fee.

5       Q.   On August 29, 2018?

6       A.   Yes.

7       Q.   Okay.  Is this a receipt that -- when

8    you did bring a guest, would you typically be

9    given a receipt for their green fee?

10      A.   No.

11      Q.   So you said you've seen this document

12   before.  When and where did you see this document?

13      A.   Well, I get it in my bill.

14      Q.   So the receipt is included in your bill?

15      A.   Yes.

16      Q.   Are those monthly bills that you get?

17      A.   Monthly bills, yes.

18      Q.   Okay.  So I assume it runs -- for

19   example, here this is August.  So August 1st

20   through August 30th, then you receive a bill in

21   September?

22      A.   Yes.  They're behind a month, 30 days.

23      Q.   Okay.  So this receipt would have been

24   attached to your monthly invoice for August of

25   2018?

**42**

Allen Abolafia, 2/19/2020

1      A.    Okay, an estimate.

2      Q.    I want an estimate, your best estimate?

3      A.    An estimate I probably played -- I

4  probably played 130 rounds of golf that year.

5      Q.    Okay.  And how many of those -- you

6  testified earlier you probably played half the

7  time on Legends; is that correct?

8      A.    I would assume, yes.

9      Q.    As you sit here today your recollection

10  is in the year before the incident, so August 2017

11  to August 2018, you would have played Legends

12  roughly 65 times; is that correct?

13      A.    It's 50 to 65 times, yes.

14      Q.    I'm going to show you what I will mark

15  next in order Exhibit 10.  Now this is something I

16  assume that you have not seen before.  Maybe you

17  have.  Have you seen this document before?

18      A.    No.

19          (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT

20  WAS MARKED AS EXHIBIT NO. 10 TO THE TESTIMONY OF

21  THE WITNESS AND IS ATTACHED HERETO.)

22  BY MR. GREEN:

23      Q.    Okay.  So I will represent to you this

24  is a printout from La Costa computer system with

25  all of the occasions that you golfed at La Costa

48

Allen Abolafia, 2/19/2020

1   between -- it starts on February 2, 2017 and runs

2   through December 15, 2018.  Okay?

3      A.   Okay.

4      Q.   We can look at the August 2, 2019, 2018

5   entry, for example.  It has LEG, Legends.  And it

6   specifies Legends versus Champions.  Do you see

7   that column?

8      A.   Yes.

9      Q.   And it indicates -- it has your name and

10  others who would part of your foursome.  Do you

11  see all that?

12     A.   Yes.

13     Q.   Do you have any reason to dispute the

14  accuracy of the club's records on when you golf at

15  the course?

16     A.   No.

17     Q.   You will note on August 29, 2018 it

18  identifies you John Hale --

19     A.   Hold on.

20     Q.   The very first page.

21     A.   Okay, sorry.

22     Q.   It's the fourth one down.  It has John

23  Hale.  You're listed twice, which I'm assuming is

24  to cover your guest who you said was Mike Lena; is

25  that correct?

**49**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1      A.    Mike Lena.

2      Q.    And then Gary Hardin.  Do you recall

3    golfing with those individuals?

4      A.    On August 20th?

5      Q.    The 29th.

6      A.    Okay.  Yes.

7      Q.    Is that the foursome, including your

8    guest?

9      A.    No.  There was one more.

10     Q.    There was a fifth person?

11     A.    Yes.

12     Q.    Who was the fifth person?

13     A.    The fifth person was Rob Simpson.

14     Q.    You testified your recollection was it

15   was roughly 65 times in a prior year that you

16   would have golfed Legends prior to August 29,

17   2018; is that correct?

18     A.    An estimate, yes.

19     Q.    Your estimate is 65 times?

20     A.    Yes.

21     Q.    During that period of time, do you

22   recall driving over the bridge that is located

23   before the 7 tee box on the Legends course?

24     A.    Yes.

25     Q.    And once that bridge was completed, you

**50**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1    would have driven the golf cart over that bridge

2    every time you played the Legends course; correct?

3        A.   Yes.

4        Q.   As of August 29, 2018, your recollection

5    is you would have driven over that bridge roughly

6    65 times before, approximately?

7        A.   Yes.

8        Q.   Okay.  I think it would be fair to say

9    you were familiar with the bridge at the time as

10   of August 29, 2018 because you had driven over it

11   that number of times, approximately?

12           MR. PECORA:  I'm going to object to the

13   use of the word "familiar."  Vague and ambiguous.

14   Go ahead and answer it if you can.

15   BY MR. GREEN:

16       Q.   Had you seen the bridge prior to August

17   29, 2018?

18       A.   Had I seen the bridge, yes.

19       Q.   Prior --

20       A.   Yes.

21       Q.   And you had seen that there's a culvert

22   or drainage ditch that goes under the bridge;

23   correct?  Prior to August 29, 2018?

24       A.   I don't think that I even thought about

25   it.

**51**

Allen Abolafia, 2/19/2020

1    A.    Blacks.

2    Q.    The difference between black and white

3  is just the distance from which you're going to

4  tee off, distance from the hole you're going to

5  tee off?

6    A.    Yes.

7    Q.    When you play golf at La Costa during

8  this time period, this one-year period before the

9  date of the incident, would you typically be the

10  one driving the golf cart?

11    A.    Yes.

12    Q.    Did you pretty much always drive the

13  golf cart?

14    A.    No.

15    Q.    Typically though it would be you?

16    A.    No.  It's 50/50.

17    Q.    Okay.  So it varies.  Two people ride in

18  the cart; correct?

19    A.    Yes.

20    Q.    On August 29, 2018, who was driving the

21  golf cart?

22    A.    I was.

23    Q.    Was your guest, Mike Lena, the passenger

24  of your golf cart?

25    A.    Yes.

**53**

Allen Abolafia, 2/19/2020

1      Q.    And you were playing with you said -- on

2   that day there's you, Mike Lena, John Hale, Gary

3   Hardin and Rob Simpson?

4      A.    Rob Simpson, yes.

5      Q.    The five of you are playing on that day;

6   is that correct?

7      A.    Yes.

8      Q.    Let me make sure I finish my question,

9   she will appreciate it.

10     A.    Yes.

11     Q.    Okay.   Were all five -- so, you're in a

12   golf cart.   Where are the other three?   Did they

13   have a golf cart?

14     A.    Yes.

15     Q.    Is the third person sitting in the back

16   of the golf cart then?   Where is the third person?

17     A.    They have their own cart.

18     Q.    So there's three golf carts out that day

19   with your group?

20     A.    Yes.

21     Q.    As you were driving up to the 7 tee box

22   on August 29th, what number order was your golf

23   cart when --

24     A.    Last.

25     Q.    It was last --

**54**

Allen Abolafia, 2/19/2020

```
 1      A.   Yes.  It runs all the way down.
 2      Q.   Do you have an understanding what the
 3   purpose of that curb is?
 4      A.   Yes.
 5      Q.   What's your understanding?
 6      A.   The purpose of the curb is not to drive
 7   the cart on the grass.
 8      Q.   Would you say it's to keep the cart on
 9   the golf cart path?
10      A.   Yes.
11      Q.   Do you recall -- so you got your driver
12   from the back of the golf cart, and then you then
13   are going -- are you going straight out off the
14   golf cart path or are you walking up adjacent to
15   the golf cart path on the passenger side?  Where
16   do you walk at that point in time?
17           MR. PECORA:  Okay.  If you break that
18   question down I will let you answer, but you had
19   three questions there.  So start again.
20   BY MR. GREEN:
21      Q.   After you grabbed your driver, what
22   direction are you heading at that point in time?
23      A.   Towards the tee box.
24      Q.   So did you walk up next to the -- on the
25   passenger side of your golf cart?
```

**60**

Allen Abolafia, 2/19/2020

1     A.   Yes.

2     Q.   **Did you walk up past the front of your**

3   **golf cart?**

4     A.   **No, the back.  Always the back.**

5     Q.   **You got your driver from the back of the**

6   **golf cart?**

7     A.   **Right.**

8     Q.   And did you then go up next to the

9   passenger side or did you go straight off the golf

10  cart path at that point in time?  Do you

11  understand my question?

12    A.   Yes, I do.

13         MR. PECORA:  Could you read the question

14  back for me?

15              (RECORD READ BY THE COURT REPORTER.)

16    A.   I went towards -- it's kind of in

17  between.  I went -- I went left because I was

18  following Mike who was in the golf cart and he had

19  already headed towards the -- I was the last one

20  out of all the carts, okay.  So Mike had already

21  stepped over, and I just followed Mike's path.

22  Now Mike went straight out of the cart onto the

23  tee box.

24  BY MR. GREEN:

25    Q.   Okay.  So Mike is in the passenger seat?

**61**

Allen Abolafia, 2/19/2020

1      A.   The other three guys were already
2  hitting the tee shots.
3      Q.   And Mike wasn't watching them hit?
4      A.   No.   Because he saw what happened, so
5  that's how.
6      Q.   So backing up to you -- after you
7  grabbed your driver, do you walk along the rest of
8  the back of the golf cart at that time?
9      A.   I walk around the golf cart and step
10  over.
11      Q.   So you walk, so you would make a left up
12  the side of the golf cart?
13      A.   And step over.
14      Q.   And sort in a diagonal manner would you
15  step over the --
16      A.   I would walk straight out because the --
17  you can actually see the bigger hole -- because
18  the bigger hole you can actually see that.   But it
19  gets smaller and smaller and smaller.   So I went
20  left kind of like this way to the tee box, and I
21  caught -- I must have caught the corner of that
22  hole.
23      Q.   So there's a drainage ditch or culvert
24  that's going under the bridge; correct?
25      A.   Yes.

**63**

Allen Abolafia, 2/19/2020

1     Q.   So when you say deeper, you're talking

2   about the height of the bridge to the level of the

3   ground; is that correct?

4     A.   Yes.

5     Q.   That's what you're meaning by deeper?

6     A.   Yes.

7     Q.   So as you get further away from the

8   center of the bridge the culvert gets more

9   shallow; correct?

10     A.   And you can't see it.  And the other

11   thing was that it wasn't mowed, so the grass was

12   high.  And if you look at your pictures you will

13   see that one is mowed and one isn't.

14     Q.   So when you stepped off the golf cart

15   path, did you step up on the curb or did you step

16   over it?

17     A.   Over it.

18     Q.   So you did not step on the curb?

19     A.   I did not step on the curb.

20     Q.   Okay.  Were you looking down at the time

21   that you stepped over the curb?

22     A.   No.

23     Q.   I'm assuming because you were looking

24   ahead towards the tee box where you were going; is

25   that correct?

**64**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1     A.    Yes.

2     Q.    And I think you said a moment ago your

3    guest Mike was looking towards you at the time you

4    stepped over the curb; is that correct?

5     A.    Again, I didn't see him because when I

6    made the step -- I'm just assuming that because he

7    saw the whole thing.

8     Q.    So he told you he saw you step over it?

9     A.    Right.

10    Q.    So you step over into as you call it the

11   hole, the culvert area, you step over into it?

12    A.    Yes.

13    Q.    What happened next?

14    A.    I went down.  And I was in a lot of

15   pain.  I was screaming.

16    Q.    So when you stepped over what kind of

17   surface does your foot land on to your correction?

18    A.    It just went down.  And I felt -- the

19   only thing I could feel was a pop.  I could hear

20   it in my head.  And so I knew what it was.

21    Q.    Is that when your foot ultimately hit a

22   surface that's when you felt the pop?

23    A.    When I fell forward.

24    Q.    So you stepped over and the depth was

25   more than you anticipated; is that fair to say?

**65**

C-36

Allen Abolafia, 2/19/2020

1      A.   That's fair to say.

2      Q.   **And is that what caused you to fall or**

3   **did your foot hit the ground before you fell?**

4      A.   No.   My foot hit the ground and then I

5   fell.

6      Q.   **That's what I'm asking.   Your foot made**

7   **contact with the ground and then you heard a pop?**

8      A.   Yes.

9      Q.   **Was your foot stuck in any kind of way?**

10      A.   Once I fell it kind of pulled itself

11   out.   I guess my foot -- I don't know because I'm

12   in so much pain, I'm not really thinking about

13   what happened.   But what I was under the

14   impression was that my Achilles got caught between

15   the bridge and the ground because there's a space

16   underneath.   There's nothing filling.

17      Q.   **Just so I'm clear you stepped down and**

18   **your foot hits the ground, at some point your foot**

19   **hits the ground, makes contact with the ground,**

20   **you hear a pop?**

21      A.   Yes.

22      Q.   **And your belief is that your heel got**

23   **stuck between the ground and the under side of the**

24   **bridge?**

25      A.   Yes.

**66**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1          MR. PECORA:  Where are you reading from?

2          MR. GREEN:  Under the investigation.

3   It's roughly line 26 of this document.

4          MR. PECORA:  Go ahead if you understood

5   the question.  Did you understand the question?

6     A.   Yes.  Would you repeat it?

7   BY MR. GREEN:

8     Q.   Yes.  The question is is that also

9   consistent with your recollection as to what

10  occurred at the time of the incident?

11    A.   Yes.

12    Q.   Attached to this document, this report

13  which is dated August 29, 2018, the day of the

14  incident, you will see a photograph.  Do you see

15  that?

16    A.   Yes.

17    Q.   Now that's your golf cart; correct?

18    A.   Yes.

19    Q.   That is the location of where it was

20  parked at the time you exited it; correct?

21    A.   Yes.

22    Q.   And if I could ask you if you could

23  draw -- you take a pen.  Can you draw a circle for

24  me on where you recall stepping off the curb?

25    A.   (Witness complies.)

77

Allen Abolafia, 2/19/2020

1    Q.   Just let the record reflect that
2    Mr. Abolafia has drawn a circle in blue Sharpie on
3    the third page, in the photograph on the third
4    page of Exhibit 11.   Mike Lena how many times do
5    you think you had golfed with him at La Costa
6    prior to the incident?
7        A.   That was the first time.
8        Q.   Have you golfed with him since the
9    incident?
10       A.   No.  He has played golf because he went
11   out and played with my friends.  He was here on
12   vacation.  So he played a couple more rounds
13   there.  But that was his first time ever playing.
14       Q.   Is he a friend of yours?
15       A.   Yes.  High school.
16       Q.   High school friend?
17       A.   Yes.
18       Q.   I'm going to show you another
19   photograph.  This is Exhibit 12.  Can you tell me
20   what's depicted in Exhibit 12?
21       A.   I couldn't give you an answer.
22           (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
23   WAS MARKED AS EXHIBIT NO. 12 TO THE TESTIMONY OF
24   THE WITNESS AND IS ATTACHED HERETO.)
25   BY MR. GREEN:

**78**

Allen Abolafia, 2/19/2020

1    Q.    And I think you already testified to the

2  area that's the browner area.  Do you see that?

3    A.    Yes.

4    Q.    That brown area that's depicted in the

5  photograph is the same brown area that's in the

6  prior photograph --

7    A.    Yes.

8    Q.    Let me finish.  The same area that's in

9  the prior photograph; correct?

10   A.    Yes.

11   Q.    Next Photograph 7.  Is that the same

12  area?

13   A.    Yes.

14   Q.    It almost looks like an identical

15  photograph?

16   A.    Yes.

17   Q.    Next, Photograph 8.  What's depicted in

18  Photograph 8?

19   A.    It's just taken further down.

20   Q.    It looks similar to one I think we've

21  already seen?

22   A.    Yes.

23   Q.    Photograph 9.  Do you know what's

24  depicted in Photograph 9?

25   A.    Yes.  This is the actual picture taken

93

C-40

Allen Abolafia, 2/19/2020

1   when it happened.

2        Q.   So you took a photograph when it

3   happened?

4        A.   Yes.

5        Q.   So can you tell me when you took the

6   photograph roughly in conjunction of when you

7   fell?

8        A.   Okay.  Actually I didn't take it me

9   personally.  Mike took it.

10       Q.   So Mike took this photograph?

11       A.   Yes.

12       Q.   On the date of the incident?

13       A.   Yes.

14       Q.   Did you see him take the photograph?

15       A.   No.

16       Q.   But your understanding from him is that

17   that's what this photograph is?

18       A.   Yes.

19       Q.   Is this the spot where you stepped off

20   over the curb?

21       A.   Yes.

22       Q.   Did you show Mike at some point where

23   you stepped over the curb?

24       A.   He saw it.

25       Q.   So based on what -- where was he

**94**

Allen Abolafia, 2/19/2020

1  Photograph 14 because I didn't ask you that.
2      A.   Just pretty much the same.  An original
3  picture.
4      Q.   If I look off to the right there's a
5  little --
6          MR. PECORA:  What do you have for 14?
7          MR. GREEN:  This one.
8  BY MR. GREEN:
9      Q.   After the yellow page we went to 12.
10     A.   You're talking about 14?
11     Q.   I'm talking to you about 14.
12         MR. PECORA:  I'm sorry, I think I
13  screwed up.
14         MR. GREEN:  That's 12.  With the seventh
15  hole side that's 12.  This one is 13.  Photo 14
16  now --
17         MR. PECORA:  I apologize.  I
18  discombobulated myself.  Excuse me.
19  BY MR. GREEN:
20     Q.   Can you tell me what's depicted in
21  Photograph 14?  I think you did but --
22     A.   Pretty much the same thing.  The
23  original picture.  No red mark.
24     Q.   Could you take your blue Sharpie, could
25  you draw a circle for me on the location where you

Allen Abolafia, 2/19/2020

1    stepped over the curb?

2        A.    (Witness complies.)

3        Q.    Can I take a look?

4        A.    Uh-huh (affirmative response).

5        Q.    Okay.  So my understanding from -- we

6    can take photograph 14.   You stepped over the curb

7    with your left foot; correct?

8        A.    Yes.

9        Q.    And you stepped in the location where

10   that circle is; correct?

11       A.    Yes.

12       Q.    Okay.  At the time you stepped over the

13   curb you were looking over at the tee box;

14   correct?

15       A.    Yes.

16       Q.    Now I see a little -- I'm going to point

17   to it with my pen.  What's that?

18       A.    That's the tee box.

19       Q.    Is that black color?

20       A.    No.  That's blue.

21       Q.    That is blue?

22       A.    Yes.

23       Q.    That's where the expert location is

24   blue?

25       A.    Black is further back.

**103**

Allen Abolafia, 2/19/2020

1    if you go to five.

2    BY MR. GREEN:

3        Q.    Okay.

4        A.    You see how mowed it is here, that's why

5    you're seeing dead grass, okay.  And if you look

6    here you will see -- if you really look close you

7    will see sprouts coming up because it wasn't

8    mowed.

9        Q.    The sprouts that are down in the hole?

10       A.    Yes.

11       Q.    Your testimony is when you went back

12   four days later, which is when Photograph 5 as

13   part of Exhibit 12 was taken, the grass was more

14   mowed than it was --

15       A.    Yes.

16       Q.    More mowed than it was on the date of

17   the incident?

18       A.    Yes.

19       Q.    But you would agree with me that on the

20   date of the incident the photograph attached to

21   the incident report you can see the hole; correct?

22       A.    Absolutely.  I mean, I can --

23       Q.    I think we just have one more photograph

24   17.  Does this depict the same area that we've

25   been discussing?

**111**

Allen Abolafia, 2/19/2020

1    discovery responses.

2    BY MR. GREEN:

3        Q.   Is that your handwriting the date

4    September 4, 2019?

5        A.   Yes.

6        Q.   Would you have signed on that day?  Did

7    you sign on that day?

8        A.   Yes.

9        Q.   So your testimony is that that

10   signature -- that you signed these two pages on

11   September 4, 2019?

12       A.   Yes.

13       Q.   Okay.  So if you look at that, if you

14   could pull up Exhibit 4 again.  If you turn to the

15   last page of Exhibit 4, you see that?

16       A.   Yes.

17       Q.   So I just want you to look at the

18   signatures here.  Now going back again and looking

19   at Exhibit 4 that signature, has your testimony

20   changed at all as to whether that's your signature

21   or not?

22       A.   It doesn't look like my signature.

23       Q.   So just for clarification is your

24   testimony that it doesn't look like it or it

25   affirmatively is not your significant?

**148**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1          A.    I think I said before it doesn't look
2    like my signature.
3          Q.    When you say it doesn't look like it
4    that's not saying the same thing as saying it's
5    not my signature.
6               MR. PECORA:    Are you suggesting that he
7    said that earlier today it's not my signature?
8               MR. GREEN:    I'm not a hundred percent.
9               MR. PECORA:    We can read the record back
10   because --
11              MR. GREEN:    I don't need to read the
12   record.    I want to be clear.    I'm not clear on it.
13   So I want to be crystal clear.
14         A.    I said earlier that it does not look
15   like my signature.    And I know that this is not --
16   I did not date it.    For sure that's not mine.    And
17   if you take a really good look my F, I mean, it's
18   not even close.    It looks like somebody tried to
19   copy this.    I mean, you could take a look and --
20   I'm not sure.
21   BY MR. GREEN:
22         Q.    You're not sure of what?
23         A.    That this is my signature or not.    But
24   when I look at it, it doesn't look like my
25   signature.

**149**

Peterson Reporting Video & Litigation Services

Allen Abolafia, 2/19/2020

1        Declaration Under Penalty of Perjury

2

3

4        I, ALLEN HARVEY ABOLAFIA, the witness

5    herein, declare under penalty of perjury that I

6    have read the foregoing in its entirety; and that

7    the testimony contained therein, as corrected by

8    me, is a true and accurate transcription of my

9    testimony elicited at said time and place.

10

11        Executed this 21 day of May 2020, at

12    Vista               , CA           .

13        (city)                (state)

14

15

16

17

18

19        ALLEN HARVEY ABOLAFIA

20

21

22

23

24

25

**154**

Peterson Reporting Video & Litigation Services

```
 1  STATE OF CALIFORNIA

 2  COUNTY OF SAN DIEGO

 3

 4       I, BOBBIE HIBBLER, a Certified Shorthand

 5  Reporter for the State of California, CSR No.

 6  12475, do hereby certify: That the proceedings

 7  were taken before me at the time and place herein

 8  named; that the said proceedings were reported by

 9  me in shorthand and transcribed through computer-

10  aided transcription, under my direction; and that

11  the foregoing is a true record of the testimony

12  elicited at proceedings had at said proceedings to

13  the best of my ability.

14       I do further certify that I am a

15  disinterested person and am in no way connected

16  with or related to any of the parties in this

17  action or to their respective counsel.

18       In witness whereof, I have hereunto set my

19  hand this __10th__day of _____March_____, 2020

20

21

22            _Bobbie   Hibbler_____

23            Bobbie Hibbler, CSR No. 12475

24

25
```

C-48

Allen Abolafia, 2/19/2020

1         Declaration Under Penalty of Perjury

2

3

4       I, ALLEN HARVEY ABOLAFIA, the witness

5  herein, declare under penalty of perjury that I

6  have read the foregoing in its entirety; and that

7  the testimony contained therein, as corrected by

8  me, is a true and accurate transcription of my

9  testimony elicited at said time and place.

10

11     Executed this _21_ day of _May_ 20_20_, at

12  _Vista_____, _CA_____.

13     (city)           (state)

14

15

16

17

18

19        ALLEN HARVEY ABOLAFIA

20

21

22

23

24

25

**154**

Peterson Reporting Video & Litigation Services

Dear Members,

As the Holiday Season is upon us we would like to take this opportunity to wish you all many blessings in the New Year, take the time to look back on what we accomplished in 2006, and share with you the anticipated improvements for the coming year.

Each year we continue to make adjustments to La Costa facilities and service. Due to these many improvements La Costa continues to be recognized by the national media with awards for our spa, fitness club, tennis complex and golf facilities. There are few clubs in the country that can offer as many high level facilities and venues that we enjoy at The Club at La Costa.

It is important that we continue to maintain the facilities that we have while building additional facilities where necessary. In the golf area the highlight of 2006 was the building of the new practice facility. The facility was done at a cost of $1.85 million and was completed in a timely fashion. The facility has added a great deal to the golf experience. With the land that was available, we were able get maximum use by adding a member's practice area as well as an outstanding short game facility. We hope that you have taken advantage of the facility and that your game has reflected your practice. As a way to improve our existing golf courses, we began to sod problem areas and have covered over 3 acres of golf course with new sod. We will continue to identify problem areas and continue to sod those areas when necessary. In addition, we are changing our agronomic practices in many different areas with the goal to improve the condition on the golf course throughout the entire year. Many of these changes have occurred as it will no longer be necessary to condition the courses for a PGA tour event in the winter. As most of you are aware, the Accenture Match Play Tournament has moved to Arizona. The tournament always added excitement to La Costa and will be missed, however its exit will enable us to have more control over the condition our golf courses. In 2006 we added equipment, new sprinkler heads, and irrigation controllers. We have improved our bunker's playability and most recently we have made the decision to hand rake the greenside bunker complexes. This will dramatically improve the condition on the edges of the bunkers where the sand raking equipment was entering and causing the area to become worn and in disrepair. We also added sand to bunkers and plan to reface the bunkers on the two outside nine holes during 2007. Throughout 2006, we have taken large areas of fairways and dug irrigation veins that will move water out of those areas and help create a better habitat for the fairway grasses to grow. We will continue to enhance the drainage area throughout the coming year. We have also been able to mitigate many of the wet areas under the trees by an aggressive tree trimming program. In 2007, we will add new yardage markings on the sprinkler heads and also new tee monument markers that will display the long and storied golf history of La Costa with you and your guests.

A new structure for the La Costa Men's Club will begin in January. With the support of the golf staff, the Men's Club will have the responsibility to organize their own tournaments, listen to member suggestions, and translate them into action in order to



provide the best possible golf events for the Membership. Should you have an interest in the Men's Club, please contact the golf shop by calling 760.438.9111 x7655.

We are in the process of working out details on the exciting new privileges that are on the horizon for La Costa Club Members. As many of you are aware, our parent organization, KSL, is in the final stages of completing the acquisition of Club Corporation of America. This transaction will bring over 100 clubs into the KSL family. These clubs are located throughout the US and Mexico and will bring an exciting new dynamic to our membership. At this point, we are still working on the details. Look for more information in the next three months.

During 2007, you will see a facelift of the member's locker rooms which will include new carpeting and other upgrades to be announced.

The Club has also set aside nearly $1 million for the complete renovation of Legends restaurant in May of 2007. The Executive team is currently reviewing plans from Puccini designs, the very same contractor responsible for the beautiful BlueFire Grill Grill. Expect to see great changes to the restaurant as well as an upgraded menu.

This past June was a very exciting time at La Costa with the completion and opening of a 6,500 square foot Kids Club, Kidtopia, and the VIBZ teen center. The new facility and childcare services mark a dramatic improvement for members and puts La Costa at the pinnacle of family-friendly clubs. We invite you to use this new facility as we feel it is a wonderful service for the Club at La Costa families. Please see the attached price list for the recent changes in Member pricing for these facilities.

We also upgraded *Splash Café* at the main pool this past year which has improved food service at the pool dramatically. In February of 2007, we will unveil the new children's area of the resort/family pool with a dramatic compilation of slides, fountains, and pools which promise to add even more fun for your children. If you have not seen the renderings of this area, we invite you to stop by the membership office and let Jamie or Arika show you this exciting facility. By the close of 2007, we will have six water features available to our membership on the La Costa property.

The tennis area will be enhanced this coming year by the resurfacing of a number of courts in early 2007 and a renovation of the tennis locker facilities. Please talk to the tennis staff regarding the various "tennis ladders" that has renewed interest and fun for all levels of tennis players and those with a competitive spirit. If you would like to start participating in tennis activities, please contact the tennis shop at 929.6386 and let our experienced staff get you started.

We have been working very hard in an effort to keep the membership informed of the many events and activities that occur here at the resort and we ask that you keep us informed of your email addresses for this purpose. As we continue to strive for better club events and communications, we encourage you to make suggestions on how we may enhance or expand upon our membership events by calling Ms. Anna Young at 929.6321.

Since KSL's purchase of La Costa in 2002, $144 million has been invested in the property. The membership is a vital part of the resort at large and is always a consideration when decisions are made. The recent facility and resort-wide improvements will continue to enhance not only La Costa's reputation as a premier resort and golf destination, but will also improve the overall club experience for our membership.

As we enter the New Year, I would like to update you with the membership pricing, dues and fees 2007. Please feel free to call the membership office with any questions

**Signature Membership:**

| | **Deposit** | |
|---|---|---|
| Signature Golf Membership | $95,000 | (90% refundable) |
| Signature Sport Membership | $15,000 | (90% refundable) |
| Signature Corporate Golf Membership | $190,000 | (90% refundable) |

| | **Monthly Dues:** | **Monthly F&B:** |
|---|---|---|
| Signature Golf & Corporate | $570 | $147 |
| Signature Golf Non-Resident | $304 | N/A |
| Signature Sport / Tennis | $220 | $92 |
| Signature Sport Non-Resident | $143 | N/A |

**Golf Fees:**

| | |
|---|---|
| Cart Fee/Guest in private Golf Cart | $18 per person |
| Cart Permit Trail Fee | $1785 annually |
| Golf Cart Plan | $940 annually |
| Accompanied Golf Member Guest Fee/Twilight Rate | $110/$75 per |
| Unaccompanied Golf Member Guest Fee + Cart/Twilight | $135/$90 per |
| Sport Member Golf Fee/Twilight | $135/$90 per |
| Practice Facility | Complimentary |

**Membership Fees:**

| | |
|---|---|
| Bag Storage-single | $199 annually |
| Bag Storage-couple | $340 annually |
| 1/2 Locker | $225 annually |
| 1/4 Locker | $175 annually |

**Tennis Guest Fee:**          $10 per guest

**Spa Day Pass Fees:**

| | |
|---|---|
| Member Spa Admission (w/o a Service) | $45 M-Th/$51 |
| After 4pm ½ off admission | $22.50 M-Th/$25.50 |

**Fitness Center Guest Fee:**          $20

**Pool Guest Fees:**          $10 per/$20 family

**Kidtopia Fees:**
- Monday through Friday 9am-4pm; Reservations suggested
- $10 per hour for your first child
- $5 per hour for your second child and any additional children
- Three hour maximum (two hours for infants)

### Additional Member Pricing Programs include the following:

- $38.75 per child for HALF DAY which includes lunch
- $68.00 per child for FULL DAY which includes lunch
- $46.75 per child for NIGHT CAMP from 6-10 PM & Saturday; includes dinner per child ages 3 and up

- Above preferred pricing is exclusive to members and your children only, not including extended family or friends.
- Please keep in mind those children 6 months and up to 3 years of age are only allowed to stay in KIDTOPIA for a *maximum of two hours*, and for day camp only!
- Please stay on property while your children are in the care of Kidtopia.

### Complimentary Kidtopia

Complimentary Kid's Camp is exclusive to members only and may be used when enjoying breakfast or lunch at Legends (and BlueFire Grill when available) OR while using the Spa for services or for a Spa day pass. No exceptions please!

- Available Monday through Friday 9am-4pm
- *Reservations mandatory 24 hours in advance* in order to guarantee a space for your child
- Yamaguchi Salon, Athletic Club, tennis, golf, personal training and Chopra Center services are not included in this offer.
- The length of time at Kid's Camp will be consummate with the amount of time spent at your chosen services or meal.
- If a spa day pass is purchased, 2 hours of camp will be complimentary.
- Reservations must be made 24 hours in advance. If we do not have reservations, we cannot guarantee space for your kids (this applies to all ages).
- Infants (6 months to 3 years old) can stay for a two hour maximum
- If bringing children during lunch hour (12-1pm), lunch orders need to be known ahead of time and will be taken with your 24 hour advance reservation
- Parents must show receipt upon picking up their child or children. Parents must drop off and pick up their kids unless prior arrangements and acknowledgments have been made between the parent and Kidtopia staff



# THE CLUB AT
# LA COSTA™

## SIGNATURE MEMBERSHIP PLAN
## AMENDED AND RESTATED MARCH, 2006



EXHIBIT
3
Abolafia

# SUMMARY OF SIGNATURE MEMBERSHIP PLAN

## MEMBERSHIP OPPORTUNITY

This Signature Membership Plan offers you an opportunity to become a Signature Member at the Club at La Costa (the "Club"), located in the city of Carlsbad, Northern San Diego County, California. The Club combines world-class golf, tennis, health, fitness and social facilities and activities with the legendary La Costa Resort & Spa[1] (the "Resort"). All defined terms used in this Signature Membership Plan shall have the same meaning as in the Amended and Restated Rules and Regulations unless stated otherwise.

## SIGNATURE MEMBERSHIP CLASSES AND PRIVILEGES

The Club offers the following classes of Signature Membership: *Signature Golf Memberships, Signature II Corporate Membership, Signature Sport Membership, Signature Non-Resident Golf Membership, Signature Non-Resident Sport Membership, and Villa Signature Sport Membership.* The Club facilities, Privileges, activities and programs available to each class of Membership are more fully described in this Signature Membership Plan.

## SPECIAL MEMBERSHIP BENEFITS

In addition to the many Privileges and facilities provided, Signature Membership offers a number of attractive benefits, including:

- **Refundable Membership Deposit.** The Membership Deposit paid for a Signature Membership is refundable upon resignation and reissuance of the Membership, sale of Home or Unit, upon transfer one-time only to an adult child or adult grandchild or upon death of the Member unless otherwise provided for in this Signature Membership Plan or in the Membership Application.

- **Immediate Family Membership Privileges.** A Member, his or her spouse or domestic partner and their unmarried children, under the age of 23 who are living at home, attending school on a full-time basis or in the military are entitled to Membership Privileges without having to pay additional Membership dues.

- **Extended Family Membership Privileges.** The parents, grandparents, children who do not fall within the definition of Immediate Family, grandchildren, sons-in-law, and daughters-in-law of the Member and spouse or domestic partner may use the Club Facilities as provided for in this Signature Membership Plan and subject to compliance with current Club requirements.

- **Resigned Memberships Reissued Prior to Membership Sell-Out.** Resigned Members do not have to wait until all new Signature Memberships in the Club have been issued before their Membership is reissued and they receive their refund as provided in this Signature Membership Plan.

- **Legacy Transfer.** Members can request a one-time only transfer of their Signature Membership through the Club to their adult child or adult grandchild.

---

[1] La Costa Resort & Spa is a registered trademark of KSL La Costa Resort Co., LLC.

i

- **Inheritability.** Upon the death of a Signature Member, the surviving spouse or domestic partner can continue the Signature Membership or the Signature Membership can be transferred on a one-time only basis to the Signature Member's adult child or adult grandchild.

- **No Assessments.** Signature Members are not subject to either operating or capital assessments.

- **Transferability of Memberships.** Memberships are transferable through the Club to the subsequent purchaser of a Member's Home or Unit within any community as designated by the Owner as hereinafter defined from time to time.

- **Nonrecallability of Signature Memberships.** Signature Memberships are nonrecallable, unless otherwise provided in this Signature Membership Plan.

- **Preferred Pricing.** Members will receive preferred pricing off all regularly priced items, including food, beverage, retail, Spa treatments, and room nights purchased at the Club Facilities and the Resort as provided for herein.

## AVAILABILITY OF SIGNATURE MEMBERSHIPS IS LIMITED

Signature Memberships are limited in number. This limitation is important to ensure our Members' enjoyment of the Club's world-class golf, tennis, health, fitness, and social facilities.

## CAREFULLY REVIEW ALL MEMBERSHIP DOCUMENTS

Every person who desires to obtain a Signature Membership, or owns or purchases a residential Home or Unit within any community, as designated by the Club from time to time should carefully read this Signature Membership Plan and all of the referenced documents and should seek professional advice to evaluate these documents.

## RELY ONLY ON INFORMATION IN THIS SIGNATURE MEMBERSHIP PLAN

NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY ORAL OR WRITTEN REPRESENTATIONS NOT CONTAINED IN THIS SIGNATURE MEMBERSHIP PLAN AND THE REFERENCED DOCUMENTS AND, IF GIVEN OR MADE, SUCH INFORMATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE CLUB. IN THE EVENT OF A CONFLICT BETWEEN THE TERMS OF MEMBERSHIP CONTAINED IN THE SIGNATURE MEMBERSHIP PLAN, RULES AND REGULATIONS, MEMBERSHIP APPLICATION AND OTHER PRINTED MATERIALS, THE SIGNATURE MEMBERSHIP PLAN SHALL GOVERN.

## MEMBERSHIP DIRECTOR AVAILABLE TO ANSWER QUESTIONS

All inquiries regarding Membership in the Club or this Signature Membership Plan and referenced documents should be directed to the Membership Director at the Club at La Costa, 2100 Costa Del Mar Road, Carlsbad, California 92009 or by calling (760) 931-7535. You may call or visit the Membership Office conveniently located at the Resort. Appointments are not necessary, however they are encouraged.

*Signature Membership Plan as amended and restated March, 2006*

ii

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1
 Signature Membership Features .............................................................................................. 1
 Club Facilities ......................................................................................................................... 1
 Preferred Pricing for Signature Members .............................................................................. 1
 Ownership and Operation of the Club Facilities .................................................................... 1

SIGNATURE MEMBERSHIP CLASSES AND PRIVILEGES ............................................ 2
 Classes of Signature Membership ........................................................................................... 2
 Privileges of Signature Membership Classes .......................................................................... 2
 Number of Signature Golf Memberships at the Club ............................................................. 2
 Signature Golf Membership Privileges ................................................................................... 2
 Signature Corporate Membership Privileges .......................................................................... 3
 Signature Sport Membership Privileges .................................................................................. 3
 Signature Non-Resident Golf Membership Privileges ........................................................... 4
 Signature Non-Resident Sport Membership Privileges .......................................................... 4
 Villa Signature Sport Membership Privileges ........................................................................ 5
 Right to Modify Signature Membership Classes and Privileges ............................................ 5
 Membership Privileges of Family Members ........................................................................... 5
 Membership Privileges for Individual Living with Member .................................................. 5
 Club Guest Access .................................................................................................................. 5

TRANSFER OF MEMBERSHIP ............................................................................................. 6
 Transfer of Membership in the Club ....................................................................................... 6
 Transfer During Member's Lifetime ....................................................................................... 6
 Transfer Upon Death .............................................................................................................. 7
 Legal Separation or Divorce of Married Members ................................................................. 7
 Reciprocal Membership Programs .......................................................................................... 8
 Acknowledgment of Signature Membership Privileges ......................................................... 8

SIGNATURE MEMBERSHIP ELIGIBILITY ...................................................................... 8
 Eligibility for Signature Membership ..................................................................................... 8
 Multiple Owners of Property .................................................................................................. 8
 Signature Members May Upgrade to a Higher Class of Membership ..................................... 9
 Signature Members May Downgrade to a Lower Class of Membership .................................. 9
 Signature Membership May be Held in the Name of a Trust .................................................. 9

CLUB CHARGES ..................................................................................................................... 9
 Membership Deposit Required to Become a Signature Member ............................................. 9
 Refundability of Membership Deposit ..................................................................................... 9
 Deduction of Amounts Owed to Club ..................................................................................... 10
 Tax Consequences of Purchasing a Signature Membership .................................................... 11
 Dues, Fees and Charges .......................................................................................................... 11
 Food and Beverage Minimum ................................................................................................. 11
 Trail and Golf Cart Fees ......................................................................................................... 11
 Private Golf Cart Program ...................................................................................................... 12
 Golf Cart Plan ......................................................................................................................... 12
 No Assessments ....................................................................................................................... 12
 Membership Year of the Club ................................................................................................. 12
 Payment of Dues By a Resigned Signature Member .............................................................. 12

APPLICATION FOR SIGNATURE MEMBERSHIP ........................................................... 13
 An Application for Signature Membership Must Be Mailed or Delivered to Management of the Club ........... 13
 Review of Application for Signature Membership .................................................................. 13

C-57

The Privileges of Signature Members to Use the Club Facilities are Governed Only by this Signature Membership Plan ...................................................................................................................................13

**OTHER MEMBERSHIPS** ........................................................................................................................**13**
Classifications of Other Memberships ...........................................................................................13
Company Memberships ...................................................................................................................14
Honorary Memberships ..................................................................................................................14
Signature Memberships For Other Designated Communities.........................................................14

**GUESTS AND GROUP PLAY** ...............................................................................................................**14**
Outside Guests ................................................................................................................................14
Promotional Use and Tournament or Group Play ..........................................................................14

**CLUB OPERATIONS** ............................................................................................................................**15**
Management and Control of the Club Facilities and Operation of the Club ...................................15

**GENERAL PROVISIONS** .....................................................................................................................**15**
Membership Director Available to Answer Inquiries .....................................................................15
Rely Only on Information in this Signature Membership Plan........................................................15
Signature Memberships at the Club are Offered Only for Recreational Purposes ..........................15

# INTRODUCTION

## SIGNATURE MEMBERSHIP FEATURES

This Signature Membership Plan offers you an opportunity to become a "Signature Member" of the Club at La Costa. The terms of Membership are described in this Signature Membership Plan and in the Rules and Regulations.

## CLUB FACILITIES

The "Club Facilities" located at the Resort are made up of the following:

<u>Golf</u>. The Club's golf facilities currently include two championship 18-hole golf courses: the North Course and the South Course. The clubhouse area includes members only area, men's and women's locker room facilities.

<u>Tennis</u>. The Club Tennis Facility currently includes all three playing surfaces, including one sunken stadium-type hard court.

<u>Health and Fitness Center</u>. The health and fitness center is complete with the latest in cardiovascular, weight training equipment and aerobic room. Signature Members will have the ability to access the kids club, for a fee, when provided by the Resort.

<u>Swimming Pools</u>. Club Members have access to a number of swimming pools throughout the Resort.

KSL Encinitas Resort Co., LLC an affiliate of the Club, may construct a beachfront project located in the City of Encinitas (not at the Club site) commonly referred to as the La Costa Beach Access ("Beach Access"), but the construction of the Beach Access is in no way guaranteed. Current Membership Privileges do not at this time include any specific rights or Privileges related to the possible Beach Access. In the event that the Beach Access is constructed, the Club may amend Membership Privileges to include Member access to the Beach Access on terms and conditions to be determined by the Club in its sole and absolute discretion.

The Owner reserves the right, in its sole discretion, to add, delete, or substitute facilities to the Club.

## PREFERRED PRICING FOR SIGNATURE MEMBERS

Signature Members will receive a minimum preferred pricing of 15% off all regular priced items at Club Facilities and Resort, including food, beverage, retail, Spa treatments, and room nights. This preferred pricing does not include banquets, special events or catered parties. This does not apply to any third party vendors/tenants offering services or lessons at the Resort.

## OWNERSHIP AND OPERATION OF THE CLUB FACILITIES

KSL La Costa Resort Co., LLC, a Delaware limited liability company (the "Owner"), owns and operates the Club Facilities (the Club and the Owner are hereinafter sometimes collectively referred to as the "Club").

# SIGNATURE MEMBERSHIP CLASSES AND PRIVILEGES

### CLASSES OF SIGNATURE MEMBERSHIP

In order to provide exceptional facilities and exclusive service to Signature Members, the Club is currently offering a limited number of Signature Memberships in the following classes: Signature Golf Membership, Signature II Corporate Membership, Signature Sport Membership, Signature Non-Resident Golf Membership, Signature Non-Resident Sport Membership and Villa Signature Sport Membership. Any of these Signature Memberships may be held in the name of a trust, subject to those conditions contained herein.

### PRIVILEGES OF SIGNATURE MEMBERSHIP CLASSES

All Signature Membership classes will be subject to this Signature Membership Plan and the Rules and Regulations, as amended from time to time by the Club. By applying for a Signature Membership, the applicant agrees the Club may amend the Signature Membership Plan and Rules and Regulations and that his/her Signature Membership shall be subject to the Signature Membership Plan and Rules and Regulations. In order to enhance the recreational and social pleasure of the Members and their guests, the Club reserves the right to establish or modify rules, regulations, policies, guidelines, or systems governing access or reservation of the Club Facilities. The following is a summary of the current rights and Privileges of each class of Signature Membership.

### NUMBER OF SIGNATURE GOLF MEMBERSHIPS AT THE CLUB

The maximum number of Signature Golf Memberships will be limited, subject to the right of the Club to modify this Signature Membership Plan from time to time. All Existing Non-Resident Memberships, Signature Non-Resident Golf Memberships, Signature Non-Resident Sport Memberships, Signature Sport Memberships, Villa Signature Sport Memberships and Presidential Memberships will be excluded from the CAP established by the Club on the number of dues paying Resident golf Members.

The Club will permit up to 425 dues paying Resident golf Members for each 18-hole golf course. The amount of tee times provided for Member play will be calculated for every nine and one quarter dues paying Resident golf Members, the Club will allocate one tee time. Once the Club reaches 425 dues paying Resident golf Members an entire golf course will be reserved for Member play.

> Example: Based on the current number of times as of August 2002, the Member Block has been calculated from 7:00 AM to 12:12 PM daily. When the Club's Membership nets an additional nine and one quarter dues paying Resident golf Members, the Member Block will be adjusted to include one additional tee time (i.e., 12:20 PM). Conversely, should there be a net loss of nine and one quarter dues paying Resident golf Members, the Member Block will be adjusted by reducing one tee time (i.e., 12:04 PM).

### SIGNATURE GOLF MEMBERSHIP PRIVILEGES

A Signature Golf Membership is refundable pursuant to the Club's refund policies and procedures and is non-recallable. Signature Golf Memberships shall count toward the CAP. A Signature Golf Membership entitles a Signature Golf Member and his/her Immediate Family to use the Club Facilities. Except as otherwise provided herein, Signature Golf Members shall not pay green fees for use of the Golf Courses, but shall pay golf cart fees or trail fees. Signature Golf Members may reserve tee times 12 days in advance in the Member Block on the designated Member Course and 48 hours in advance on the designated Resort Course.

Signature Golf Members are not required to pay any court fees for use of the Tennis Facilities and may reserve tennis court times seven days in advance and one day in advance on center court.

Signature Golf Members may use the fitness facilities and participate in select classes at the Club for no additional fees and are entitled to enjoy the Spa's treatments, lessons and services at Members' preferred pricing.

To ensure adequate access to the Golf Courses, the Club will block tee times on one or more of the Golf Courses, for use by golf Members. The Member Block will alternate between the two Golf Courses unless otherwise dictated by tournaments. Blocked tee times may be utilized by the Club from time to time, for play by other than golf Members based upon prior commitments made by the Club with respect to the course(s) in question.

## SIGNATURE CORPORATE MEMBERSHIP PRIVILEGES

The Club has previously issued Signature Golf Memberships in the name of an entity formerly known as "Signature Corporate Memberships". These "Signature I Corporate Memberships" are no longer being issued, and any new designated users must be owners, directors, officers or employees of the entity ("Designees") and complete a Signature I Corporate Designee Membership Application.

A Signature II Corporate Membership can be issued in the name of an entity. The entity must designate one individual, as an owner, director, officer or employee of the entity, who with his/her Immediate Family may use the Club Facilities on the same basis as a Signature Golf Member. The entity may change the designated users, not to exceed four total designees at any one time, upon payment of an administrative fee to the Club (to be set solely by the Club from time to time). Each individual designated user must submit a Signature II Corporate Designee Membership Application and must be approved by the Club. Each dues paying designated user entitled to use the Club Facilities shall count toward the CAP. There must be at least one current dues paying Signature II Corporate Membership Designee at all times. The Club reserves the right to establish from time to time the rules governing the designation of individuals as the designated users of a Signature II Corporate Membership, including establishing a limit on the number of times a particular designation may be changed during the Membership Year. Currently, designees can only be deleted or replaced at the end of the Membership Year. The entity named in the application must be a corporation or some other form of legal entity that engages in a legally bonafide business and is in good standing in the State of California. The Club also reserves the right to require the entity to provide documentation confirming its establishment as an actual active business entity, such as a copy of its Articles of Incorporation, Partnership Agreement, Operating Agreement or other documentation supporting its existence as a legal bonafide business.

## SIGNATURE SPORT MEMBERSHIP PRIVILEGES

A Signature Sport Membership is refundable pursuant to the Club's refund policies and procedures and is non-recallable. A Signature Sport Membership entitles a Signature Sport Member and his/her Immediate Family to use of all tennis, health, fitness and social facilities of the Club. A Signature Sport Member may only play golf on the Resort Course upon payment of applicable greens fees and golf cart fees, subject to availability of tee times and the rights of Members. Signature Sport Members may reserve tee times two days in advance on the Resort Course and are not permitted to play on the Member Course. Signature Sport Members are limited to playing golf four times per calendar month. The green fee rate charged for golf will be the lower of either 35% off the then posted rate for Resort Guests or the lowest advertised rate.

Signature Sport Members are not required to pay any court fees for use of the Tennis Facilities and may reserve tennis court times seven days in advance and one day in advance on center court.

## SIGNATURE NON-RESIDENT GOLF MEMBERSHIP PRIVILEGES

A Signature Non-Resident Golf Membership is refundable pursuant to the Club's refund policies and procedures and is recallable. Signature Non-Resident Golf Memberships will be excluded from the CAP. A Signature Non-Resident Golf Membership entitles such Member and his/her Immediate Family to use all of the Club Facilities. Except as otherwise provided herein, Signature Non-Resident Golf Members shall not pay green fees for use of the Golf Courses, but shall pay golf cart fees or trail fees. A Member in this class will not be permitted to reside within a 50 mile radius of the Club for more than 180 days per calendar year. Members in this class will be limited to aggregate of 16 rounds of golf per month. A Signature Non-Resident Golf Member will have limited use of the Tennis Facilities for a total of 40 days during any 90 day period.

Signature Non-Resident Golf Members are not required to pay any court fees for use of the Tennis Facilities and may reserve tennis court times seven days in advance and one day in advance on center court.

Annually, a Signature Non-Resident Golf Member shall provide the Club with proof of his/her Non-Resident status by providing copies of two of the following documents; driver's license (or state identification card), passport (only for Members who are not U.S. citizens), tax return (with financial information deleted), or voter registration. Failure to present such proof shall be grounds for termination as set forth in Article III of the Rules and Regulations.

## SIGNATURE NON-RESIDENT SPORT MEMBERSHIP PRIVILEGES

A Signature Non-Resident Sport Membership is refundable pursuant to the Club's refund policies and procedures and is recallable. A Signature Non-Resident Sport Membership entitles such Member and his/her Immediate Family to use the Club Facilities. A Signature Non-Resident Sport Member may only play golf on the Resort Course upon payment of applicable greens fees and golf cart fees, subject to availability of tee times and the rights of the Members. Signature Non-Resident Sport Members may reserve tee times two days in advance on the Resort Course and are not permitted to play on the Member Course. A Member in this class will not be permitted to reside within a 50 mile radius of the Club for more than 180 days per calendar year. Signature Non-Resident Sport Members are limited to playing golf four times per calendar month. The green fee rate charged for golf will be the lower of either 35% off the then posted resort guest rate or lowest advertised rate.

Signature Non-Resident Sport Members are not required to pay any court fees for use of the Tennis Facilities and may reserve tennis court times seven days in advance and one day in advance on center court.

Annually, a Signature Non-Resident Sport Member shall provide the Club with proof of his/her Non-Resident status by providing copies of two of the following documents; driver's license (or state identification card), passport (only for Members who are not U.S. citizens), tax return (with financial information deleted), or voter registration. Failure to present such proof shall be grounds for termination as set forth in Article III of the Rules and Regulations.

4

## VILLA SIGNATURE SPORT MEMBERSHIP PRIVILEGES

A Villa Signature Sport Membership is not refundable and is recallable subject to the terms of the Addendum to the Club at La Costa Signature Membership Plan for La Costa Resort Villa ("Addendum") and the Villa Signature Sport Membership License Agreement/Application ("Villa Application"). A Villa Signature Sport Membership entitles such Member and his/her Immediate Family to use the Club Facilities on the same basis as a Signature Sport Member subject to the terms and conditions as provided in the Addendum and Villa Application.

## RIGHT TO MODIFY SIGNATURE MEMBERSHIP CLASSES AND PRIVILEGES

The Club may modify, in its sole discretion, from time to time, Signature Membership classes, ownership, structure comprising the CAP, Club Facilities, playing Privileges, blocked tee times, and related amenities in order to match the changing needs of the Club's Membership and/or to operate the Club in an efficient manner as the Club determines necessary or appropriate in its sole discretion.

## MEMBERSHIP PRIVILEGES OF FAMILY MEMBERS

A Member's Immediate Family shall be entitled to use the Club Facilities in accordance with the Member's class of Membership and the Rules and Regulations of the Club. A Member's Immediate Family includes the spouse or domestic partner and their unmarried children under the age of 23, living at home, attending school on a full-time basis or in the military. In addition, parents, grandparents, children who do not meet the above requirements, grandchildren, sons-in-law, and daughters-in-law of the Member and spouse or domestic partner are entitled to a 25% discount off the then posted resort guest green fee.

## MEMBERSHIP PRIVILEGES FOR INDIVIDUAL LIVING WITH MEMBER

A Member living together with another individual in the same household as a registered domestic partner may designate the other individual on a Membership Year basis to use the Club Facilities as an Immediate Family member. The total number of adults who may have Immediate Family Membership Privileges is limited to two adults per Membership. The Member and the domestic partner shall be individually and jointly responsible for the payment of all charges and fees incurred by the domestic partner. The Club reserves the right to establish such fees and other rules and require the Member and domestic partner to submit such information and forms as the Club deems appropriate.

## CLUB GUEST ACCESS

All Signature Members are entitled to have Club Guests use the Club Facilities in accordance with the Rules and Regulations of the Club, including limitations on the number of times a particular guest may use the golf and tennis facilities during a Membership Year. An individual Club Guest may not play golf as a guest more than six times in any Membership Year. The sponsoring Signature Member is responsible for the payment of the applicable daily guest fees established by the Club from time to time and all charges at the Resort incurred by the guest. All individuals other than the Signature Member and his/her Immediate Family will be deemed guests of such Member and will be subject to the Club Guest policy of the Club and the Rules and Regulations relating to Accompanied Guests and Sponsored Guests, as amended from time to time.

# TRANSFER OF MEMBERSHIP

## TRANSFER OF MEMBERSHIP IN THE CLUB

Any new Member who joined the Club after October 1, 2002 may transfer his/her Membership only through the Club, subject to a ten percent transfer fee as set forth in his/her Membership Application. Resignation of a Membership is irrevocable, unless otherwise determined by the Club.

a)   A Signature Member who owns a Home or Unit in any community as designated by the Owner, in its sole discretion, shall have the option for the buyer of his/her Home or Unit to have preferred eligibility to apply for, and if approved by the Club to acquire that Signature Member's Membership. The new Signature Member will pay the current Signature Membership Deposit amount and complete the Membership Application. Should the buyer's Membership Application be approved by the Club, then that buyer shall obtain a new Membership. As set forth herein, the selling Signature Member's Membership Deposit shall be refunded within 30 days after approval of such new Signature Member. The selling Signature Member shall be asked to resign his/her Membership upon approval for the new Signature Membership.

b)   A Signature Member may transfer his/her Signature Membership only through the Club. If a Signature Member resigns from the Club, such Member may have his/her resigned Signature Membership Deposit refunded according to the following:

(i)    Each class of Signature Membership (Golf and Sport) shall have separate and distinct resignation/resale lists. There shall be no cross over of classes regardless of when the resignation occurs.

(ii)   Prior to the CAP or limit for each class of Signature Membership being reached, every fifth Signature Membership issued in that class will generate a Signature Membership Deposit refunded to the first resigned Signature Member on the resigned list.

(iii)  After the CAP of each class of Signature Membership has been reached, each new Signature Membership issued in that class will generate a Signature Membership Deposit refunded to the first resigned Signature Member on the resigned list.

The Club reserves the right to repurchase a resigned Signature Membership from the resigned Signature Member resigned list, which is not being transferred to the subsequent purchaser of the resigning Signature Member's Home or Unit in any designated community as described herein, on such terms agreed to by the Club and the Signature Member in its sole discretion. Any Signature Membership so purchased will be added to the Club's reserved Signature Memberships or reissued to a new purchaser instead of issuing an unissued Signature Membership. The Club has no obligation to repurchase any Signature Memberships, and any such repurchase of Signature Memberships is at the sole discretion of the Club.

## TRANSFER DURING MEMBER'S LIFETIME

A Signature Member can request the one-time transfer of his/her Signature Membership to an adult child or adult grandchild who is approved for Signature Membership in the Club without the payment of any additional Membership Deposit. In order to effectuate a transfer to an adult child or adult grandchild, the Signature Member shall resign the Signature Membership. The adult child or grandchild will then purchase the Signature Membership from the Club, within 30 days of resignation, at the same

6

Membership Deposit which was previously paid by the Signature Member. The Club shall then pay to the Signature Member the Membership Deposit previously paid by the Signature Member for the Signature Membership within 30 days of payment by the adult child or adult grandchild of the required Membership Deposit. A new 30-year period for the refund of the Membership Deposit shall commence for the adult child or adult grandchild. The transfer of the Signature Membership to an adult child or adult grandchild shall not be subject to any waiting or resigned lists.

### TRANSFER UPON DEATH

Upon the death of a Signature Member the surviving spouse or domestic partner, if any, may elect: (i) to continue the Signature Membership Privileges without having to pay any additional Membership Deposit; or (ii) to designate one adult child or adult grandchild on a one-time basis to acquire the Signature Membership without payment of any Signature Membership Deposit. If the Signature Membership is acquired by an adult child or adult grandchild, a new 30-year period for the refund of the Signature Membership Deposit shall commence for the adult child or adult grandchild. The surviving spouse or domestic partner must timely notify the Club of which it elects to do within 90 days of the death of the Signature Member. Failure to notify the Club within 90 days shall be deemed an election to continue the Signature Membership Privileges in the name of the surviving spouse or domestic partner. If there is no surviving spouse or domestic partner, and the deceased Signature Member has not designated one adult child or adult grandchild as the beneficiary of such Signature Membership, the adult child or adult grandchild of such Member, by written consent signed by all of the surviving children of the decedent, may designate one adult child or adult grandchild, who if approved for Signature Membership in the Club, may acquire such Signature Membership without payment of any Membership Deposit. In the event there is no adult child or adult grandchild or surviving spouse or domestic partner who wants to continue Signature Membership Privileges, or if no adult child or adult grandchild is approved for Membership in the Club, the Signature Membership shall be deemed resigned and placed on the resigned list for reissuance, and the Membership Deposit paid by the deceased Signature Member to the Club will be refunded to the estate of decedent, without interest, within 30 days of reissuance of the Membership. Signature Memberships acquired on or before March 27, 2006, shall also have such refund rights after death of a Signature Member as set forth in the "Refundability of Membership Deposit" section below.

### LEGAL SEPARATION OR DIVORCE OF MARRIED MEMBERS

When a Signature Membership is issued in the name of more than one person, each person will be jointly and severally liable for all dues, fees and other charges and liabilities associated with such Signature Membership. In the event of the divorce or separation of married Signature Members, the Signature Membership, including all of its rights and benefits, will vest in the spouse awarded such Signature Membership by an agreement of separation or a decree of divorce. Until the award of the Signature Membership and use Privileges, both spouses will be jointly and severally liable for all dues and charges. In the event of the divorce or separation of spouses having a Signature Membership where the agreement of separation or decree of divorce is silent regarding the Signature Membership, the Signature Membership, including all of its rights and benefits, will vest in the spouse awarded the Home or Unit within any community as designated by the Club from time to time, if any. Notwithstanding the foregoing, only one Signature Golf Membership shall be counted towards the CAP. The Club reserves the right, in its sole discretion, not to transfer the Signature Membership to either spouse if the Club, in its sole discretion, is unable to determine the person who is lawfully entitled to receive the Signature Membership. In the case of divorce, if the Club has been unable to determine which spouse is legally entitled to the Signature Membership within six months after the date of the divorce decree, the Signature Membership shall automatically be deemed resigned.

7

## RECIPROCAL MEMBERSHIP PROGRAMS

Signature Golf Memberships will be entitled to certain reciprocal programs that may be offered in any existing resort owned and operated by the Owner and certain affiliates. A list of the reciprocal programs will be provided on an annual basis to all Signature Golf Members. Reciprocal Programs may be modified from time to time at the sole discretion of the Club.

## ACKNOWLEDGMENT OF SIGNATURE MEMBERSHIP PRIVILEGES

Signature Membership permits the Signature Member to use the Club Facilities in accordance with the terms of this Signature Membership Plan, such Member's Membership Application and the Rules and Regulations, but does not grant to the Signature Member any legal or equitable right, title, interest, vested or prescriptive right or easement to use the Club Facilities. Membership in the Club is not a security or investment in the Club or the Owner and does not provide the Signature Member with an equity or ownership interest or any other property right, title or interest in the Club or the Club Facilities. A Signature Member only acquires a revocable license to use the Club Facilities, in accordance with the terms and conditions of this Signature Membership Plan and the Rules and Regulations, as the same may be amended from time to time, and the Membership Application. The Club reserves the right, but has no obligation, to reserve Memberships, to discontinue operations of any or all of the Club Facilities, to sell, lease or otherwise dispose of the Club Facilities in any manner whatsoever and to any person whomsoever, to issue any additional class, classification or type of Membership or terminate any class, classification or type of Membership or any dues category, to convert the Club into a Membership-owned club, and make any other changes in the terms and conditions of Membership or the Club Facilities available for use by Signature Members.

In the event of termination of a person's class of Membership or the discontinuance of operation of all or substantially all of the Club Facilities, the Club will refund the Membership Deposit to the affected Member(s) within 30 days, if any. In the event that the Club Facilities are sold and the buyer assumes liability for the repayment of the appropriate Membership Deposit as provided in the Membership Application, the Member shall look solely to the new owner for repayment of the Membership Deposit and the seller of the Club Facilities shall be released from all liability for the repayment thereof. In the event of a sale of the Club Facilities, other than a foreclosure sale, the buyer shall take title subject to the terms and provisions of the then existing Signature Membership Plan.

# SIGNATURE MEMBERSHIP ELIGIBILITY

## ELIGIBILITY FOR SIGNATURE MEMBERSHIP

Signature Memberships will be available to persons who complete the application and pay the required Signature Membership Deposit. The number of Signature Memberships is limited, and eligibility for such Membership is subject to availability. All applications for Signature Membership must be approved by Management of the Club. The Club will make the final determination, in its sole and absolute discretion, whether to approve or disapprove a Membership Application. If a Membership Application is not approved, the Signature Membership Deposit shall be returned less a processing fee.

## MULTIPLE OWNERS OF PROPERTY

In the event a Home or Unit in any community as designated by the Owner in its sole discretion, is owned by more than one person, only one designated owner is eligible to obtain a Membership and use the Club Facilities, subject to availability. The additional owner(s) of the property must also become Signature Members, in order to use the Club Facilities. Only one Signature Membership can be transferred through

8

the Club to the subsequent purchaser of the Home or Unit, as provided above. Therefore, there is no guarantee that the additional Signature Membership(s) once resigned, will be reissued.

### SIGNATURE MEMBERS MAY UPGRADE TO A HIGHER CLASS OF MEMBERSHIP

Signature Sport Members have the right to upgrade to a Signature Golf Membership if a Signature Golf Membership is then available and not reserved, subject to such conditions as may be imposed by the Club. In order to upgrade, the Signature Sport Member shall pay to the Club the difference between the Signature Sport Membership Deposit paid and the current Signature Golf Membership Deposit.

### SIGNATURE MEMBERS MAY DOWNGRADE TO A LOWER CLASS OF MEMBERSHIP

Downgrades of Signature Golf Membership will not be permitted except in cases of hardship as verified in writing and approved by the Club General Manager. If the Club General Manager approves a downgrade to a lower class of Signature Membership, the Signature Golf Member must resign the Signature Golf Membership and acquire the Signature Sport Membership. The Signature Member will receive a refund of the Membership Deposit for the Signature Golf Membership minus a transfer fee, if any, when the Club reissues the Signature Golf Membership to a new Signature Golf Member.

### SIGNATURE MEMBERSHIP MAY BE HELD IN THE NAME OF A TRUST

For the convenience of Members, a Signature Membership may be held in the name of a trust (the "Trust"). The Membership will be issued in the name of the Trust. The Trust must designate one beneficiary of the Trust, who with his or her Immediate Family will have the right to use the Club Facilities. The Trust may change the designated user upon payment of the administrative fee charged by the Club. The individual designated must submit a Membership Application and must be approved by the Club. No more than one designated user and his or her Immediate Family shall be entitled to simultaneously use the Club Facilities, except as a guest. The Club reserves the right to establish from time to time the rules governing the designation of an individual as the designated user of a Membership, including establishing a limit on the number of times a particular designation may be changed during a Membership Year or during the term of the Membership and requiring proof that the individual qualifies as a designated user and proof that the Trust is valid, as determined by the Club from time to time in its sole discretion.

## CLUB CHARGES

### MEMBERSHIP DEPOSIT REQUIRED TO BECOME A SIGNATURE MEMBER

Each person/entity who acquires a Signature Membership will be required to pay the Membership Deposit in effect at the time the person/entity is approved for Signature Membership. Membership Deposits are non-transferable, except to the Signature Member's adult child, adult grandchild or surviving spouse, as described in this Signature Membership Plan, and are refundable only in accordance with such Signature Membership Plan, the Rules and Regulations of the Club and the Membership Application.

### REFUNDABILITY OF MEMBERSHIP DEPOSIT

The Membership Deposit will be refunded, without interest, upon the earlier of either of the following:

(a)     30 years after the date the Signature Membership is originally issued by the Club; or

(b)     within 30 days after the resigned Signature Membership has been reissued by the Club to a new Signature Member.

Signature Members who joined the Club on or before March 27, 2006 will also be refunded the Membership Deposit within 30 days after the death of a Signature Member and receipt by the Club of a written request for refund, provided that such written request is received by the Club within one year of the date of death of such Member.

The difference between the amount paid by the new Signature Member and the amount refunded to the resigning Signature Member will be retained by the Club. Any Member who joined the Club after October 1, 2002, shall be subject to a ten percent transfer fee as set forth in his/her Membership Application, if his/her Membership is resigned and reissued earlier than 30 years, or in the case of Members who joined the Club on or before March 27, 2006, the Member receives a refund after death of the Member.

The Signature Membership shall terminate 30 years from the acceptance of the Membership Application by the Club. The Membership Deposit shall be refunded to the Signature Member in accordance with the Membership Application. At the end of the 30-year period, provided Signature Memberships are then being offered and the Member is in good standing, the Signature Member will have a right of first refusal for 30 days from the termination date to notify the Club of his or her election to purchase a new Signature Membership and pay the Membership Deposit of the same amount which was previously paid by the Signature Member. If the Signature Member does not acquire a new Signature Membership within this 30-day period, the Club may issue the new Signature Membership to such persons as it deems appropriate from time to time.

At the time set forth above when the Membership Deposit is to be refunded, each Existing Member at the Club who acquired a Signature Golf Membership during the Initial Offer Period for Signature Memberships between August 1, 2002 and October 1, 2002 ("Initial Offer Period") shall be entitled to a 100% refund of the Membership Deposit paid to the Club (but not to previous owner(s) of the Resort). Existing Members, who joined during the Initial Offer Period, may receive up to 90% of the Initiation Fee paid to the previous owner(s) of the Resort. If he/she remains a Signature Member for at least five consecutive Membership Years, such Member will qualify for a refund of 50% of the Initiation Fee paid to the previous owner(s) of the Resort. In addition, the Signature Member will qualify for an additional ten percent of the Initiation Fee paid to previous owner(s) for each additional year he/she remains a dues paying Member, up to a maximum of four years.

> Example: If a Preferred Family or Single Resident Member who originally paid a $30,000 Initiation Fee elects to convert to a Signature Membership as one of the first 50 converting Signature Members during the Initial Offer Period, he/she would be required to pay an additional $45,000 Membership Deposit. From August 1, 2002 forward a converted Signature Member who resigns from the Club shall be eligible for a 100% refund of the Membership Deposit paid to the Club. If the Signature Member remains at the Club for five years he/she would be eligible for a refund of 50% of the $30,000 Initiation Fee paid to the previous owner(s) of the Resort, for a total refund of $60,000. If he/she remains a Signature Member for two more years he/she would be eligible for an additional 20% refund of his/her $30,000 Initiation Fee paid to the previous owner(s) of the Resort for a total refund of $66,000.

## DEDUCTION OF AMOUNTS OWED TO CLUB

The Club will deduct from any amount to be repaid to the Member any amount which the Member owes the Club.

## TAX CONSEQUENCES OF PURCHASING A SIGNATURE MEMBERSHIP

All Signature Members acquire their Membership subject to all applicable tax laws as may exist now or at any time in the future. The Club makes no representations and expresses no opinions regarding the federal or state income tax consequences of refunding the Membership Deposit. Persons interested in acquiring a Signature Membership should consult with their own tax adviser with respect to the tax consequences of paying the Membership Deposit.

## DUES, FEES AND CHARGES

Generally, on an annual basis (but more often as circumstances warrant as determined by the Club), the Club will determine the amount of dues, fees and charges to be payable by Members. Signature Membership classes will pay dues in advance on a quarterly basis, in which case, the dues shall be owing and payable on or before the first day of January, April, July and October of the then Membership Year. Non-Signature Membership classes may be required to pay dues in advance on an annual basis. The current dues for use of the Club Facilities are indicated on the Schedule of Dues and Charges, which will be provided by the Club each Membership Year. All Members shall provide the Club with one credit or debit card to which the Member authorizes the Club to charge dues, fees and charges in the event that the Member does not pay outstanding amounts on his or her club account when due, and the Member shall substitute such credit or debit card with another credit or debit card if it expires and is not renewed or is cancelled. Such past due charges will be billed on a monthly basis and Members will receive a written statement of their past due charges. The amount of dues for each year and frequency of payment is subject to change as determined by the Club, in its sole discretion. Payment of dues by Members is a continuing obligation of Signature Membership which is not suspended due to the closure of any or all of the Club Facilities which result from acts of God, natural disasters, pestilence, weather, fires, facility repair or enhancement, due to disease or other unanticipated cause, requirements imposed by governmental authorities after the date hereof and any events beyond the reasonable control of the Owner or the Club.

## FOOD AND BEVERAGE MINIMUM

All Signature Members will be required to spend an annual minimum for food and beverages ordered and served at the Resort, to be paid on a quarterly basis. The current food and beverage minimum shall be charged to the Signature Member's club account. This minimum can be spent at any Resort food and beverage outlet, for all products (including alcoholic beverages). The Club reserves the right to change the food and beverage minimum, pricing and the payment schedule at its sole discretion.

Failure to consume the actual required minimum on food and beverages will not relieve the Signature Member of the obligation as defined hereunder, and the Club shall have the right to charge such Member's club account for the defined minimum at the end of each Membership Year quarter or at a period determined at the sole discretion of the Club.

## TRAIL AND GOLF CART FEES

Signature Golf Members will be entitled to use his/her privately owned golf carts provided they pay an annual trail fee and execute the "Private Golf Cart Trail Fee Agreement". Signature Golf Members will have the option to purchase an annual Golf Cart Plan, as described below. All private golf carts, with current insurance certificates on file and registered with the Club as of August 1, 2002, will be permitted and all other Non-Signature Membership classes must pay a golf cart fee at the time of play. Guests of Members must pay a guest and golf cart fee even if riding in a private golf cart with any Member.

## PRIVATE GOLF CART PROGRAM

The Club has established a "Private Golf Cart Program," which allows Signature Members and Existing Members (with private golf carts as previously defined above) to operate privately owned golf carts at the Club Facilities. These Members will be permitted to use their private golf carts at the Club in accordance with the rules established by the Club, from time to time, and upon payment of the trail fees.

## GOLF CART PLAN

Members will be entitled to purchase an annual "Golf Cart Plan." This plan allows the Member and their Immediate Family unlimited use of one golf cart for daily golf play for an entire Membership Year. Guests playing with Members on the Golf Cart Plan are not included in such plan and will be required to pay the current golf cart fee. The Golf Cart Plan must be paid annually and will be renewed on January 1st of each year.

## NO ASSESSMENTS

Signature Members will only pay Membership dues, fees and other Club charges as established by the Club from time to time. Signature Members will not be subject to any liability for capital or operating assessments for the costs and expenses of ownership or operation of the Club or the Club Facilities. The Owner will pay all operating deficits incurred in the operation of the Club Facilities and will retain all operating revenues resulting from operation of the Club Facilities. The Club operating budget and the calculation of the dues may include a reserve for capital replacements and improvements and this shall not be deemed an assessment for purposes of this provision.

## MEMBERSHIP YEAR OF THE CLUB

The Club's "Membership Year" will constitute the 12-month period commencing January 1 and ending December 31, unless otherwise established by the Club from time to time.

## PAYMENT OF DUES BY A RESIGNED SIGNATURE MEMBER

A resigned Signature Member shall be obligated to continue to pay dues, fees and other charges associated with the resigned Signature Membership and shall be entitled to use the Club Facilities until such Signature Membership is either removed from the resigned list, is reissued, or has elected inactive status. Signature Members will be obligated to pay dues and fees for a 12 month period following the submission of the resignation. Once the 12 months of payments have been paid in full, the Signature Membership shall be deemed inactive. In the event that there are any amounts owed to the Club by a resigned Signature Member which are past due, the Club reserves the right to move the resigned Signature Membership to the bottom of the resigned list until such amounts have been paid in full.

## APPLICATION FOR SIGNATURE MEMBERSHIP

### AN APPLICATION FOR SIGNATURE MEMBERSHIP MUST BE MAILED OR DELIVERED TO MANAGEMENT OF THE CLUB

Each person who desires to become a Signature Member must mail or deliver to the Management of the Club a fully completed and signed Membership Application, along with a check for the required Membership Deposit and dues.

Each applicant for Signature Membership agrees that, should the Club or the Owner breach this Signature Membership Plan, the Rules and Regulations of the Club, as amended from time to time, or any other obligation owed to that Signature Member, his/her remedies shall be limited to a refund of his/her Signature Membership Deposit and that he/she shall not be entitled to recover damages or obtain any equitable relief against the Club or the Owner. The Club has the right to deduct any outstanding debt(s) from the Membership Deposit before a refund is generated. Furthermore, the Club may at its option take whatever action it deems necessary to effect collection.

### REVIEW OF APPLICATION FOR SIGNATURE MEMBERSHIP

All applicants applying for a Signature Membership must be approved by Management of the Club. After receiving the Membership Application, the Club, in its sole discretion, will determine whether the applicant has satisfied the relevant conditions of Signature Membership. A Membership Application will not be acted upon unless fully completed, executed and accompanied by available U.S. funds for payment of the appropriate Membership Deposit. In the event the Membership Application has not been acted upon favorably, the applicant will receive a refund of any amount paid with the application, without interest. All applicants will be notified within 90 days from submission of a completed application if Signature Membership is approved or disapproved.

### THE PRIVILEGES OF SIGNATURE MEMBERS TO USE THE CLUB FACILITIES ARE GOVERNED ONLY BY THIS SIGNATURE MEMBERSHIP PLAN

If approved for Signature Membership in the Club, the Signature Member agrees to be bound by the terms and conditions of this Signature Membership Plan and the Rules and Regulations of the Club, as amended from time to time, and irrevocably agrees to fully substitute the Membership Privileges acquired pursuant to this Signature Membership Plan for any present or prior Privileges in or to use the Club Facilities.

## OTHER MEMBERSHIPS

From its inception, the Club has offered different classifications of Memberships. As of August 1, 2002, only Non-Signature Members in good standing shall have the option to remain in his/her Existing Membership classification. All of the Non-Signature Membership classifications are recallable by the Club in its sole discretion as provided in the Rules and Regulations.[2]

### CLASSIFICATIONS OF OTHER MEMBERSHIPS

The Club previously offered Memberships that will no longer continue to be offered: Signature I Corporate, Charter, Founder, Regular, Non-Resident, Tennis, Presidential, Preferred Family Resident, Preferred Single Resident, Preferred Non-Resident, Preferred Corporate, Preferred Tennis, Executive Single, Preferred Junior, Legendary Resident, Legendary Non-Resident and Legendary Tennis.

## COMPANY MEMBERSHIPS

The Club may issue up to 10 Company Memberships in the Club to such persons as the Club determines appropriate from time to time. These "Company Memberships" will be available on such terms and conditions as the Club determines appropriate and will not count toward any membership limit. Company Members have the same Privileges as Signature Golf Members, but will not pay Membership Deposits, dues or greens fees or cart or trail fees but will pay for goods and services purchased at the Club. Company Members will not be obligated to pay dues unless the Club is ever converted into an equity, member-owned club.

## HONORARY MEMBERSHIPS

The Club may issue up to 10 Honorary Memberships in the Club to such persons as the Club determines appropriate from time to time. These "Honorary Memberships" will be in addition to all other Memberships and will be available on such terms and conditions and afford such Privileges as the Club determines.

## SIGNATURE MEMBERSHIPS FOR OTHER DESIGNATED COMMUNITIES

The Club may offer Signature Memberships to purchasers of new Homes or Units in any other communities designated by the Owner on such terms and conditions as determined by the Owner from time to time. These Signature Memberships may differ from other Signature Memberships in regards to Privileges, refunds, transferability and other provisions. These Signature Memberships may be offered on a fractional or other basis. These Signature Memberships will be included in the number of outstanding Resident golf Members where appropriate and will be treated on the same basis as other Signature Memberships except as specifically set forth in the Membership Application for these Signature Memberships.

# GUESTS AND GROUP PLAY

## OUTSIDE GUESTS

The Club will permit use of the North Course and South Course by daily fee players as Outside Guests. Outside Guests may also be permitted to use dining, lounge, health, fitness center, locker rooms and Tennis Facilities at the existing published rates.

## PROMOTIONAL USE AND TOURNAMENT OR GROUP PLAY

The Club reserves the right, in its sole discretion, to designate other persons, including, without limitation, officers, directors, partners and employees of the Club and its affiliates and their guests to use the Club Facilities upon such terms and conditions as may be determined from time to time by the Club. The Club reserves the right, in its sole and absolute discretion, to restrict or to otherwise reserve in advance the Club Facilities for maintenance, reseeding, tournament or group play and other special events, from time to time. Tournaments may include professional events such as the Accenture World Match Play, which will result in restricted access within the Resort. The Club shall give Members reasonable notice of the closure time and dates.

# CLUB OPERATIONS

## MANAGEMENT AND CONTROL OF THE CLUB FACILITIES AND OPERATION OF THE CLUB

The Owner owns the Club Facilities and it or its agents will manage and operate the Club Facilities, the Club and the Resort. As a result, the Owner is solely responsible for the government and administration of the Club Facilities, the Club and the Resort and will have the exclusive authority to accept or reject Members, set dues and charges, establish rules and regulations and control the management and affairs of the Club and the Resort. The Owner also reserves the right to engage a professional management company to operate the Club Facilities, the Club and the Resort.

# GENERAL PROVISIONS

## MEMBERSHIP DIRECTOR AVAILABLE TO ANSWER INQUIRIES

Should you have any questions concerning this Signature Membership Plan or the Signature Membership opportunities available at the Club, please contact the Membership Director.

## RELY ONLY ON INFORMATION IN THIS SIGNATURE MEMBERSHIP PLAN

No person has been authorized to give any information or make any representation not contained in this Signature Membership Plan, and if given or made, such information or representation must not be relied upon as having been authorized by the Club. By applying for Signature Membership, each applicant agrees and represents to the Club and the Owner that he/she is relying solely on the information contained in this Signature Membership Plan and not on any other oral, written or implied representation or promise. Further, each applicant for Signature Membership acknowledges that the Owner will not approve any such Membership Application unless the applicant represents that he/she is not relying on any representation not contained in this Signature Membership Plan.

## SIGNATURE MEMBERSHIPS AT THE CLUB ARE OFFERED ONLY FOR RECREATIONAL PURPOSES

Signature Memberships at the Club are being offered exclusively for the purpose of permitting Signature Members the recreational use of the Club Facilities. Signature Memberships should not be viewed as an investment and no Signature Member should expect to derive any economic profits from such Membership at the Club. No federal or state authority has passed upon or endorsed the merits of this Signature Membership Plan. The Signature Member is acquiring a license to use the Club Facilities, subject to compliance with the Rules and Regulations of the Club and the provisions of this Signature Membership Plan.



Aboolafia
017088

# SIGNATURE SPORT

## MEMBERSHIP APPLICATION



THE CLUB AT
LA COSTA



EXHIBIT
4
Aboolafia

**PERSONAL/CORPORATE**

Applicant's Name _Allen Abolafia_

Social Security Number/Federal Id _____

Birth Date/State of Incorporation _8/17/1955_

Spouse's Name _N/A_                                    Wedding Anniversary Date _____

Social Security Number _N/A_                           Birth Date _____

Local Address _69 Quail Run_ _____ _Henderson_ , _NV_ _89014_
            Street                                      City      State    Zip

Away Address _____
            Street                                      City      State    Zip

Billing Address _____
            Street                                      City      State    Zip

Club Communications
Address _____
            Street                                      City      State    Zip

Telephone                                             Telephone
Local Residence _____                    Away _____

E-mail Address _____                     Fax Number _____

Spouse's E-mail Address _____

Unmarried children under the age of 23.  Name        Birth Date                Email Address
_Jordan Abolafia_                        _01/14/1992_ _____

Annual Income    ☐ $50,000 - $75,000      ☐ $75,000 - $100,000    ☐ $100,000 - $150,000    ☐ $150,000 - $200,000
                 ☐ $200,000 - $500,000    ☐ $500,000 - $1,000,000 ☐ $1,000,000 - or Above

**AUTOMOBILE**

Make _BMW 650ci Convertible_ Color _Silver_ Year _2016_ License Number _Nevada # 200514860_

Make _BENTLEY_ _____ Color _____ Year _____ License Number _____

**BUSINESS**

Applicant's Company Name _____ Title _____

Business Address _____
                Street                                 City      State    Zip

Telephone _____ Years In Present Employment _____ Retired ☐

E-mail Address _____ Fax Number _____ Website _____

Spouses Company Name _____ Title _____

Business Address _____
                Street                                 City      State    Zip

Telephone _____ Years In Present Employment _____ Retired ☐

E-mail Address _____ Fax Number _____ Website _____

**BANKING RELATIONS**

I Name of Institution _____ Address _____

Officer to Contact _____ Telephone _____

**MEMBERSHIP IN OTHER CLUBS**

Name of Club/Organization _____ Spanish Trails _____ Year Accepted _____

Type _____ Address _____

Telephone _____ Contact Person _____ Present/Former member _____

Name of Club/Organization _____ Year Accepted _____

Type _____ Address _____

Telephone _____ Contact Person _____ Present/Former member _____

**PERSONAL REFERENCES (May not be a current Member of The Club at La Costa)**

Name _____ Telephone _____ Years known _____

Name _____ Telephone _____ Years known _____

**MEMBER SPONSORS**

Name _____

Address _____ Telephone _____

**CREDIT CARD AUTHORIZATION**

Name _____ Membership Number _____

Address _____

The following is the Club at La Costa policy on delinquent accounts

If your club account balance is not paid within 30 days of the original billing date, the total account balance will be charged off against a major credit card At that time a 15% handling fee will also be assessed to your club account.

If your balance is not paid within 30 days of the original billing date, a notice will appear on your statement reminding you that if a payment is not received before the next billing cycle, the account balance will be charged back to your credit card

Therefore, in order to secure that measure we will require a major credit card number and your signature Due to credit card regulations, a photocopy of the cardholder's card imprint (front and back), must be provided, upon completion of this form

Please note this form only authorizes the credit card listed below . We request a new credit card authorization form be completed for any new/additional cards

☐ American Express  ☐ Discover  ☐ MasterCard  ☐ Visa  ☐ Diners  ☐ Other

Credit Card Number 5147 55 __ 3019 Expiration Date 01 / 08

Printed name on card A. ABOLAFIA Signature _____ Date _____

Check those that apply.

☐ Refundable deposit or down payment (amount) $ _____

☐ Note payments (see addendum)  ☑ Monthly Dues  ☑ Charges  ☐ 15th of each month  ☑ 28th of each month  ☐ Charge card - One time only

The undersigned hereby applies for a Signature Sport Membership at the La Costa Resort and Spa (the "Club") and acknowledges the receipt of the Signature Membership Plan with the attached current Schedule of Dues and Fees and the current Rules and Regulations. Concurrently with the submission of this Application, the undersigned agrees to pay the Club a refundable membership deposit of $ 15,000.00

Upon approval of this Application, the Club promises to pay to the undersigned Membership applicant ("Member"), the "Membership Deposit" (as hereinafter defined), in lawful money of the United States of America, payable in one (I) installment on the anniversary date thirty (30) years from the date of approval of this Membership Application by the Club (the "Maturity Date") or earlier as provided in the Application

Upon signing the Application, I authorize the disclosure and release of information to the Club for investigating my qualifications for Membership, including without limitation, my credit history. I further authorize any person or entity to furnish the Club information requested by The Club and agree to hold the Club harmless for any and all such acts. The information contained in this application is complete and correct. The Club is hereby authorized to make whatever inquires the Club considers necessary and appropriate to verify this information, including checking with consumer reporting agencies, creditors and employers. I understand that any documents or other information submitted in support of the application become the property of the Club and will be kept by the Club whether or not this application is approved. I understand that the Club may receive information about me from others, and it may furnish information about its credit experience with me to others seeking the information. I intend that this application be relied upon for the purpose of requesting credit from the Club

I have been informed that KSL Encinitas Resort Corporation, an affiliate of the Club, may construct a beachfront project located in the City of Encinitas (not at the Club site) commonly referred to as the La Costa Beach Access ("Beach Access") but that the construction of the Beach Access is in no way guaranteed. I acknowledge that my membership privileges do not at this time include any specific rights or privileges related to the possible Beach Access. In the event that the Beach Access is constructed, I understand that the Club may amend my membership privileges to include Member access to the Beach Access with terms and conditions to be determined by the Club in its sole and absolute discretion. I further acknowledge that I am purchasing the Membership without any reliance or expectation that my Membership will include privileges to the Beach Access and understand that there is no that privileges for the Beach Access will be included as a membership privilege

Undersigned shall have thirty (30) days to rescind the Application after it has been submitted, in writing. This application together with the Signature Membership Plan and the 2006 Amended and Restated Rules and Regulations represents the entire understanding between the parties and supersedes any prior oral or written understandings, or agreements between them regarding any memberships at the Club

Applicant's Signature _____   Date __01/25/07__

_____ I have received and understand the 2006 Signature Membership Plan and the 2006 Amended and Restated Rules and Regulations.

Co-Applicant's Signature _____   Date _____

_____ I have received and understand the 2006 Signature Membership Plan and the 2006 Amended and Restated Rules and Regulations

This Membership Application shall not be binding on the Club until the acceptance below is signed

Approved and Accepted By the Club at La Costa

Authorized Representative _____   Date __1/25/07__



THE CLUB AT
LA COSTA

2100 Costa Del Mar Road
Carlsbad, CA 92009
(760) 929-6326
www.lacosta.com



## THE CLUB AT
# LA COSTA™

## 2006 AMENDED AND RESTATED
## RULES AND REGULATIONS



EXHIBIT

5

Abolafia

PENGAD 800-631-6989

Effective March 1, 2006 these 2006 Amended and Restated Rules and Regulations amend and supercede in their entirety the La Costa Country Club 1999 Amended Rules and Regulations, the 2002 Amended and Restated Rules and Regulations and any other rules and regulations or membership by-laws adopted in connection with the Club at La Costa (the "Club").

These 2006 Amended and Restated Rules and Regulations are referred to herein as the "Rules and Regulations".

# TABLE OF CONTENTS

**ARTICLE I GENERAL PROVISIONS**................................................................1
   SECTION 1   NAME. ...........................................................1
   SECTION 2   DEFINITIONS. ...................................................1
   SECTION 3   TERM USAGE. ...................................................4

**ARTICLE II MEMBERSHIPS**.........................................................................4
   SECTION 1   CLASSES AND CLASSIFICATIONS. ....................4
   SECTION 2   DESCRIPTION OF MEMBERSHIP PRIVILEGES.........5
   SECTION 3   MEMBERSHIP CLASSIFICATIONS. ....................6
   SECTION 4   PRIVILEGES OF THE CLUB. .............................13
   SECTION 5   FAMILY MEMBERSHIP PRIVILEGES. ...............14
   SECTION 6   CHILDREN. ......................................................14
   SECTION 7   MEMBERSHIP CARD. .......................................14
   SECTION 8   ONE TIME TRANSFER OF LEGENDARY MEMBERSHIPS............15
   SECTION 9   SALABILITY.....................................................15
   SECTION 10  INACTIVE STATUS: ........................................17
   SECTION 11  A MEMBERSHIP MAY NOT BE PLEDGED EXCEPT FOR PURCHASE MONEY
   OBLIGATIONS.................................................................18

**ARTICLE III TERMINATION, EXPULSION AND SANCTIONS**........................19
   SECTION 1   CAUSES OF TERMINATION. .............................19
   SECTION 2   EXPULSION AND OTHER SANCTIONS FOR CAUSE. ....21
   SECTION 3   ARBITRATION. ................................................22
   SECTION 4   PAYMENT OF FEES AND CHARGES. ................23
   SECTION 5   RIGHT TO TERMINATE....................................23

**ARTICLE IV MEMBERSHIP DUES AND CHARGES**.......................................24
   SECTION 1   DUES................................................................24
   SECTION 2   FEES.................................................................24
   SECTION 3   OUTSIDE GUEST. ............................................25
   SECTION 4   MEMBER CLUB GUEST. ..................................25
   SECTION 5   CHARGE ACCOUNTS. .....................................26
   SECTION 6   GRATUITIES....................................................27
   SECTION 7   DEATH.............................................................27

**ARTICLE V MANAGEMENT AND CONTROL OF THE CLUB**.........................27
   SECTION 1   OWNERSHIP OF FACILITIES AND OPERATION OF THE CLUB. ....27
   SECTION 2   MANAGEMENT OF THE CLUB. ........................28
   SECTION 3   ADVISORY BOARD ........................................28

**ARTICLE VI NOTICE TO MEMBERS**.........................................................28
   SECTION 1   NOTICES. ........................................................28
   SECTION 2   MEMBERSHIP CORRESPONDENCE......................29

**ARTICLE VII PROPERTY DAMAGE AND PERSONAL INJURY**........................29

**ARTICLE VIII RIGHT TO REGULATE USE OF PROPERTY**............................30
   SECTION 1   NON-MEMBER EVENTS....................................30
   SECTION 2   NON-MEMBER PLAY.......................................30
   SECTION 3   PROMOTIONAL USE AND TOURNAMENT OR GROUP PLAY. ....31
   SECTION 4   BEACH ACCESS...............................................31

C-80

**ARTICLE IX AMENDMENT OF RULES AND REGULATIONS**.................................................................31

**ARTICLE X CLUB RULES** ............................................................................................................................31
    SECTION 1      GENERAL CLUB RULES. ...........................................................................31
    SECTION 2      GOLF RULES ..............................................................................................33
    SECTION 3      HOURS OF PLAY. ......................................................................................35
    SECTION 4      STARTING TIMES.....................................................................................36
    SECTION 5      REGISTRATION. ........................................................................................36
    SECTION 6      PRACTICE FACILITY. ..............................................................................37
    SECTION 7      GOLF CART RULES. ..................................................................................37
    SECTION 8      PRIVATE GOLF CART RULES...................................................................38
    SECTION 9      HANDICAPS. .............................................................................................40
    SECTION 10    GOLF COURSE ETIQUETTE. ...................................................................40
    SECTION 11    DINING AND SOCIAL RULES. .................................................................41
    SECTION 12    GENERAL TENNIS RULES.......................................................................41
    SECTION 13    GENERAL HEALTH AND FITNESS RULES.............................................42

**ARTICLE XI ENTIRE AGREEMENT** .......................................................................................................44

**ARTICLE XII NO PROPERTY RIGHTS** ...................................................................................................44

**ARTICLE XIII THE OWNER'S  RIGHT TO MARKET AND TRANSFER** ...........................................44
    SECTION 1      MARKETING. .............................................................................................44
    SECTION 2      CLUB TRANSFER. .....................................................................................44

# 2006 AMENDED AND RESTATED RULES AND REGULATIONS OF THE CLUB AT LA COSTA

## ARTICLE I
## GENERAL PROVISIONS

### SECTION 1     NAME.

These 2006 Amended and Restated Rules and Regulations govern the Members of the Club. The Club offers world-class golf, tennis, health and fitness facilities and social activities at La Costa Resort & Spa[1]. The Resort is located in the City of Carlsbad, Northern San Diego County, California.

### SECTION 2     DEFINITIONS[2].

As used in these Rules and Regulations and the 2006 Signature Membership Plan, unless a different meaning or intent clearly appears from the context, the following terms shall have the following meanings:

(a)     "Accompanied Guest" shall mean the guest of a Member using the Club Facilities while such Member is present.

(b)     "Advisory Board" shall mean a group of Signature Members who advise the Management of the Club on various club activities, among other things.

(c)     "Application" or "Membership Application" shall mean the written application for Membership as designated by the Owner, and "Applicant" shall mean the person(s) or entity submitting the application.

(d)     "CAP" shall mean a limit of 425 dues paying Resident golf Memberships per course. All Non-Resident Memberships (including Signature and Non-Signature), Signature Sport Memberships and Presidential Memberships will be excluded from the CAP.

(e)     "Club" shall mean the business of the Owner conducted under the name the Club at La Costa in accordance with these Rules and Regulations, or under such other name as may be established by the Owner. Actions taken by, on behalf of, or in the name of the Owner, or assignees may only be taken by KSL La Costa Resort Co., LLC or its designees.

(f)     "Club Facilities" shall mean the Golf Courses, the Tennis Facilities, fitness facilities, swimming pools and the Member's Club Room, but not including any other portion of the Resort Facilities, except as otherwise set forth herein.

---

[1] La Costa Resort & Spa is a registered trademark of KSL La Costa Resort Co., LLC.
[2] All definitions defined herein shall describe the terms in the 2006 Signature Membership Plan and other Club Documents.

1

(g)    "Club Guests" shall mean those persons invited by a Member to enjoy the privileges of the Club associated with such Member's class or classification of Membership. Club Guests shall refer to both Sponsored Guests and/or Accompanied Guests.

(h)    "Designee" shall mean one of the designated users of a Signature I Corporate, Signature II Corporate or Preferred Corporate Membership.

(i)    "Existing Member" shall mean a person who purchased a Membership from a previous owner(s) of the Club.

(j)    "Extended Family" shall mean the parents, grandparents, children who do not fall within the definition of immediate family, grandchildren, siblings, sons-in-law and daughters-in-law of a Member and spouse (who does not reside with such Member).  A Member's Extended Family shall be treated as Guests subject to the terms and conditions set forth herein.

(k)    "Golf Courses" shall mean the 18-hole North Course and the 18-hole South Course.

(l)    A "Home" or "Unit" shall be defined as any real property, which has been made available to the general public in a community designated by the Owner.

(m)    "Immediate Family" shall mean the spouse or domestic partner of a Member and their unmarried children under the age of 23, living at home, in the military or attending school on a full time basis.

(n)    "Initiation Fee" shall mean the price paid to the previous owner(s) of the Resort by each Existing Member for his/her Membership.

(o)    "Management of the Club" shall mean individuals employed by the Club from time to time to take actions specified in these Rules and Regulations, including individuals designated as "Membership Director", "Director of Golf", "Club Manager", "General Manager", and in other positions or job titles.

(p)    "Member Block" shall mean a designated number of tee times reserved on a regular basis for golf Members.

(q)    "Member Course" shall mean the designated golf course, for a specified amount of time, allocated to golf play for a golf Member.

(r)    "Member" shall mean a Signature or Non-Signature Member of the Club given rights as a licensee under these Rules and Regulations to use the Club Facilities.

(s)    "Members' Club Room" shall mean such room or other facility designated from time to time by the Club as such, which may be available for use by Members, subject to the policies established by the Club from time to time.

2

(t)    "Membership" shall mean the contract license granted to a Member under these Rules and Regulations to use Club Facilities and shall consist of all classes and classifications of Membership referenced in Article II, Section 1.

(u)    "Membership Card" shall mean the card issued by the Club to each new Member, evidencing the Membership class or classification of such Member and containing his/her identification number.

(v)    "Membership Deposit" shall mean a refundable payment to the Club by a Signature Member for his/her Membership.

(w)    "Membership Year" shall mean the 12-month period commencing January 1 and ending December 31, unless otherwise established by the Club from time to time.

(x)    "Non-Resident" shall mean a Signature Non-Resident, Non-Resident, Preferred Non-Resident or Legendary Non-Resident Member.

(y)    "Non-Signature Member" shall mean an Existing Member who has not become a Signature Golf, Signature I Corporate, Signature II Corporate, Signature Sport, Signature Non-Resident Golf, Signature Non-Resident Sport or Villa Signature Sport Member.

(z)    "Outside Guests" shall mean those daily players permitted by the Club to use the Golf Courses.  The Club may also permit Outside Guests to use dining, lounge, health, fitness center, locker room and Tennis Facilities at the existing published rates.

(aa)    "Owner" shall mean KSL La Costa Resort Co., LLC a Delaware limited liability company, its successors and assigns.  In the case of an assignment by KSL La Costa Resort Co., LLC, the assignor shall be fully relieved of any obligation and/or liability arising out of or under these Rules and Regulations.

(bb)    "Privileges" shall mean the license to use the Club Facilities, activities and programs given to Members of the Club as set forth in these Rules and Regulations and as otherwise provided by the Club.

(cc)    "Resident" shall mean any person who is not a Non-Resident or Signature Non-Resident.

(dd)    "Resort" shall mean the La Costa Resort & Spa.

(ee)    "Resort Course" shall mean the golf course not designated as the Member Course.

(ff)    "Resort Facilities" shall mean all real property, and the improvements and other amenities located thereon which comprise the Resort, including, among other things, a luxury hotel complex and conference center, various on-premises restaurants, swimming pools, and the Club Facilities.

(gg)   "Resort Guests" shall mean those individuals who are (i) guests at the Resort or at any rental pool unit operated directly or indirectly by the Owner; or (ii) are invitees of the Owner who are utilizing the Resort Facilities.

(hh)   "Rules and Regulations" shall mean these 2006 Amended and Restated Rules and Regulations as they may be amended from time to time, in the Club's sole and absolute discretion.

(ii)   "Signature Member" shall mean a person who purchases a Signature Golf, Signature I Corporate, Signature II Corporate, Signature Sport, Signature Non-Resident Golf, Signature Non-Resident Sport or Villa Signature Sport Membership from the Club.

(jj)   "Signature Membership" shall mean the Membership of a Signature Member.

(kk)   "Signature Membership Plan" shall mean the 2006 Amended and Restated Signature Membership Plan as it may be amended from time to time, in the Club's sole and absolute discretion.

(ll)   "Signature Non-Resident" shall mean a Signature Golf or Signature Sport Member who resides outside a 50 mile radius of the Club for more than 180 days per calendar year.

(mm)   "Spa" shall mean the steam room, sauna, jacuzzi, pools, lockers and other spa facilities located at the Resort.

(nn)   "Sponsored Guest" shall mean the guest of a Member using the Club Facilities without such Member being present.

(oo)   "Tennis Facilities" shall mean the surfaced tennis courts and the tennis locker room located at the Resort.

## SECTION 3   TERM USAGE.

For the purpose of these Rules and Regulations, unless the context shall indicate or require otherwise, words of the singular shall be deemed and construed to include correlative words of the plural, and the term "person" and "Member" shall include both the masculine and feminine gender.

## ARTICLE II
## MEMBERSHIPS

## SECTION 1   CLASSES AND CLASSIFICATIONS.

The Membership of the Club shall consist of the following classes and classifications: Signature Golf, Signature I Corporate, Signature II Corporate, Signature Sport, Signature Non-Resident Golf, Signature Non-Resident Sport, Villa Signature Sport, Charter, Founder, Tennis, Presidential, Regular, Non-Resident, Preferred Family Resident, Preferred Single Resident, Preferred Non-Resident, Preferred Corporate, Preferred Tennis, Preferred Junior, Executive

4

Single, Legendary Resident, Legendary Non-Resident, Legendary Tennis and such other classes of Membership as may be established from time to time by the Club. The number of Memberships in each class shall be determined from time to time by the Club in its sole and absolute discretion.

## SECTION 2   DESCRIPTION OF MEMBERSHIP PRIVILEGES.

(a)     All Memberships are nonproprietary, nonvoting and only confer upon the holder thereof a license, which is subject to revocation as provided in these Rules and Regulations, and not coupled with an interest, to use the Club Facilities, subject to the use of the Club Facilities by Resort Guests and invitees of the Owner and further subject to these Rules and Regulations and such amendments and supplements and such other rules and regulations as may be adopted from time to time by the Club, in its sole and absolute discretion. Additionally, a Member's access to, or use of, Resort Facilities may be restricted by the Owner for the purpose of maintenance and repair, as well as construction and expansion. The Memberships do not confer on, or vest in, the Member any title, interest or estate in the Club Facilities, or any rights of the Owner or the Club (whether legal or equitable) in any of the assets of the Owner or the Club including, but not limited to, the Club Facilities and the surrounding real property, or vest in, or confer on the Member any right to share in the income, profits or distributions of the Club Facilities, the Club or the Owner. The Memberships are only personal and revocable contract rights and in no way constitute an interest or ownership in real or personal property. The Memberships do not confer to the Member any right and such Members shall have no right to vote or otherwise participate in the control of the Club. The Members shall not be liable for the debts or other obligations of the Club.

(b)     The maximum number of Signature Golf Memberships will be limited, subject to the right of the Club to modify the Signature Membership Plan and these Rules and Regulations from time to time. All Existing Non-Resident Memberships, Signature Sports Memberships, Signature I Corporate Memberships, Signature II Corporate Memberships, Signature Non-Resident Golf Memberships, Signature Non-Resident Sport Memberships, Signature Sport Memberships, Villa Signature Sport Memberships and Presidential Memberships will be excluded from the CAP established by the Club on the number of Resident golf Members.

The Club will permit up to 425 dues paying Resident golf Members for each 18-hole golf course. The amount of tee times provided for Member play will be calculated for every nine and one quarter dues paying Resident golf Members, the Club will allocate one tee time. Once the Club reaches 425 dues paying Resident golf Members an entire golf course will be reserved for Member play.

Example:  Based on the current number of times as of August 2002, the Member Block has been calculated from 7:00 AM to 12:12 PM daily.  When the Club's Membership nets an additional nine and one quarter dues paying Resident golf Members, the Member Block will be adjusted to include an additional tee time (i.e., 12: 20 PM).  Conversely, should there be a net loss of nine and one quarter dues paying Resident golf Members, the Member Block will be adjusted by reducing one tee time (i.e., 12:04 PM).

## SECTION 3     MEMBERSHIP CLASSIFICATIONS.

In addition to the various classes of Signature Memberships that are currently offered by the Club, Membership classifications may include, but are not necessarily limited to, the following and may be amended and supplemented as determined by the Club in its sole and absolute discretion.  With the exception of Signature Memberships, the Club will no longer offer any of the below listed classifications of Memberships.

(a)     <u>Signature Golf Membership.</u>  A Signature Golf Membership is refundable pursuant to the Club's refund policies and procedures and is non-recallable.  Signature Golf Memberships shall count towards the CAP.  A "Signature Golf Membership" entitles a Signature Golf Member and his/her Immediate Family to use the Club Facilities.  Except as otherwise provided herein, Signature Golf Members shall not pay green fees for use of the Golf Courses, but shall pay golf cart fees or trail fees.  Signature Golf Members may reserve tee times 12 days in advance in the Member Block on the designated Member Course and 48 hours in advance on the designated Resort Course.

Signature Golf Members are not required to pay any court fees for use of the Tennis Facilities and may reserve tennis court times seven days in advance and one day in advance on center court.

Signature Golf Members may use fitness facilities and participate in select classes at the Club for no additional fees and are entitled to enjoy the Spa's treatments, lessons and services at Members' preferred pricing.

(b)     <u>Signature Corporate Membership.</u>  'The Club has previously issued Signature Golf Memberships in the name of an entity formerly known as "Signature Corporate Memberships".  These "Signature I Corporate Memberships" are no longer being issued, and any new designated users must be owners, directors, officers or employees of the entity and complete a Signature I Corporate Designee Membership Application.

(c)     A "Signature II Corporate Membership" can be issued in the name of an entity. The entity must designate one individual, as an owner, director, officer or employee of the entity, who with his/her Immediate Family may use the Club Facilities on the same basis as a Signature Golf Member.  The entity may change the designated users, not to exceed four total designees at any one time, upon payment of an administrative fee to the Club (to be set solely by the Club from time to time).  Each individual designated user must submit a Signature II Corporate Designee Membership Application and must be approved by the Club.  Each dues paying designated user entitled to use the Club Facilities shall count toward the CAP.  There must be at least one current dues paying Signature II Corporate Membership Designee at all times.  The Club reserves the right to establish from time to time the rules governing the designation of individuals as the designated users of a Signature II Corporate Membership, including establishing a limit on the number of times a particular designation may be changed during the Membership Year.  Currently, designees can only be deleted or replaced at the end of the Membership Year.  The entity named in the application must be a corporation or some other form of legal entity that engages in a legally bonafide business and is in good standing in the State of California.  The Club also reserves the right to require the entity to provide documentation confirming its establishment as an actual active business entity, such as a copy

6

of its Articles of Incorporation, Partnership Agreement, Operating Agreement or other documentation supporting its existence as a legal bonafide business.

(d)   Signature Sport Membership.  A Signature Sport Membership is refundable pursuant to the Club's refund policies and procedures and is non-recallable.  A "Signature Sport Membership" entitles a Signature Sport Member and his/her Immediate Family to use of all tennis, health, fitness and social facilities of the Club.  A Signature Sport Member may only play golf on the Resort Course upon payment of applicable green fees and golf cart fees, subject to availability of tee times and the rights of Members.  Signature Sport Members may reserve tee times two days in advance on the Resort Course and are not permitted to play on the Member Course.  Signature Sport Members are limited to playing golf four times per calendar month.  The green fee rate charged for golf will be the lower of either 35% off the then posted rate for Resort Guests or the lowest advertised rate.

Signature Sport Members are not required to pay any court fees for use of the Tennis Facilities and may reserve tennis court times seven days in advance and one day in advance on center court.

(e)   Signature Non-Resident Golf Membership.  A Signature Non-Resident Golf Membership is refundable and recallable pursuant to the Club's refund policies and procedures.  Signature Non-Resident Golf Memberships will be excluded from the CAP.  A "Signature Non-Resident Golf Membership" entitles a Signature Non-Resident Golf Member and his/her Immediate Family to use all of the Club Facilities.  Except as otherwise provided herein, Signature Non-Resident Golf Members shall not pay green fees for use of the Golf Courses, but shall pay golf cart fees or trail fees.  A Member in this class will not be permitted to reside within a 50 mile radius of the Club for more than 180 days per calendar year.  Members in this class will be limited to aggregate of 16 rounds of golf per month.  A Signature Non-Resident Golf Member will have limited use of the Tennis Facilities for a total of 40 days during any 90 day period.

Signature Non-Resident Golf Members are not required to pay any court fees for use of the Tennis Facilities and may reserve tennis court times seven days in advance and one day in advance on center court.

Annually, a Signature Non-Resident Golf Member shall provide the Club with proof of his/her Non-Resident status by providing copies of two of the following documents; driver's license (or state identification card), passport (only for Members who are not U.S. citizens), tax return (with financial information deleted), or voter registration.  Failure to present such proof shall be grounds for termination as set forth in Article III of these Rules and Regulations.

(f)   Signature Non-Resident Sport Memberships.  A Signature Non-Resident Sport Membership is refundable pursuant to the Club's refund policies and procedures and is recallable.  A "Signature Non-Resident Sport Membership" entitles a Signature Non-Resident Sport Member and his/her Immediate Family to use the Club Facilities.  A Signature Non-Resident Sport Member may only play golf on the Resort Course upon payment of applicable green fees and golf cart fees, subject to availability of tee times and the rights of the Members.  Signature Non-Resident Sport Members may reserve tee times two days in advance on the

7

Resort Course and are not permitted to play on the Member Course. A Signature Non-Resident Sport Member in this class will not be permitted to reside within a 50 mile radius of the Club for more than 180 days per calendar year. Signature Non-Resident Sport Members are limited to playing golf four times per calendar month. The green fee rate charged for golf will be the lower of either 35% off the then posted rate for Resort Guests or the lowest advertised rate.

Signature Non-Resident Sport Members are not required to pay any court fees for use of the Tennis Facilities and may reserve tennis court times seven days in advance and one day in advance on center court.

Annually, a Signature Non-Resident Sport Member shall provide the Club with proof of his/her Non-Resident status by providing copies of two of the following documents: driver's license (or state identification card), passport (only for Members who are not U.S. citizens), tax return (with financial information deleted), or voter registration. Failure to present such proof shall be grounds for termination as set forth in Article III of these Rules and Regulations.

(g)     Villa Signature Sport Membership. A Villa Signature Sport Membership is not refundable and is recallable subject to the terms of the Addendum to the Club at La Costa Signature Membership Plan for La Costa Resort Villa ("Addendum") and the Villa Signature Sport Membership License Agreement/Application ("Villa Application"). A "Villa Signature Sport Membership" entitles such Member and his/her Immediate Family to use the Club Facilities on the same basis as a Signature Sport Member subject to the terms and conditions as provided in the Addendum and Villa Application. A Villa Signature Sport Membership is limited to owners of a Unit in the La Costa Resort Villa.

(h)     Charter and Founder Memberships. "Charter and Founder Memberships" permit the Charter and Founder Members unlimited use of the Club Facilities in accordance with such Member's Application and these Rules and Regulations, as the same may be amended from time to time. Charter and Founder Members shall also have the right to use the Spa upon payment of such charges and fees as shall be established from time to time by the Club. No new Charter or Founder Memberships will be offered.

(i)     Regular Memberships. "Regular Memberships" permit a Regular Member unlimited use of the Club Facilities in accordance with such Member's Application and these Rules and Regulations, as the same may be amended from time to time. Regular Members shall also have the right to use the Spa upon payment of such charges and fees as shall be established from time to time by the Club. Regular Memberships will expire on November 16, 2006, if extended; otherwise they expired on November 16, 2001. No new Regular Memberships will be offered.

(j)     Non-Resident Memberships. "Non-Resident Memberships" permit a Non-Resident Member to use the Club Facilities in accordance with such Member's Application and these Rules and Regulations, as the same may be amended from time to time. A Non-Resident Member (i) shall retain a principal and legal voting residence either (x) outside of the State of California, or (y) within the State of California and north of Santa Clara County; and (ii) shall not reside in any California county southward from Santa Clara County for more than 180 days in any calendar year. A Non-Resident Member and his/her Immediate Family shall have the

8

right to make use: (A) of the Golf Courses for a total of 16 combined rounds per month; and (B) of the Tennis Facilities for a total of 40 days during any 90 day period. Such usage shall be calculated in the aggregate for such Non-Resident Member and his/her Immediate Family. The aggregate use of the Non-Resident Member and his/her Immediate Family may not exceed the limits set forth in this paragraph. If such Non-Resident Member's aggregate use exceeds these limits then: (1) such Non-Resident Member shall pay the same dues and minimum food and beverage charges as a Regular Member for the applicable one month period; and (2) the Club may, in its sole and absolute discretion, impose expulsion or other sanctions in accordance with Article III of these Rules and Regulations. Non-Resident Members shall also have the right to use the Spa upon payment of such charges and fees as shall be established from time to time by the Club. The Non-Resident Memberships will expire on November 16, 2006, if extended; otherwise they expired November 16, 2001. No new Non-Resident Memberships will be offered.

In the event that any Non-Resident Member becomes a Resident, his/her Non-Resident Membership shall thereupon immediately terminate. Annually, with payment of his/her January billing statement, a Non-Resident Member shall provide the Club with proof of his/her Non-Resident status by providing copies of two of the following documents: driver's license (or state identification card), passport (only for Non-Resident Members who are not U.S. citizens), tax return (with financial information deleted) or voter registration. In addition, the Club may require any Non-Resident Member to present proof of his/her residence and place of business at any time. Failure to present such proof shall be grounds for termination as set forth in Article III, below.

(k)    Tennis Memberships. Tennis Memberships expired on November 16, 2001. No new Tennis Memberships will be offered.

(l)    Presidential Memberships (f/k/a Presidents List). Persons presented with "Presidential Memberships" by the previous owner(s) of the Resort shall have the Privileges and shall be subject to the limitations established and prescribed by the Club. The Presidential Membership of such person(s) may be terminated or his/her Privileges changed at any time at the Club's sole and absolute discretion. Presidential Memberships are not transferable.

(m)    Preferred Family Resident Memberships (f/k/a Preferred Resident Memberships). A "Preferred Family Resident Membership" permits a Preferred Family Resident Member and his/her Immediate Family unlimited use of the Club Facilities, in accordance with such Preferred Resident Member's Application and these Rules and Regulations, as the same may be amended from time to time. Preferred Family Resident Members shall also have the right to use the Spa upon payment of such charges and fees as shall be established from time to time by the Club. Preferred Family Resident Memberships will expire on December 31, 2021. No new Preferred Family Resident Memberships will be offered.

(n)    Preferred Single Resident Memberships. A "Preferred Single Resident Membership" permits a Preferred Single Resident Member unlimited use of the Club Facilities in accordance with such Preferred Single Resident Member's Application and these Rules and Regulations, as the same may be amended from time to time. Preferred Single Resident Members shall also have the right to use the Spa upon payment of such charges and fees as

9

shall be established from time to time by the Club.  A Preferred Single Resident Member must be a single adult over 21 years of age.  Preferred Single Resident Memberships will expire on December 31, 2021.  No new Preferred Single Memberships will be offered.

(o)  <u>Preferred Non-Resident Memberships</u>.  A "Preferred Non-Resident Membership" permits a Preferred Non-Resident Member to use the Club Facilities in accordance with such Preferred Non-Resident Member's Application and these Rules and Regulations, as the same may be amended from time to time.  Preferred Non-Resident Members shall (i) retain a principal and legal voting residence either (x) outside of the State of California, or (y) within the State of California and north of Santa Clara County; and (ii) not reside in any California county southward from Santa Clara County for more than 180 days in any calendar year.  A Preferred Non-Resident Member and his/her Immediate Family shall have the right to make use: (A) of the Golf Courses for a total of 16 combined rounds per month; and (B) of the Tennis Facilities for a total of 40 days during any 90 day period.  Such usage shall be calculated in the aggregate for such Preferred Non-Resident Member and his/her Immediate Family.  The aggregate use of the Preferred Non-Resident Member and his/her Immediate Family may not exceed the limits set forth in this paragraph.  If such Preferred Non-Resident Member's aggregate use exceeds these limits, then: (1) such Preferred Non-Resident Member shall pay the same dues and minimum food and beverage charges as a Preferred Family Resident Member for the applicable one month period; and (2) the Club may, in its sole and absolute discretion, impose expulsion or other sanctions in accordance with Article III of these Rules and Regulations.  Preferred Non-Resident Members shall also have the right to use Spa upon payment of such charges and fees as shall be established from time to time by the Club.  Preferred Non-Resident Memberships will expire on December 31, 2021, and may not be sold or transferred to any other party.

In the event that any Preferred Non-Resident Member becomes a Resident, his/her Preferred Non-Resident Membership shall terminate immediately.  Annually, with payment of his/her January billing statement, a Preferred Non-Resident Member shall provide the Club with proof of his/her Non-Resident status by providing copies of two of the following documents: driver's license (or state identification card), passport (only for Non-Signature Members who are not U.S. citizens), tax return (with the financial information deleted) or voter registration.  In addition, the Club may require any Preferred Non-Resident Member to present proof of his/her residence and place of business at any time.  Failure to present such proof shall be grounds for termination as set forth in Article III, below.

(p)  <u>Preferred Corporate Memberships</u>.  "Corporate Designees" (as defined below) of a Preferred Corporate Membership are permitted unlimited use of the Club Facilities in accordance with such Preferred Corporate Member's Application and these Rules and Regulations, as the same may be amended from time to time.  The Corporate Designees of Preferred Corporate Members shall also have the ability to use the Spa upon payment of such charges and fees as shall be established from time to time by the Club.  Preferred Corporate Memberships will expire on December 31, 2021.  No new Preferred Corporate Memberships will be offered.

The Preferred Corporate Membership covers the following individuals ("Corporate Designees"): either (i) two adults over 21 years of age, who are employed by the

company named in the Application, and their respective Immediate Families; or (ii) three adults over 21 years of age who are employed by the company named in the Application, but not their Immediate Families of such three Corporate Designees. In connection with option (i) above, up to two additional Corporate Designees who are employed by the company named in the Application and their respective Immediate Families may be added to the Preferred Corporate Membership upon payment of such additional charges, dues and fees as may be established by the Club. The company named in the Application must be a corporation or some other form of legal entity that engages in a legally bonafide business. The Club may require proof of employment with the named company at any time. Failure to present such proof shall be grounds for termination as set forth in Article III, below.

(q)     Preferred Tennis Memberships. A "Preferred Tennis Membership" permits a Preferred Tennis Member unlimited use of the Tennis Facilities in accordance with such Preferred Tennis Member's Application and these Rules and Regulations, as the same may be amended from time to time. Preferred Tennis Members shall also have the right to use the Spa upon payment of such charges and fees as shall be established from time to time by the Club. Preferred Tennis Memberships will expire on December 31, 2021. No new Preferred Tennis Memberships will be offered.

(r)     Executive Single Memberships. An "Executive Single Membership" permits an Executive Single Member unlimited use of the Club Facilities in accordance with such Executive Single Member's Application and these Rules and Regulations, as the same may be amended from time to time. Executive Single Members shall also have the right to use the Spa upon payment of such charges and fees as shall be established from time to time by the Club. The Executive Single Membership grants Privileges to the Immediate Family of such Executive Single Member. The Executive Single Membership will expire five years from the date such Member's Application was accepted by the previous owner(s). No new Executive Single Memberships will be offered.

(s)     Preferred Resident and Non-Resident Junior Memberships. A "Preferred Resident Junior Membership" permits a Preferred Resident Junior Member unlimited use of the Club Facilities in accordance with such Preferred Junior Member's Application and these Rules and Regulations, as the same may be amended from time to time. Preferred Resident Junior Members shall also have the right to use the Spa upon payment of such charges and fees as shall be established from time to time by the Club. A "Preferred Non-Resident Junior Membership" requires a Preferred Non-Resident Junior Member" to meet the same non-residency requirements as Preferred Non-Resident Members set forth in Article II, Section 3(o) above and allows the use: (A) of the Golf Courses for a total of 16 combined rounds per month; and (B) of the Tennis Facilities for a total of 40 days during any 90 day period. A Preferred Non-Resident Junior Member's use may not exceed the limits set forth in this paragraph. If such Preferred Non-Resident Junior Member's use exceeds these limits, then: (1) such Preferred Non-Resident Junior Member shall pay the same dues and minimum food and beverage charges as a Preferred Resident Junior Member for the applicable one month period, and (2) the Club may, in its sole and absolute discretion, impose expulsion or other sanctions in accordance with Article III of these Rules and Regulations. Preferred Non-Resident Junior Members shall also have the right to use the Spa upon payment of such charges and fees as

11

shall be established from time to time by the Club.  No new Preferred Resident or Non-Resident Junior Memberships will be offered.

In the event that any Preferred Junior Non-Resident Member becomes a Resident, his/her Preferred Junior Non-Resident Membership shall terminate immediately. Annually, a Preferred Non-Resident Junior Member shall provide the Club with proof of his/her Non-Resident status by providing copies of two of the following documents: driver's license (or state identification card), passport (only for Members who are not U.S. citizens), tax return (with financial information deleted) or voter registration.

In addition, the Club may require any Preferred Non-Resident Junior Member to present proof of his/her residence and place of business at any time.  Failure to present such proof shall be grounds for termination as set forth in Article III, below.  The Preferred Junior Memberships (both Resident and Non-Resident) will expire upon the earlier to occur of either (x) December 31, 2021, or (y) the first day of the calendar year in which such Junior Member reaches his/her 22nd birthday.

(t)      Legendary Resident Memberships.  A "Legendary Resident Membership" permits a Legendary Resident Member and his/her Immediate Family unlimited use of the Club Facilities in accordance with such Legendary Member's Application and these Rules and Regulations, as the same may be amended from time to time.  Legendary Resident Members shall also have the right to use the Spa upon payment of such charges and fees as shall be established from time to time by the Club.  Legendary Resident Memberships will expire on December 31, 2060.  Legendary Resident Memberships may be terminated earlier in accordance with Article III of the Rules and Regulations.  No new Legendary Resident Memberships will be offered.

(u)      Legendary Non-Resident Memberships.  A "Legendary Non-Resident Membership" permits a Legendary Non-Resident Member to use the Club Facilities in accordance with such Legendary Non-Resident Member's Application and these Rules and Regulations, as the same may be amended from time to time.  Legendary Non-Resident Members shall (i) retain a principal and legal voting residence either (x) outside of the State of California, or (y) within the State of California and north of Santa Clara County; and (ii) not reside in any California county southward from Santa Clara County for more than 180 days in any calendar year.  A Legendary Non-Resident Member and his/her Immediate Family shall have the right to make use: (A) of the Golf Courses for a total of 16 combined rounds per month; and (B) of the Tennis Facilities for a total of 40 days during any 90 day period.  Such usage shall be calculated in the aggregate for such Legendary Non-Resident Member and his/her Immediate Family.  The aggregate use of the Legendary Non-Resident Member and his/her Immediate Family may not exceed the limits set forth in this paragraph.  If such Legendary Non-Resident Member's aggregate use exceeds these limits, then: (1) such Legendary Non-Resident Member shall pay the same dues and minimum food and beverage charges as a Legendary Resident Member for the applicable one month period, and (2) the Club may, in its sole and absolute discretion, impose expulsion or other sanctions in accordance with Article III of these Rules and Regulations.  Legendary Non-Resident Members shall also have the right to use Spa upon payment of such charges and fees as shall be established from time to time by the

12

Club.  The Legendary Non-Resident Memberships will expire on December 31, 2060.  No new Legendary Memberships will be offered.

In the event that any Legendary Non-Resident Member becomes a Resident, his/her Legendary Non-Resident Membership shall terminate immediately.  Annually, with payment of his/her January billing statement, a Legendary Non-Resident Member shall provide the Club with proof of his/her Non-Resident status by providing copies of two of the following documents: driver's license (or state identification card), passport (only for Non Signature Members who are not U.S. citizens), tax return (with the financial information deleted) or voter registration.  In addition, the Club may require any Legendary Non-Resident Member to present proof of his/her residence and place of business at any time.  Failure to present such proof shall be grounds for termination as set forth in Article III, below.

(v)      <u>Legendary Tennis Memberships</u>.  A "Legendary Tennis Membership" permits a Legendary Tennis Member unlimited use of the Tennis Facilities in accordance with such Legendary Tennis Member's Application and these Rules and Regulations, as the same may be amended from time to time.  Legendary Tennis Members shall also have the right to use of the Spa upon payment of such charges and fees as shall be established from time to time by the Club.  Legendary Tennis Memberships will expire on December 31, 2060.  Legendary Tennis Memberships may be terminated earlier in accordance with Article III of these Rules and Regulations.  No new Legendary Tennis Memberships will be offered.

## SECTION 4      PRIVILEGES OF THE CLUB.

By payment of the Membership Deposit or Initiation Fee and annual dues (and/or other applicable dues and charges), and subject to scheduling at the sole and absolute discretion of the Club with respect to all Club Facilities (other than the Members' Club Room), all Members (excluding Presidential Members) and their Immediate Family and such other classes of Members designated by the Club, are entitled to the following:

(a)      Play on the Member Course or Resort Course, subject to their Privileges as defined herein (amount of play as specified by the applicable Membership, not applicable to Tennis, Preferred Tennis or Legendary Tennis Memberships);

(b)      use of the fitness and Tennis Facilities;

(c)      use of the Spa (upon payment of applicable entrance and service fees established by the Club from time to time); and

(d)      use of the golf locker room on play days (not applicable to Tennis, Preferred Tennis and Legendary Tennis Memberships.)  Personal lockers may be available upon payment of an additional charge established by the Club from time to time; however, Signature Golf Members have priority to lockers.

13

## SECTION 5    FAMILY MEMBERSHIP PRIVILEGES.

The Immediate Family of all classes and classifications of Membership (except all classes and classifications of Junior Memberships) may enjoy the Membership Privileges of the Club, subject to the restrictions and limitations of their respective Membership class or classification.

A Member living together with another individual in the same household as a registered domestic partner may designate the other individual on a Membership Year basis to use the Club Facilities as an Immediate Family member. The total number of adults who may have Immediate Family Membership Privileges is limited to two adults per Membership. The Member and the domestic partner shall be individually and jointly responsible for the payment of all charges and fees incurred by the domestic partner. The Club reserves the right to establish such fees and other rules and require the Member and domestic partner to submit such information and forms as the Club deems appropriate.

## SECTION 6    CHILDREN.

Members are responsible for the conduct and safety of his/her children and their children's guests. Children under 12 years of age are permitted to use the Club Facilities only if accompanied or supervised by an adult. Children under 16 years of age are not permitted to use the locker rooms unless accompanied by an adult. Children under 16 years of age are not permitted in the health and Fitness Facilities. Children under the lawful drinking age are not permitted in any lounge unless accompanied by an adult.

## SECTION 7    MEMBERSHIP CARD.

When a person has satisfied all of the requirements set forth in these Rules and Regulations, has been approved by the Management of the Club as a Member, and has paid the Membership Deposit and other sums that may then be required by the Club, a Membership Card including a membership number, in the form and substance adopted by the Club shall be delivered to such Member. The name and address of each Member and the date of issuance of the Membership shall be entered in the records of the Club.

A Membership Card indicating a club account number and type of Membership shall be issued to each Member as well as the members of his/her Immediate Family eligible for Membership Privileges. Members and his/her Immediate Family must have their Membership Cards with them at all times while using the facilities of the Club.

A Membership Card may not be used by any person other than the person to whom it is issued. Membership Cards are not transferable.

In the event of a lost or stolen Membership Card, the Club must be notified immediately. The account will be canceled and placed on "call security". Until notification of card loss or theft is received in writing by the Club, the Member shall be responsible for all charges placed on the account. For each new Membership Card replaced, a charge covering the cost of the replacement card and administrative fees will be placed on such Member's club account.

C-95

**SECTION 8    ONE TIME TRANSFER OF LEGENDARY MEMBERSHIPS.**

The Legendary Membership (whether Resident, Non-Resident, or Tennis), prior to the termination thereof, may be transferred once by the Legendary Member to one person ("Transferee") who is the spouse, son or daughter (including stepchildren) of such Member, subject to compliance with the following:

(a)    <u>One Time Transfer</u>.  Each Legendary Membership is entitled to only one transfer under this provision.  Accordingly, if a Legendary Member transfers a Legendary Membership hereunder, neither the Transferee nor a buyer of such Membership under Section 9 below may transfer the Membership under this provision.  The issuance of a Membership to a spouse upon the death of a Legendary Member pursuant to Article III, Section 1(j), does not constitute the one time transfer under this section.

(b)    <u>Application</u>.  A Membership Application shall be submitted by the Transferee in writing, signed by the Transferee.

(c)    <u>Transfer Fee</u>.  The Membership Application shall be accompanied with payment, in full, of a transfer fee in an amount to be established by the Club in its sole and absolute discretion.

(d)    <u>Management of the Club Review and Notification</u>.  Management of the Club shall review all Applications.  The Management of the Club shall notify, in writing, each Applicant of the decision regarding Membership.  If the Transferee is approved by the Management of the Club, the transfer shall be effective and a Membership Card shall be issued to the Transferee.  If the Application is rejected by Management of the Club, the funds previously deposited with the Club will be returned to the Transferee.

(e)    <u>Good Standing</u>.  The Legendary Member seeking to transfer his/her Membership must be alive and in good standing and must, prior to submittal of the Transferee's Membership Application, pay all outstanding obligations owed to the Club by the Member.

In the event that a Legendary Membership is transferred hereunder, the new Legendary Member will have all rights and obligations thereof except the right to transfer under this Section.

A Legendary Membership which converts to a Signature Membership is entitled, upon approval from the Club, to a one time transfer to a spouse, son or daughter (including stepchildren) with no additional Membership Deposit.  The new Membership will have a term of 30 years.

**SECTION 9    SALABILITY.**

(a)    <u>Membership Salability</u>.  All Signature Memberships will be sold by the Club. Charter and Founder Memberships, Non-Resident Memberships, Preferred Non-Resident Memberships, Preferred Resident and Non-Resident Junior Memberships, Presidential Memberships, Executive Single Memberships, Preferred Tennis Memberships (excluding the

"Converted Tennis Memberships" described below), and Legendary Non-Resident Memberships are at all times non-salable and non-assignable to third parties. Regular Memberships, Preferred Family Resident Memberships, Preferred Single Resident Memberships, Preferred Corporate Memberships, Converted Tennis Memberships, and Legendary Resident Memberships ("Salable Memberships") may be sold upon the terms and conditions set forth in this Section. A Preferred Tennis Member who (i) had originally purchased a Tennis Membership (expiring in 2001), (ii) converted to a Preferred Tennis Membership (expiring in 2021), and (iii) paid at least $6,000 in Initiation Fees with respect to such Tennis Memberships shall be deemed to hold a "Converted Tennis Membership."

(b)    Method of Sale. The Club is under no obligation to purchase any Salable Membership, and is not in any way responsible for assisting a Non-Signature Member in selling or securing a purchaser for any Salable Membership. Moreover, no Non-Signature Member may attempt to sell any Salable Membership through any form of advertisement or public communication, including without limitation, mail, fax machines, television, radio, newspapers, advertising circulars, handbills, public notices, the Internet, or other on-line or off-line computer services. The Non-Signature Member is permitted to attempt to sell his/her Salable Membership through direct communications to his/her family, friends, business associates, acquaintances and referrals from any of the foregoing. No Non-Signature Member may attempt to sell any Membership that is non-salable under Section 9(a) above. A violation of this subsection (b) shall subject the Non-Signature Member to expulsion or other sanctions under Article III.

(c)    Right of First Refusal. The Club shall have a right of first refusal to repurchase any Salable Membership sought to be sold. This right of first refusal shall be exercisable by the Club, in its sole and absolute discretion, at any time within 60 days of receiving notice from the Non-Signature Member that such Member desires to sell his/her Membership to a third party as specified in subparagraph (d) below. The Club may, in its sole and absolute discretion, exercise its right to repurchase a Non-Signature Membership at a price which is equal to the amount of the actual Initiation Fee paid for the Membership by such Non-Signature Member, less the amount of any fees or dues outstanding and less the amount of any administrative fee or charge established by the Club, which is presently the greater of either (x) ten percent of the selling Non-Signature Member's actual Initiation Fee paid, or (y) the administrative fee or charge then in effect, as established by the Club from time to time. In no event shall a Non-Signature Member receive an amount for his/her Membership in excess of the actual Initiation Fee paid. The Club does not maintain a list of Salable Memberships to be sold.

(d)    Conditions on Sale of a Membership. The Non-Signature Member shall provide the Club with written notice of such Member's desire to sell or his/her Salable Membership to a potential purchaser. The Non-Signature Member shall deliver the notice to the Club by personal delivery, overnight express mail or certified mail, return receipt requested. Thereafter, the Club shall provide the applicable Membership Application for completion and execution. Any and all sales shall be approved by and at the sole discretion of the Club, and are the subject to the conditions set forth below:

The selling Non-Signature Member's dues and charges shall be paid in full;

Dues and charges will continue to be billed and payable to such selling Non-Signature Members up to and until the actual date of sale.  Any dues or other payments which were paid in advance by the selling Non-Signature Member will be prorated and refunded to the selling Non-Signature Member, as of the date of sale;

Each notice for a sale of a Salable Membership shall be in a form provided, or otherwise approved, by the Club and shall be accompanied by a Membership Application completed by the proposed purchaser and the then-current Initiation Fee for the specific class of such Salable Membership.  In the event the Club has discontinued the sale of the applicable salable membership, which it is permitted to do in its sole and absolute discretion, then the Initiation Fee to be paid by the purchaser of such Salable Membership shall be the last current Initiation Fee for the specific class of such Membership just prior to its discontinuance.  In the event the proposed purchaser is accepted for Membership, the selling Non-Signature Member shall receive a return of his/her actual Initiation Fee paid less an administrative fee or charge in an amount established by the Club, which amount is presently the greater of either (x) ten percent of the selling Non-Signature Member's actual Initiation Fee paid, or (y) the administrative fee or charge then in effect, as established by the Club from time to time.  In no event shall a selling Non-Signature Member receive an amount for his/her Membership in excess of his/her actual Initiation Fee paid, less the administrative fee or charge.

(e)     <u>Divorce or Separation</u>.  When a Membership is issued in the name of more than one person, each person will be jointly and severally liable for all dues, fees and other charges and liabilities associated with the Membership.  In the event of the divorce or legal separation of married Members and his/her spouse are both deemed to be Members, the Membership, including all of its Privileges and benefits will vest in the spouse awarded the Membership by an agreement of separation or a decree of divorce.  Until the award of the Membership and use Privileges, both spouses will be jointly and severally liable for all dues and charges.  Any and all dues and other charges which accrue prior to any change in a Member's family or Membership status, as set forth above, shall continue to be due and owed from such Member regardless of whether or not he/she retains the Membership in the Club.

## SECTION 10   INACTIVE STATUS:

(a)     <u>Electing Inactive Status</u>.  Charter Members, Founder Members, Regular Members, Non-Resident Members, Preferred Single Resident Members, Preferred Non-Resident Members, Preferred Corporate Members, Preferred Tennis Members, Legendary Resident Members, Legendary Non-resident Members and Legendary Tennis Members shall all have the right to elect "Inactive Status" as more specifically set forth below.  Signature Members, Presidential Members, Preferred Junior Members, and Executive Single Members shall not have this right.  A Non-Signature Member who has elected Inactive Status shall not have any Privileges with respect to the use of any Club Facilities and/or Resort Facilities during the period of Inactive Status.

(b)     <u>Conditions on Inactive Status</u>.  The eligible Non-Signature Member may elect Inactive Status for a period of one year by providing the Club with written notice thereof, during which time such Member may discontinue paying dues; provided, however, that at the time of such election such Member shall not be delinquent in the payment of any dues or

17

charges.  With respect to a Charter or Founder Member only, if such Charter or Founder Member is successful in introducing a new Signature Member to the Club and such new Member purchases a then offered Signature Membership at the then-current Membership Deposit during the one year period on Inactive Status, the Club will offer to purchase such inactive Charter or Founder Membership at the rate of $6,000 for a Charter Membership and $3,000 for a Founder Membership.

(c)     Election to Reactivate Status.  A Non-Signature Member who has elected Inactive Status as set forth in Section 10(b) above, shall have a one time right to reactivate his/her Non-Signature Membership by informing the Club in writing of such reactivation prior to the earlier to occur of: (i) the expiration of the one year inactive period; or (ii) the sale of such Non-Signature Membership.  Such reactivation shall only be effective upon the Club's receipt of the Non-Signature Member's written notice and such Member's payment of all dues, charges and fees which would otherwise have accrued and been payable had such Inactive Status not been elected.  Upon reactivation, the Non-Signature Member's Privileges for the use of the Club Facilities and Resort Facilities shall be fully reinstated.

(d)     Except for the one time right to reactivate the Non-Signature Membership set forth in Section 10(c) above, an election of Inactive Status is irrevocable.  At the end of one year after the eligible Non-Signature Member elects Inactive Status, without either: (i) a sale of the Regular Membership, Preferred Family Resident Membership, Preferred Single Resident Membership, Preferred Corporate Membership, converted Tennis Membership or Legendary Resident Membership (as applicable), (ii) a repurchase by the Club of the Charter or Founder Membership (as set forth in Section 10(b) above), or (iii) a reactivation of the Non-Signature Membership, if applicable, such Non-Signature Member shall be deemed to have resigned from the Non-Signature Membership, and such Membership shall be terminated.  In the event of such a resignation from and termination of Non-Signature Membership, such Non-Signature Member shall not be entitled to the return of the Initiation Fee or any other monies from the Club.

# SECTION 11     A MEMBERSHIP MAY NOT BE PLEDGED EXCEPT FOR PURCHASE MONEY OBLIGATIONS.

A Member may not pledge or hypothecate a Membership except to the extent the lien or security interest is incurred as a result of obtaining such Membership.  The holder of any security interest in the Membership shall not be deemed to be a Member, and shall not have the right to use Club Facilities, before or after foreclosure upon any security interest unless and until approved for such Membership and transfer of such Membership in accordance with the Rules and Regulations as set forth herein and the Signature Membership Plan.

18

# ARTICLE III
## TERMINATION, EXPULSION AND SANCTIONS

## SECTION 1    CAUSES OF TERMINATION.

Members are responsible for their own conduct and for the conduct of their family and guests.  Any Member whose conduct or whose family's or guest's conduct shall be deemed by the Club to be improper or likely to endanger the welfare, safety, harmony or good reputation of the Club or its Members, may be reprimanded, fined, suspended or expelled from the Club and have all Privileges associated with the Membership suspended or terminated by the Club. The Club shall be the sole judge of what constitutes improper conduct likely to endanger the welfare, safety, harmony or good reputation of the Club or its Members.

The Membership of Members shall terminate upon the occurrence of any of the following events[3]:

(a)    The resignation of the Member,

(b)    The unauthorized sale of any Membership or Membership Designee status in any form, part or parcel, including the advertisement or other solicitation in any form of a Membership for sale by a Member, designee or agent;

(c)    The failure of a Signature Non-Resident Golf Member, Signature Non-Resident Sport Member, Non-Resident Member, Preferred Non-Resident Member, Preferred Non-Resident Junior Member, or Legendary Non-Resident Member to provide proof reasonably satisfactory to the Club of non-residency as set forth in these Rules and Regulations;

(d)    A Signature Non-Resident Member, Signature Non-Resident Sport Member, Non-Resident Member, Preferred Non-Resident Member, Preferred Non-Resident Junior Member, or Legendary Non-Resident Member becoming a Resident;

(e)    The failure of a Corporate Designee of a Preferred Corporate Member, or any Designee of a Signature I Corporate Member or Signature II Corporate Member to provide proof, reasonably satisfactory to the Club, of employment with the company in whose name the Corporate Membership was issued as set forth in these Rules and Regulations;

(f)    The failure of a Preferred Corporate Member or Signature I Corporate Member or Signature II Corporate Member to provide proof, reasonably satisfactory to the Club, that it engages in a legally bonafide business;

(g)    In the case of a Corporate Designee of a Preferred Corporate Member or any Designee of a Signature I Corporate Member or Signature II Corporate Member ceasing to be an employee of the company named in the application;

(h)    The expulsion of a Member pursuant to Section 2 below;

---

[3] Section (i) shall not apply to any Signature Membership classes as stated in the Signature Membership Plan.

(i)      The recall of Non-Signature Memberships, Non-Resident Signature Golf and Sport Memberships pursuant to Section 5 below, and

(j)      The death of a Non-Signature Member.  Upon the death of a Non-Signature Member, the following rules shall apply:

A Non-Signature Member's Membership terminates upon his/her death with the exception, however, that upon the death of a Charter Member, Founder Member, Regular Member, Tennis Member, Non-Resident Member, Preferred Family Resident Member, Preferred Tennis Member, Preferred Non-Resident Member, Legendary Resident Member, Legendary Non-Resident Member and Legendary Tennis Member, the applicable Membership shall be issued in the name of the then legal spouse or domestic partner, if any, and upon the death of a Corporate Designee of a Preferred Corporate Member, the named corporate entity shall designate a new individual to utilize the Preferred Corporate Membership;

A Non-Signature Membership may not be willed, placed in a trust, bequeathed, or otherwise transferred upon the death of any Non-Signature Member, except as provided in (i) above, and;

A Non-Signature Member's estate, spouse or domestic partner and heirs shall not be entitled to a refund of any portion of the Initiation Fee paid for the applicable Membership.

Any such Member shall be notified of such proposed action and shall be given an opportunity to be heard by at least three members of the Management of the Club to show cause why he/she should not be disciplined.  If such Member desires to be heard, the Club shall set a time and date (not less than ten days thereafter) for such hearing.  The Club may without a hearing, immediately suspend some or all Privileges associated with a Membership while a complaint is being reviewed by the Club.  The Club may without a hearing, immediately suspend some or all Privileges associated with a Membership and/or, after notice, terminate a Membership for failure to pay Membership dues and club account charges.  The Management of the Club shall be the sole binding authority on all disciplinary actions.  The Club may suspend a Member and/or their Immediate Family and/or guests from some or all Membership Privileges for such period as may be determined by the Club.  Dues and other obligations shall accrue during such suspension and shall be paid in full before reinstatement of any Privileges.  The Club has the right to deduct any outstanding debt(s) from the Membership Deposit before a refund is generated.  Furthermore, the Club may at its option take whatever action it deems necessary to effect collection.

A Signature Membership terminated by the Club for disciplinary cause shall be deemed resigned and the Membership Deposit only not including any Initiation Fees paid to the previous owner(s), shall be refunded upon the resale of the Membership as provided in the rules applicable upon death of a Signature Member as set forth in the Signature Membership Plan.

## SECTION 2    EXPULSION AND OTHER SANCTIONS FOR CAUSE.

The Owner may expel or impose other lesser sanctions on any Member for good cause as provided herein.

(a)    <u>Good Cause</u>.  The following conduct constitutes good cause hereunder ("Good Cause"):

<u>Payment Default</u>.  A Member has defaulted in the payment of any sums due to the Club (including, without limitation, charges incurred by the Immediate Family or Club Guests) by either: (a) failing on two or more occasions to pay the Club all amounts due within 30 days of the date any billing statement is issued by the Club; or (b) failing to pay the Club all amounts due within 60 days of the date any billing statement is issued by the Club;

<u>Felony</u>.  A Member and/or their Immediate Family are convicted of a felony, federal crime or serious misdemeanor;

<u>False Information</u>.  The Member submits false information on his/her Membership Application;

<u>Non-Permitted Use</u>.  The Member, their Immediate Family or a Club Guest allows the Membership to be used by a person not authorized under these Rules and Regulations;

<u>Theft</u>.  The theft by a Member, their Immediate Family, or a Club Guest of (i) any of the Owner's property, wherever located; or (ii) any property owned by any person or entity on or from the Resort Facilities;

<u>Detrimental Conduct.</u>  The commission of any act or omission by a Member, their Immediate Family or a Club Guest in or about Club Facilities or the presence of such person or persons upon Club Facilities which is detrimental to the best interests of the Club or the Owner.  Such detrimental conduct includes without limitation, any of the following: (i) any verbal abuse, harassment, assault, battery or threatened or actual inappropriate physical contact on Resort Facilities or against any Member, Club Guest, Resort Guest or employee or personnel of the Owner; (ii) any attempt to intimidate or bribe any employee or personnel of the Owner; (iii) damaging, destroying or vandalizing any of the Resort Facilities or any other property of the Owner; or (iv) any other behavior which is detrimental to or disruptive of normal operations of the Resort Facilities or of the Owner.

<u>Safety Violations</u>.  A Member or their Immediate Family or Club Guest which acts in any way that creates or is likely to create an unsafe environment to themselves or others, including but not limited to Members, Club Guests or employees;

<u>Rules Violations</u>.  A violation of (i) any of the Rules and Regulations contained herein, and all amendments and modifications thereto and restatements thereof.

(b)     Notice of Hearing.  In the event the Club determines to seek any sanction against a Member under this Section, the Club shall provide such Member written notice which shall state: (i) the date, time and place of a hearing to be held by the Management of the Club to hear and consider the matter as provided in this Section; (ii) a general summary of the reason or reasons for the hearing and potential sanctions: and (iii) the sanctions which the Club will request Management of the Club to consider.  The notice shall be given in accordance with Article VI of these Rules and Regulations.

(c)     Hearing.  Unless the Club and the Member agree otherwise, Management of the Club shall hold a hearing not less than 15 calendar days nor more than 30 calendar days after the date the notice under subsection (b) above is deemed given.  At the hearing, the Club shall present information of Good Cause as defined in subsection (a) above.  The Member shall have the right to be present at the hearing, and may present any information on his/her behalf. Management of the Club shall, in its sole and absolute discretion, determine whether to permit and consider any particular information offered, and may permit and consider oral statements, written statements, hearsay statements and other information it deems appropriate.

(d)     Management of the Club Decision.  After the hearing, Management of the Club shall consider whether there exists Good Cause for sanctions under this Section.  If Management of the Club concludes, in its sole and absolute discretion, that there is Good Cause, it may impose sanctions as it deems appropriate whether or not such sanctions were stated in the notice given in subsection (b) above.  Sanctions which Management of the Club may impose include without limitation: expulsion, suspension, monetary penalty, reprimand or denial or limitation of Privileges for the Member.  In the event of detrimental conduct by a Member's Immediate Family or Club Guest, permissible sanctions may also include, without limitation, the denial of Privileges to such Immediate Family or Club Guest in such manner and for such time as Management of the Club may determine.  A Member who is expelled under this Section is not entitled to the return of any Initiation Fees or any other funds subject to Article III, Section 1.  Within 15 days of the hearing, Management of the Club shall send to the Member a written "Notice of Decision", which shall state Management of the Club's decision, the imposition of sanctions, if any, and the date the sanctions, if any, are to take effect.

(e)     Interim Suspension of Privileges.  In the event the Club determines in its sole and absolute discretion that the circumstances warrant, the Club may, without notice or hearing, impose an interim suspension on a Member under which all Privileges of such Member shall be immediately suspended.  Said suspension shall end on the earlier of (i) the Notice of Decision issued by the Management of the Club; (ii) 90 days after the interim suspension is imposed; or (iii) as determined by the Club in its sole and absolute discretion.  In the event of an interim suspension, the Club must provide written notice pursuant to subsection (b) above within 24 hours of the suspension if such notice has not already been given.

## SECTION 3     ARBITRATION.

In the event there is a dispute concerning the Privileges and obligations of the Members or the Club under their respective Membership Plans, Signature Membership Plan or these Rules and Regulations, the matter shall be submitted to binding arbitration in San Diego County, State of California, by either the Club or the Advisory Board.  Such arbitration shall

comply with and be governed by the provisions of the California Arbitration Act, Sections 1280 through 1294.2 of the California Code of Civil Procedure.  Notwithstanding anything to the contrary, the arbitration panel shall consist of one neutral arbitrator selected from a panel of retired judges including judges on the Judicial Reference Panel and/or JAMS.

(a)      If the parties cannot agree to the neutral arbitrator, any party may file a petition with the appropriate court to compel arbitration together with a list of arbitrators (defined above) that would be acceptable to said petitioning party.

(b)      The arbitrator may establish a hearing and discovery schedule.  There shall be no other discovery or pre-hearing procedures permitted.  The decision by the arbitrator shall be binding on the parties.

(c)      The cost of arbitration, including reasonable attorneys' fees, shall be borne by the losing party or in such proportion as the arbitrator shall determine.  Pending resolution, the parties shall share the cost of the arbitrator.  If a party fails to pay its share, the other may advance the entire costs and treat it as damages if successful.

## SECTION 4      PAYMENT OF FEES AND CHARGES.

Upon termination, a Member shall immediately pay in full all fees, charges, expenses and other amounts owing as of the date of termination.  There shall be no refund of a Non-Signature Member's Initiation Fee paid in connection with a terminated Membership.  Upon termination, a Signature Membership will be placed on the resigned list and will be entitled to a refund of his/her Membership Deposit less any charges or fees owed the Club as set forth herein.

## SECTION 5      RIGHT TO TERMINATE.

The Club reserves, and all Members acknowledge and agree, that the Club has the right to terminate any Membership any time with or without cause, without giving any reason therefore.  The Club reserves the right to terminate any individual Non-Signature Membership or any class or classification of Membership (except all Resident Signature Membership classes, and Presidential Membership).  Upon termination the Club shall return to the Member, as the case may be, the Initiation Fee or Membership Deposit paid, at which time such class or individual Membership shall be deemed terminated less any indebtedness to the Club.  A Signature Membership terminated by the Club for disciplinary cause shall be deemed resigned and the Membership Deposit shall be refunded upon the resale of that class or classification of Membership.  However, with respect to Charter and Founder Members only, Charter Members shall receive a payment of $6,000 in lieu of the Initiation Fee actually paid by such Charter Member, and a Founder Member shall receive a payment of $3,000 in lieu of the Initiation Fee actually paid by such Founder Member.  A Member who has been terminated shall remain liable for any indebtedness of such Member.  The Club does not relinquish the right to collect in full all charge accounts and other amounts owing from such Member to the date of such termination as set forth herein.  Notwithstanding the foregoing, the Club shall not be obligated to return any part of any Initiation Fee paid to the previous owner(s) by a Non-Signature Member whose Membership has been terminated in accordance with Sections 1 and 2 above.  The receipt by the Member of the sum referred to in this section shall be such Member's sole

23

compensation and remedy for such termination and shall constitute a release from any and all liability, claims, demands, actions or causes of action arising out of or related to such termination or discontinuance.

## ARTICLE IV
## MEMBERSHIP DUES AND CHARGES

### SECTION 1    DUES.

Generally, on an annual basis (but more often as circumstances warrant as determined by the Club, the Club will determine the amount of dues, fees and charges to be payable by Members. Signature Members will pay dues in advance on a quarterly basis, in which case, the dues shall be owing and payable on or before the first day of January, April, July and October of the then Membership Year. Non-Signature Membership classifications may be required to pay dues in advance on an annual basis. The current dues for use of the Club Facilities are indicated on the Schedule of Dues and Charges document, which will be provided by the Club each Membership Year. The amount of dues for each year is subject to change as determined by the Club in its sole discretion. The Club's Membership Year will constitute the 12-month period commencing January 1 and ending December 31, unless otherwise established by the Club. Payment of dues by Members is a continuing obligation of Membership which is not suspended due to the closure of any or all of the Club Facilities which result from acts of God, natural disasters, pestilence, weather, fires, the need to replace turf and landscaping on the Club property due to disease or other unanticipated cause, requirements imposed by governmental authorities after the date hereof and any events beyond the reasonable control of the Club.

Members will receive a minimum preferred pricing of 15% off all regular priced items including food and beverage, retail, spa and rooms. All discounts on rooms will be subject to availability, including holidays and black out periods. This preferred pricing does not include banquets, special events or catered parties. This does not apply to any third party vendors/tenants offering services or lessons at the Resort.

### SECTION 2    FEES.

Signature Golf Members will be entitled to use their individually owned golf carts provided they pay an annual trail fee and execute the "Private Golf Cart Trail Fee Agreement". Signature Golf Members will have the option to purchase an annual "Golf Cart Plan". Non-Signature Members must pay a golf cart fee at the time of play regardless of ownership of a golf cart. Guests of Members must pay a guest and golf cart fee even if riding in a private golf cart with a Member. All private golf carts in existence, with current insurance certificates on file and registered with the Club as of August 1, 2002 will be permitted.

Members are required to pay golf cart fees and/or trail fees. Signature Golf Members will be entitled to purchase private golf carts, as long as an annual trail fee is paid. All Non-Signature Membership classifications will not be allowed to join the annual Golf Cart Plan.

24

SECTION 3    OUTSIDE GUEST.

In addition to Signature Membership and Non-Signature Membership classes and classifications, the Club will permit use of the Golf Courses by daily fee players as Outside Guests. Outside Guests may also be permitted to use dining, lounge, health, fitness facilities, locker rooms and Tennis Facilities at the existing published rates.

SECTION 4    MEMBER CLUB GUEST.

Club Guests of Members will be entitled to use the Club Facilities upon the payment of guest fees and will be subject to the following rules:

All guests shall be designated as either Accompanied Guests or Sponsored Guests. All individuals other than the Member and his/her Immediate Family will be deemed guests of such Member and will be subject to the guest policy of the Club and Rules and Regulations relating to Accompanied Guests and Sponsored Guests, as amended from time to time.

Accompanied Guests will be charged guest fees for the use of the Club Facilities, as determined from time to time by the Club. All purchases of services, food and beverages and merchandise by the Accompanied Guest will be charged to the Member's club account or paid at the time service is rendered.

Sponsored Guests are permitted to use the Club Facilities without being accompanied by the Member, subject to the issuance of a Sponsored Guest card so long as they play with another Member or with a forecaddie. Sponsored Guests with a Sponsored Guest cards will charge purchases at the Club Facilities to the Member's club account. Sponsored Guests must be registered by the sponsoring Member with the Club prior to arrival of the guests. Sponsored Guest cards will be issued for the length of use, not to exceed two weeks. Sponsored Guest cards must be picked up in the Club Member Services Office. The Sponsored Guest card is subject to the following conditions:

(a)    The Member does not have to give up Membership Privileges for the period of time the Sponsored Guest is using the Club Facilities.

(b)    The Club may charge an administrative fee for each Sponsored Guest card issued.

(c)    The Club must be notified of a cancellation of a Sponsored Guest card at least two days prior to the anticipated arrival date of the guest. Failure to advise the Club of the cancellation will result in the Member's club account being charged the minimum administrative fee.

All Sponsored Guest charges shall be placed on the account of the sponsoring Member unless otherwise approved by the Director of Golf. The sponsoring Member shall be responsible for the applicable daily guest fees established by the Club from time to time and all charges at the Resort incurred by the guest. The sponsoring Member is also responsible for the conduct of a guest while at the Club. If the manner, deportment or appearance of any guest is deemed unsatisfactory and not in compliance with the stated attire requirements, the

Sponsoring Member shall, at the request of the Club, cause such guests to surrender his/her Sponsored Guest card and leave the premises of the Club.

A Sponsored Guest card may be issued for the same guest only two times per year with a 14-day maximum use per visit on a non-consecutive basis.

Golf Members are allowed unlimited guests per Membership Year on the Golf Courses. However, a Member may not have the same guest more than six times during a Membership Year. Any exceptions must be approved by the Director of Golf. It is the responsibility of the Member to be informed as to whether his/her guest has exceeded this limit.

A Sponsored Guest on a gratis golf guest day will never receive a rain check. Regulations on rain checks for Members will always be posted in the golf shops. Accompanied Guests or Sponsored Guests are permitted use of the Tennis Facilities no more than three times per calendar month.

Club Guests of Members in accordance with their Membership Privileges shall pay guest and golf cart fees even if riding in a private golf cart.

## SECTION 5    CHARGE ACCOUNTS.

All food and beverage, merchandise and services can be charged to the Member's club account or paid at the time service is rendered. If the Member's club account is past due more than 30 days from the due date, the Club may at its option take whatever action it deems necessary to effect collection. If the Member's club account is past due more than 60 days, the Club will suspend the Membership. Past due bills may, at the discretion of the Club, be charged a one and one-half percent service charge per month from the date of the original statement until paid in full, with a minimum service charge per month of ten dollars. The Member shall be liable for any attorneys' fees and costs (including such fees required in connection with appeal proceedings) incurred in connection with the collection of such delinquent account(s).

All Members shall provide the Club with one credit or debit card to which the Member authorizes the Club to charge dues, fees and charges in the event that the Member does not pay outstanding amounts on his or her club account when due, and the Member shall substitute such credit or debit card with another credit or debit card if it expires and is not renewed or is cancelled. Such past due charges will be billed on a monthly basis and Members will receive a written statement of their past due charges.

Members will be required to spend an annual minimum for food and beverages served at the Resort which shall be billed and paid quarterly. The current food and beverage minimum must be charged to a Member's club account. This minimum can be spent at any Resort food and beverage outlet, for all products (including alcoholic beverages and Club-sponsored member events). The Club reserves the right to change the food and beverage minimum and the payment schedule at its sole discretion.

26

Failure to consume the actual required minimum on food and beverages will not relieve the Member of the obligation as defined hereunder, and the Club shall have the right to charge such Member's account for the defined minimum.

## SECTION 6     GRATUITIES.

For the convenience of Members, a gratuity percentage, as determined by the Club, may be added to all food and beverage sales.  A Member may increase the gratuity percentage by signing the ticket invoice and including the increased amount of the gratuity as such Member deems appropriate.

Each November, it will be customary to send a letter from the Club providing the Members with an opportunity to contribute to a voluntary "Holiday Fund" for all club employees, along with a suggested contribution added to such Member's bill.  This Holiday Fund provides the Membership with an opportunity to show appreciation to club employees during the holiday season.  The Management of the Club shall be responsible for the distribution of these funds.

Tipping is permitted to bartenders, servers, golf operations staff, valet parking attendants and locker room attendants.

## SECTION 7     DEATH.

In the event of a Member's death, the heirs, successors, assigns and estate of the Member shall be liable, to the extent permitted by law, for any dues accrued and charges incurred by the Member until the date of his/her death.

A Non-Signature Member's estate, spouse or domestic partner and heirs shall not be entitled to a refund of any portion of the Initiation Fee paid for the applicable Membership.

## ARTICLE V
## MANAGEMENT AND CONTROL OF THE CLUB

## SECTION 1     OWNERSHIP OF FACILITIES AND OPERATION OF THE CLUB.

The Owner owns the Resort Facilities and it or its agents will manage and operate the Club Facilities, the Club and Resort.  As a result, the Owner is solely responsible for the government and administration of the Club Facilities, the Club and the Resort and will have the exclusive authority to accept or reject Members, set dues and charges, establish Rules and Regulations and control the management and affairs of the Club Facilities, the Club and the Resort.  The Owner also reserves the right to engage a professional management company to operate the Club Facilities, the Club and the Resort.

Members will only pay Membership dues, fees and other Club charges as are established from time to time.  Members will not be subject to any liability for capital or operating assessments for the costs and expenses of ownership or operation of the Club or the

27

Club Facilities. The Owner will pay all operating deficits incurred in the operation of the Club Facilities and will retain all operating revenues resulting from operation of the Club Facilities. The Club operating budget and the calculation of the dues may include a reserve for capital replacements and improvements and this shall not be deemed an assessment for purposes of this provision.

## SECTION 2    MANAGEMENT OF THE CLUB.

All applicants applying for a Membership must be approved by Management of the Club. After receiving the Membership Application, the Club, in its sole discretion, will determine whether the applicant has satisfied the relevant conditions of Membership. Notwithstanding the foregoing, the Owner shall not be obligated to implement any request, ruling or decision of Management of the Club. The Owner shall have the final authority on all matters concerning Members.

## SECTION 3    ADVISORY BOARD.

The Club may establish an Advisory Board whose purpose includes fostering good relations between the Members and Management of the Club, providing input on programs, plans and activities of the Club, advising on the Club's policies and rules. Management of the Club, including the Director of Golf, who shall be appointed by the Club from time to time, shall meet with the Advisory Board on a periodic basis to discuss the operation of the Club Facilities. Management of the Club will have the final authority on all matters concerning the Club Facilities and the Members of the Club.

The appointed Advisory Board shall initially consist of at least six Signature Members. Each Signature Member of the Board shall serve a one year term. Management of the Club shall have the right, in its sole discretion, to extend the term of any Member of the Advisory Board.

The Owner shall indemnify and hold harmless each person who shall serve as a member of the Advisory Board from and against any and all claims and liabilities to which such person shall become subject by reason of his/her having been, or hereafter being a member of the Advisory Board, or by reason of any action alleged to have been taken or omitted by him/her as such member of the Advisory Board, and shall reimburse each such person for all legal and other expenses reasonably incurred by him/her in connection with any such claim or liability if such person acted in good faith and without negligence or willful misconduct.

**ARTICLE VI**
**NOTICE TO MEMBERS**

## SECTION 1    NOTICES.

Whenever notice is required to be given to Members, such notice may be given personally, by telegraph, by fax, by messenger, by a nationally recognized overnight delivery service and/or by regular mail addressed to the Member either at the address of such Member appearing on the books of the Club or the address given by such Member to the Club for the purpose of the notice. Notice given by regular mail shall be effective on the second business

28

day after mailing. Notice given in any other manner herein above provided shall be effective when delivered to the Member or delivered at such Member's address. If no address appears on the Club's books and no other has been given, notice shall be deemed to have been given if notice is sent to such Member by written communication in care of the Club's principal office. It is each Member's obligation to inform the Club in writing of any change in address and/or residency.

## SECTION 2    MEMBERSHIP CORRESPONDENCE.

Complaints or suggestions concerning Management of the Club, service or operation of the Club should be in writing, signed by the Member and addressed to the Membership Director. Members should address all correspondence to the Club to:

> The Club at La Costa
> 2100 Costa Del Mar Road
> Carlsbad, California 92009
> Attention: Membership Director

## ARTICLE VII
## PROPERTY DAMAGE AND PERSONAL INJURY

Each Member, as a condition of Membership, and each Club Guest, as a condition of invitation to the Club Facilities, assumes the sole responsibility for his/her property. The Owner shall not be responsible for any loss or damage to private property used or stored on the Resort Facilities, whether in lockers or elsewhere.

No person shall remove from the room in which it is placed or from the Resort Facilities any property or furniture belonging to the Owner. No person shall remove toiletries or other supplies provided by the Owner for Members' and Club Guests' personal on-site use. Every Member shall be liable for any property damage and/or personal injury occurring on the Resort Facilities, or at any activity or function operated, organized, arranged or sponsored by the Owner, caused by the Member, any Club Guest or any Immediate Family or Extended Family Member. The cost of such damage shall be charged to Member's club account.

Any Member, Club Guest or other person who, in any manner, makes use of or accepts the use of any apparatus, appliance, facility, privilege or service whatsoever owned, leased or operated by the Owner, or who engages in any contest, game, function, exercise, competition or other activity operated, organized, arranged or sponsored by the Owner either on or off the Resort Facilities shall do so at his/her own risk, and shall indemnify, defend and hold harmless the Club, the Owner and any and all of their respective parent companies, subsidiaries, affiliates, partners, shareholders, directors, officers, employees, representatives, agents, members of the Owner's advisory boards, committees and/or subcommittees, and their respective successors and assigns, from any and all loss, cost, claim, injury, damage or liability sustained or incurred by him/her, resulting there from and/or resulting from any act or omission of the Club, the Owner and any and all of their respective parent companies, subsidiaries, partners, shareholders, directors, employees, representatives, agents or members of the Owner's advisory boards, committees and/or subcommittees, and their respective

29

successors and assigns, or arising out of or incident to Membership or use of the Resort Facilities. Additionally, the Member shall indemnify and hold harmless the Owner, the Club and any and all of their respective parent companies, subsidiaries, partners, shareholders, directors, employees, representatives, agents or members of 'the Owner's advisory boards, committees and/or subcommittees, and their respective successors and assigns, in respect to any such loss, cost, claim or injury, damage or liability sustained or incurred by the Member, such Member's Immediate Family and/or such Member's Extended Family and any Club Guest of such Member.

The Member's Immediate Family, such Member's Extended Family and such Member's Club Guests are fully responsible for all private property they may bring onto Club Facilities and/or Resort Facilities.  The Member acknowledges and agrees that the Owner is not responsible for any of said personal property including without limitation any loss or damage to personal property resulting from theft, vandalism, negligence or any other cause, whether human or natural.

Any personal property which has been left, without payment of storage thereon, in or on the Club Facilities and/or Resort Facilities for 90 days or more (or such longer period as required by applicable law) shall be deemed to be abandoned and may be disposed of or sold by the Owner, with or without notice, at public or private sale and the proceeds, if any, shall belong to the Owner.

The Club is not responsible for any personal property brought onto the Club's premises. Any personal property which has been abandoned or lost at the Club will be governed by the procedure in California Civil Code § 1980 et seq. or 2080 et seq., in the Club's discretion.

## ARTICLE VIII
## RIGHT TO REGULATE USE OF PROPERTY

### SECTION 1     NON-MEMBER EVENTS.

The Owner may authorize Club sponsorship of tournaments and other special events involving the temporary use of the Club Facilities and/or Resort Facilities by non-members.

### SECTION 2     NON-MEMBER PLAY.

In addition to the foregoing, the Owner may authorize use of the Club Facilities and/or Resort Facilities by Resort Guests, other classes and classifications of Membership and members of other clubs, and their respective guests, as well as by invitees of the Owner, on such terms and conditions as the Club may determine from time to time.  The Owner shall have the unqualified right to make such rules, regulations, and restrictions in the use of all or any part of the Club Facilities and/or Resort Facilities, Club Memberships or related matters, as the Owner desires.  Such rules, regulations and restrictions shall become effective immediately upon adoption in writing by the Owner and shall be considered a part of these Rules and Regulations and, unless otherwise specified, shall apply thereafter to all classes and classifications of Memberships and their Club Guests, visitors, and Members of their Immediate Family or Extended Family.

30

**SECTION 3    PROMOTIONAL USE AND TOURNAMENT OR GROUP PLAY.**

The Club reserves the right, in its sole discretion to designate other persons, including, without limitation, officers, directors, partners and employees of the Club and its affiliates and their guests to use the Club Facilities upon such terms and conditions as may be determined from time to time by the Club. The Club reserves the right, in its sole and absolute discretion, to restrict or to otherwise reserve in advance the Club Facilities for maintenance, reseeding, tournament or group play and other special events, from time to time. Tournaments may include professional events such as the Accenture World Match Play, which will result in restricted access to the Resort Facilities. The Club shall give Members reasonable notice of the closure time and dates.

**SECTION 4    BEACH ACCESS.**

KSL Encinitas Resort Co., LLC, an affiliate of the Club, may construct a beachfront project located in the City of Encinitas (not at the Club site) commonly referred to as the La Costa Beach Access ("Beach Access"), but that the construction of the Beach Access is in no way guaranteed. Current Membership Privileges do not at this time include any specific rights or Privileges related to the possible Beach Access. In the event that the Beach Access is constructed, the Club may amend Membership Privileges to include Member access to the Beach Access on terms and conditions to be determined by the Club in its sole and absolute discretion.

**ARTICLE IX**
**AMENDMENT OF RULES AND REGULATIONS**

The Club has the right, in its sole and absolute discretion, to amend these Rules and Regulations and/or adopt new Rules and Regulations at any time, which amendment and/or adoption shall be in writing by the Club. Moreover, the Club has the right, in its sole and absolute discretion, to issue written policies, which shall be binding upon all Members as if they were set forth in these Rules and Regulations. Every Member agrees that, by accepting his/her Membership, not only is he/she bound by the terms hereof and the other written policies of the Club, but he/she does hereby agree to be bound by any and all changes, repeals, amendments or additions to these Rules and Regulations and any written policies by the Club as soon as copies thereof are posted, distributed or otherwise made available to Members.

**ARTICLE X**
**CLUB RULES**

**SECTION 1    GENERAL CLUB RULES.**

In addition to these Rules and Regulations, Members and their guests shall abide by all posted rules and regulations contained herein of the Club, which may be amended from time to time.

(a)    All players must check in with the pro shop before registering with the starter.

31

(b)     All Club-owned golf carts must be acquired at the pro shop or golf staging area. Under no circumstance may golf carts be taken from the cart barn;

(c)     The roster or list of Club Members shall not be accessible to anyone other than Club personnel and Members.  Use of the roster or list of Club Members for solicitation or commercial purposes is prohibited.

(d)     The Club encourages the use of the clubhouse and restaurant facilities by Members for private parties, on any day or evening, provided it does not interfere with the normal operation of the Resort or with the services regularly available to such Members. Members are requested to make reservations with the appropriate Club personnel for available dates, arrangements and payments.  All food and beverage service shall be provided by the Club.  Private parties are permitted use of the Club Facilities with the prior approval of the General Manager of the Resort.  The sponsor of the private party shall be required to sign the then current contract for the event or activity.  Special event functions shall be scheduled from time to time at the discretion of the Club.

(e)     The personnel of the Club have full authority to enforce these Rules and Regulations and any infractions will be reported to Management of the Club.

(f)     The Club Facilities shall be open on the days and during the hours established by the Club.  The Club reserves the right to close both Golf Courses to hold promotional events and tournaments as described herein.  Areas of the Club Facilities may also be closed from time to time for scheduled maintenance and repairs.

(g)     Performance by entertainers shall be permitted on the Club Facilities only with the permission of the Management of the Club.

(h)     Dining room activities for groups shall be permitted with the permission of Management of the Club.

(i)     All alcoholic beverages shall only be served or sold and consumed in the designated areas on the Club Facilities during established hours.  Alcoholic beverages shall not be sold or served to any person not permitted to purchase the same under the laws of the State of California or be sold for off-premises consumption.  All alcoholic beverages consumed or otherwise possessed on Club Facilities must be purchased at the Club, with the exception of alcoholic beverages donated for charity events.

(j)     Commercial advertisements or solicitations shall not be posted or circulated in or at the Club without the prior written approval of the Management of the Club.

(k)     It is contrary to the policy of the Club to have the Club Facilities used for functions or fund raising efforts for the benefit of a political cause, unless approved by the General Manager.  The Club Facilities shall not be used in connection with organized religious services or other activities unless approved by the General Manager.

(l)     Other than as permitted by the Club, no petition, poster or promotional material shall be originated, solicited, circulated or posted on the Club's property.

(m)     All food and beverages consumed on the Club Facilities must be furnished by the Club.

(n)     Dogs and other pets, with the exception of trained service animals, are not permitted on the Club Facilities without the prior approval of the General Manager.  Members are responsible for damage caused by an animal owned by such Member or under such Member's control.

(o)     Members and their guests may not abuse any of the employees, verbally or otherwise.  All service employees are under the supervision of the Director of Golf and no Member or guest shall reprimand or discipline any employee or send any employee off the Club Facilities for any reason.  Any employee not rendering courteous and prompt service should be reported to the Director of Golf immediately.

(p)     Self-parking is permitted in areas identified as such.  No parking will be allowed on grassed areas.  "No Parking" signs must be observed.

(q)     All bicycles, power or motor vehicles are not permitted on golf course property.

(r)     Smoking is not permitted indoors at the Resort under the laws of the State of California.

(s)     Firearms and other weapons of any kind are not permitted on the Club Facilities at any time.

(t)     All complaints, criticisms or suggestions relating to the operations of the Club must be in writing, signed and sent to the Director of Golf.

(u)     Violation of any of these Rules and Regulations or conduct in a manner prejudicial to the best interests of the Club shall subject the person in violation to disciplinary action.

(v)     The Club reserves the right to amend or modify these Rules and Regulations when necessary and shall notify the Membership of such changes.

## SECTION 2     GOLF RULES

The Rules of Golf as adopted by the USGA together with the Rules of Etiquette as adopted by the USGA shall be the rules of the Club, except where modified by the Southern California Golf Association Rules or with any of the rules herein.

(a)     "Cutting-in" is not permitted at any time.  All players must register with the starter.  Under no circumstances are players permitted to start play from residences.

(b)     Golf practice is not allowed on the golf course.  The designated golf practice facilities should be used for all practice.

(c)     If a foursome or other group of players fails to keep their place on the course and loses more than one clear hole on the players ahead, the group is obligated to quicken its pace,

33

even if it means skipping one or more holes.  No more than five minutes may be used to search for lost balls.

(d)      All players who stop after playing nine holes for any reason must occupy the next tee before the following players arrive at the tee or they shall lose their position on the golf course and must get permission from the starter to resume play.

(e)      Excessive noise, club throwing or profanity will not be permitted at any time.

(f)      Horseplay, profanity, disruptive conduct and indiscreet behavior on or near the Golf Courses are strictly prohibited.

(g)      All tournament play must be approved in advance by the Director of Golf.

(h)      Enter and leave bunkers at the nearest level point to the green.  Smooth sand over with a rake upon leaving.

(i)      Repair all ball marks on the green.

(j)      Repair all divots.

(k)      Searching for golf balls not in play is not allowed on the course at any time.

(l)      Player assistants may be on duty to help regulate play and enforce golf cart regulations.  The player assistants have full authority on the golf course to enforce all rules and speed of play.

(m)      Each player must have a set of golf clubs.

(n)      Proper golf attire is required for all players on the course or practice facilities.  A description of "proper attire" shall be posted prominently in the men's and women's locker rooms from time to time.  It is expected that Members will choose to dress in a fashion befitting the surroundings and atmosphere provided in the setting of the Club.  It is also expected that Members will advise his/her guests of these dress requirements.  Members are expected to insure that their guests and family members adhere to such rules.  Appropriate golf attire consists of the following:

> Acceptable for Men:
> Shirts with collars and sleeves, slacks and golf shorts up to four inches above the knee are considered appropriate attire.
>
> Not Acceptable for Men:
> Tank tops, tee shirts, fishnet tops, cut-offs, jams, sweat pants, denim, bathing suits, or other athletic shorts are not permitted.
>
> Acceptable for Women:
> Dresses, skirts, slacks, golf shorts up to four inches above the knee and shirts with collars, collared shirts without sleeves, blouses with sleeves which are without collars are considered appropriate attire.

34

Not Acceptable for Women:
Halter tops, tee shirts, fishnet tops, bathing suits, sweat pants, denim, tennis dresses or athletic shorts are not permitted.

Acceptable Shoes:
Appropriate golf shoes or approved shoes are required on the golf course and practice areas.  Soft spikes are required.

Not Acceptable Shoes:
Use of shoes other than soft spike golf shoes must be approved by the Director of Golf.

This dress code is mandatory for all players.  Improperly dressed golfers will be asked to change before playing.  If you are in doubt concerning your attire, please check with the golf shop before starting play.  Any misuse or disregard of these rules may cause privileges to be suspended.

(o)     If lightning is in the area, all play shall cease.

(p)     The Club may close the Golf Courses to play whenever the grounds could be damaged by play, for adverse weather conditions or for maintenance purposes.

(q)     Jogging, bicycling or recreational walking is not permitted on the Golf Courses.

(r)     "Discontinued Play" Policy: less than four holes played, full 18 hole credit; four to ten holes played, nine hole credit.

(s)     Twosomes may play at the discretion of the Director of Golf.  Twosomes should not expect to play through foursomes and should not exert any pressure on the groups ahead. Foursomes shall have the right of way.

(t)     Twosomes and singles may be grouped with other players, if available, at the discretion of the Director of Golf.

(u)     Singles shall have no priority on the golf course and shall be permitted to play only at the discretion of the Director of Golf.

(v)     Groups of five or more players shall only be permitted on the golf course with the permission of the Director of Golf.

## SECTION 3     HOURS OF PLAY.

Resident golf Members will receive a block of tee times daily.  The Member Block will alternate between the two Golf Courses unless otherwise dictated by tournaments.  Tee times may be utilized by the Club from time to time, for play by other than Resident golf Members based upon prior commitments made by the Club with respect to the course(s) in question.

35

The golf course superintendent is authorized to determine when the Golf Courses are fit for play. His/her decision shall be final. In his absence, the Director of Golf shall make this decision.

## SECTION 4    STARTING TIMES.

All players must have a starting time reserved through the golf shop. To ensure adequate access to the Golf Courses, the Club will block tee times on one or more of the Golf Courses for use by golf Members. The Member Block will alternate between the two Golf Courses unless otherwise dictated by tournaments. Blocked tee times may be utilized by the Club from time to time for play by other than Resident golf Members based upon prior commitments made by the Club with respect to the course(s) in question.

All Resident golf Members, excluding Signature Golf Members, will be entitled to make starting times ten days in advance for the designated Member Block. In addition, Signature Golf Members will be allowed to reserve tee times on the designed Resort Course 48 hours in advance. All Non-Signature Golf Members will be permitted to reserve tee times 24 hours on the designated Resort Course.

(a)     Signature Sport Members can reserve tee times two days in advance on the designated Resort Course only.

(b)     Golf tee time reservations can be made at 6:30 AM. All tee times must be made over the phone, with one tee time per phone call. No standing reservations will be accepted.

(c)     The Member receiving a tee time must give their name, Membership number and the name of players in their group at the time of reservation.

(d)     Starting time changes must be approved by the Director of Golf.

(e)     Please notify the golf shop of any cancellation as soon as possible.

(f)     Players who fail to cancel their starting time by 4:00 PM the day before play will be subject to the "No Show Penalty". The No Show Penalty will be: (a) first offense – warning; (b) second offense – $25.00 per person charge; (c) third offense – $25.00 per person charge and posting of name in locker rooms; and (d) fourth offense – suspension or loss of tee time privileges. Members are responsible for all penalties or fines incurred by such Member's Club Guest or Club Guests.

(g)     Split tee or shotgun times may be in effect.

(h)     No one is allowed to start play on any tee other than the first tee without prior approval of the Director of Golf.

## SECTION 5    REGISTRATION.

(a)     Members and guests must register in the golf shop before beginning play and all Members and guests shall present their Membership Cards or Sponsored Cards at registration.

(b)      Failure to check in and register ten minutes prior to a reserved starting time may cause cancellation or set back.

(c)      Players late for their starting time will lose their right to the starting time and shall begin play only at the discretion of the starter.

## SECTION 6      PRACTICE FACILITY.

The practice facility is open during normal operating hours as posted in the golf shop and on the practice facility.  At times posted on the practice facility and in the golf shop, the practice facility shall be closed for general maintenance.

(a)      Range balls are for use on the practice facility only.  Range balls are not permitted to be used on the Golf Courses.

(b)      Balls must be hit from designated areas only.  No hitting from the rough or sides of the facilities.

(c)      Proper golf attire is required at all times on the practice facility.

(d)      Lessons by unauthorized professionals are prohibited on the practice facility.

## SECTION 7      GOLF CART RULES.

(a)      The use of golf carts is mandatory when posted.

(b)      All handicap players must register with the Director of Golf and obtain a handicap flag.

(c)      There is a maximum of one cart per twosome and two carts per threesome or foursome unless otherwise authorized by the Director of Golf.

(d)      Only two persons and two sets of golf clubs are permitted per golf cart.

(e)      Club golf carts may only be used on the Golf Courses when the courses are open for play.  Club golf carts are not to be driven to residences at any time and both Club and private golf carts are not permitted in the parking lot.

(f)      Golf carts shall not be used by Members or guests on Club Facilities without proper assignment and registration with the cart attendants.

(g)      Each operator of a golf cart must be at least 16 years of age and have a valid automobile driver's license.

(h)      Obey all golf cart traffic signs.

(i)      Always use golf cart paths where provided, especially near tees and greens.  Use the 90° rule when in effect and cross fairways only at right angles.  Players are required to remain on golf cart paths, without exception, on par three holes.

C-118

(j)     Except on golf cart paths, do not drive a golf cart within 30' feet of a green, a tee or a bunker.

(k)     Never drive a golf cart through a hazard.

(l)     Be careful to avoid soft areas on fairways, especially after rain.

(m)     Operation of a golf cart is at the risk of the operator.  Cost of repair to a golf cart which is damaged by a Member shall be charged to such Member or, in the case of damage by a guest, to the sponsoring Member.  Members using a golf cart shall be held fully responsible for any and all damages, including damages to the golf cart, that are caused by the misuse of the golf cart by such members or their guests, and the Member shall reimburse the Club and/or any operator of the Club for any and all damages the Club may sustain by reason of misuse.

(n)     The Member using a golf cart accepts and assumes all responsibility for liability connected with operation of the golf cart.  The Member also expressly indemnifies and agrees to hold harmless the Club and its partners, officers, directors, employees, affiliates, representatives and agents, from any and all damages, whether direct or consequential, arising from or related to such Member's use and operation of the golf cart.

(o)     When the "carts on path only" signs are posted, they must be strictly followed.

(p)     "Course closed" or "hole closed" signs are to be adhered to without exception.

(q)     Violation of the golf cart rules may result in loss of golf cart privileges and/or playing privileges.

(r)     Signature Golf Members will have the option to purchase an annual Golf Cart Plan.  Signature Golf Members that opt for this plan must abide by the above listed golf cart rules.

## SECTION 8     PRIVATE GOLF CART RULES.

(a)     Any user of a private golf cart must sign the current Private Golf Cart Trail Fee Agreement.

(b)     Any modification to the original manufacturer's vehicle shall be done within accepted industry safety standards.

(c)     Signature Golf Members may purchase a private golf cart provided the cart complies with the Club's safety and operational policy.  Please check with the Director of Golf for the latest regulations of the Club prior to purchase.

(d)     The Club will establish from time to time the safety specifications that all privately owned golf carts must meet.  All privately owned golf carts must include a rearview mirror, reflectorized warning devices in both the front and rear of the golf cart and any other safety equipment required by the Club from time to time.

(e)      Golf cart owners must store their golf carts on their own property and golf carts need to be driven, not trailered to the Club.

(f)      Golf cart owners, when playing together, or with a non-cart owner, must abide by the rules of one golf cart for every two players.

(g)      Any person who is not a golf cart owner and who is riding as the second person on a privately owned golf cart must pay the regular golf cart fee to the golf shop before beginning play.

(h)      Privately owned golf carts must be annually approved by the Club as complying with the appearance, safety and other standards set forth herein and as may be established from time to time by the Club.

(i)      All owners of privately owned golf carts shall be required to sign a release of liability agreeing to hold the Club and its affiliates harmless as a result of any loss or damage relating to the ownership or operation of the golf cart.

(j)      Each year a Signature Member or Non-Signature Member with a privately owned golf cart with current insurance certificates on file and registered with the Club as of August 1, 2002 shall be required to register the cart and to provide the Club with proof that the operation of the golf cart is covered by a liability insurance policy for such Member with policy limits in such amounts as established from time to time by the Club and shall require that such policy provide that it cannot be cancelled before 30 days prior written notice to the Club. The golf cart owner must also name the Club as an additional insured.

(k)      Members using a privately owned golf cart will be fully responsible for any and all damages caused by the use or misuse of the golf cart by anyone operating it or otherwise, and such Members shall reimburse the Club for any and all damages the Club may sustain by reason of use or misuse, including without limitation, damage to other golf carts and any property of the Club.

(l)      All privately owned golf carts registered at the Club after August 1, 2002 must be electrically operated.

(m)      A trail fee for privately owned golf carts has been established and from time to time will be reviewed by the Club. The trail fees will be billed on an annual basis with January 1st the effective date. The trail fee is non-refundable. The trail fees shall not be prorated, except for the first year a Signature Golf Member applies for private golf cart privileges.

(n)      An identification number and a yearly decal will be issued for the cart when the application, proof of liability insurance, and payment are received. The identification number and yearly decal must be placed on the front of the golf cart in clear view.

(o)      Members with a privately owned golf cart must check in at the golf shop prior to beginning play.

(p)     When a Member owned golf cart is no longer used in the privately owned golf cart program, all stickers and decals must be removed.  Privately owned golf carts without a trail fee decal will not be allowed access to the Golf Courses.

(q)     Members with privately owned golf carts are required to ensure that their private golf carts are restricted to licensed drivers who will operate the cart in a safe, prudent manner and in accordance with all governmental regulations.

(r)     Violations of these Rules and Regulations may result in the revocation of privately owned golf cart privileges, playing privileges and/or a suspension or termination of Membership Privileges.

## SECTION 9     HANDICAPS.

Handicaps are computed under the supervision of the Director of Golf in accordance with the current USGA Handicap System.

(a)     Accurate records are to be kept of scores turned in and recorded for all full rounds played.  The Director of Golf shall determine if there are violations by Members in turning in their scores.

(b)     To be eligible for prizes at special events, a participant must have proof of an approved USGA Handicap.

(c)     All Members with an approved USGA Handicap may participate in Club tournaments.  All handicaps submitted may be reviewed by the Director of Golf.

(d)     To establish a handicap, a Member must have turned in a minimum of five scores.  Members are responsible for turning in all their scores on a daily basis.  The Director of Golf has the authority to adjust the handicap of any Member failing to turn in a score.  The pro shop shall assist Members with the posting procedures.

(e)     All existing Non Signature Golf Members will be charged a handicap fee at the beginning of each Membership Year.  Signature Golf Members will receive complimentary handicap fees.

## SECTION 10     GOLF COURSE ETIQUETTE.

Persons using the golf course should do their part to make a round of golf at the Club a pleasant experience for everyone.  Here are some suggestions:

(a)     The USGA "Pace of Play" standard for 18 holes of golf is four hours and 15 minutes.  All players are expected to conform to this standard.

(b)     Do not waste time.  Anticipate the club(s) you may need and go directly to your ball.  Always be near your ball to play promptly when it is your turn.  If a player is delayed in making his shot, it would be courteous for the player to indicate to another player to play, which should not be deemed playing out of turn.

(c)     The time required to hole out on and around the green is a major cause of slow play. Study and clear the line of your putt while others are doing the same. Be ready to putt when it is your turn.

(d)     When approaching a green, park your golf cart on the cart path on the best direct line to the next tee. This can save about one half hour per round. Never leave the golf cart in front of the green where you will have to go back to get it, while the following players wait for you to get out of the way.

(e)     When play of a hole is completed, leave the green promptly and proceed to the next tee without delay. Do the scoring for the completed hole while the others in your group are playing from the next tee.

(f)     The player assistants shall report slow play and all breaches of golf etiquette to the Director of Golf.

## SECTION 11   DINING AND SOCIAL RULES.

(a)     Reservations are required for most activities of the Club and are taken on a first-come, first-served basis by pre-registering with the appropriate personnel of the Club. Dinner and event reservations may be required from time to time. Members are asked to assist in maintaining required excellent service levels by making reservations for dining prior to 5:00 PM on the same day. The dining and special event reservation policies shall be determined by the Club.

(b)     For a party of 16 or more, a 24 hour notice is requested and a set menu should be arranged whenever possible.

(c)     Tables shall be assigned on a first-come, first-serve basis for all functions held in the dining rooms of the Club.

(d)     Reservations for dining shall be held for 15 minutes after the reserved time unless a call is received indicating the party is detained.

(e)     Reservations for banquets should be made at least three weeks in advance. All Members must conform to the deposit schedule for reservations. A non-refundable deposit may be required for a banquet reservation.

(f)     Failure to cancel special event reservations may result in a charge to the Member's club account, which shall be determined by the Club.

## SECTION 12   GENERAL TENNIS RULES.

The USTA Rules of Tennis shall apply at all times, except when in conflict with the local rules or with any of the rules herein.

(a)     Members may reserve tennis courts by phoning the tennis pro shop seven days in advance and one day in advance on center court. The Member receiving a court time must

41

give their name, Membership number and the names of the players of their group.  No standing reservations will be accepted.

(b)      All players must check in and register at the tennis pro shop ten minutes prior to their court time or the court will be released to the first name on the waiting list.  Members and their guests shall present their identification cards at registration.

(c)      Players who fail to cancel their reservation four hours prior to their scheduled court time or do not register ten minutes prior to their court time may be charged a fee determined by the Club, from time to time.

(d)      At the end of their playing period, players must promptly relinquish their court to the next players.  Once a player is off the court, the player may sign up for the next available court time.

(e)      Singles may play on a court for one hour and doubles may play for one and one half hours, except for certain times designated by the tennis pro shop.

(f)      Proper tennis attire as determined by the tennis pro shop is required at all times. Colors are permitted, but tee shirts with graphic designs, undershirts, fishnet shirts, cut-offs, bermudas, jams, denim, bathing suits, gym shorts, slacks, fitness attire and walking shorts are not permitted.  Regulation tennis shoes are required.  No black soled shoes are permitted.

(g)      Proper tennis etiquette should be observed at all times.  Excessive noise, racquet throwing or profanity will not be permitted at any time.  Trash and other litter must not be left on the courts.

(h)      Use of the tennis courts shall be subject to the control of the tennis pro shop at all times.  The tennis pro shop shall determine the suitability of the courts for play.  Courts will be closed when necessary for maintenance operations or due to adverse weather conditions.

## SECTION 13    GENERAL HEALTH AND FITNESS RULES.

(a)      Regular operating hours for the health and fitness center will be posted by the Club and may be changed from time to time.

(b)      Prior to use of the health and fitness center, a Member and any guests will be required to sign a waiver of liability agreeing to hold the Owner and its affiliates, and their partners, shareholders, directors, officers, employees, representatives and agents harmless from any and all injuries sustained from the use of the facilities.

(c)      All Members and their guests must sign in at the front desk with their Membership Card.

(d)      Guests of a Member will be charged for use of the health and fitness center, which will be billed to such Member's club account.

42

(e)     Any person with health or physical problems should first consult his/her physician before using the health and fitness center and notify staff upon entrance to the facilities.

(f)     All weights and pieces of equipment must be returned to their proper places at the completion of use.

(g)     Casual workout attire is acceptable at the health and fitness center: tee shirts, gym shorts or warm-up pants for men; leotards, tights, tee shirts, gym shorts or warm-up pants for women.  Only aerobic or court shoes may be worn.

(h)     It is recommended that pregnant women obtain their physician's approval prior to using the health and fitness center.

(i)     Smoking and alcoholic beverages are prohibited at the health and fitness center. No food or drink may be brought onto the premises.

(j)     It is the responsibility of all persons to obtain instruction on how to use the equipment prior to usage of such equipment, and the equipment is only to be used in accordance with such instructions.

(k)     It is the responsibility of all persons using the health and fitness center to consult with their physician, and such person should be in good physical condition and have no physical, medical or psychological conditions, disabilities, impairments or ailments, chronic or otherwise, which would preclude, impair or prevent him/her from using the health and fitness center, or engaging in active or passive exercise.

(l)     Members assume full risk of loss and responsibility for damage to their health.

(m)     No clothing or personal articles may be stored under benches or in the common areas.

(n)     Children under 16 years of age are not permitted to use the health and fitness center.

(o)     Horseplay, profanity, disruptive conduct and indiscreet behavior at the health and fitness center are strictly prohibited.

(p)     Stereo, television and tapes should not be turned up so loud as to disturb fellow Members.

(q)     All jewelry and watches must be removed prior to exercising.  Neither the Club nor health and fitness center personnel will be held responsible for personal belongings, i.e., glasses, keys, watches, jewelry, etc.

## ARTICLE XI
## ENTIRE AGREEMENT

The Membership Application, Signature Membership Plan and these Rules and Regulations (as they may be amended, modified, changed, deleted and/or rewritten pursuant to Article IX hereof) set forth the entire agreement between the Owner and the Member, and set forth all of the Owner's and such Member's respective Privileges and obligations regarding such Member's Membership and Privileges, including without limitation, such Member's use of the Club Facilities. Moreover, the Membership Application, Signature Membership Plan and these Rules and Regulations supercede any and all prior and contemporaneous agreements, negotiations, representations, understandings and discussions between or among the Member, the Owner and/or any other person or entity.

Each Member agrees that should the Club or the Owner breach this agreement or any other obligation owed to that Member, his/her remedies shall be limited to a refund of his/her Membership Deposit or Initiation Fee and that he/she shall not be entitled to recover damages or obtain any equitable relief against the Club or the Owner.

## ARTICLE XII
## NO PROPERTY RIGHTS

It is expressly stipulated and understood that no property right or vested rights of any kind accrue to the benefit of any Member and that acceptance for Membership is the full and sole consideration for the payment of the Initiation Fee or Membership Deposit.

## ARTICLE XIII
## THE OWNER'S
## RIGHT TO MARKET AND TRANSFER

### SECTION 1    MARKETING.

The Owner and its designees only may market Memberships to prospective members or purchasers (including allowing prospective members or purchasers to use Club Facilities), may advertise Memberships, and may authorize the sale of products displaying the name and logo of the Club.

### SECTION 2    CLUB TRANSFER.

The Owner shall have the absolute right, without the consent of or notification to the Members, to sell, encumber, hypothecate, transfer, convey or assign all or any portion of 'the Owner's legal (and/or equitable) right, title and interest in and to the Club (including, without limitation, Privileges with respect to Members and Privileges under these Rules and Regulations), the Club Facilities and/or the real property underlying or surrounding the Club Facilities.

2006 Amended and Restated Rules and Regulations

C-125

The Club at La Costa
2100 Costa Del Mar Road
Carlsbad, California  92009
760-438-9111
www.lacosta.com

C-126





# La Costa Golf

2100 Costa Del Mar Rd.
Carlsbad, CA, 92009
P: (800) 854-5000

## INVOICE

588922

**Invoice**

**Abolafia, Allen**
1780 Blackbird Circle
Carlsbad, CA, 92011-5008
T: 702.595.2332

Monday, November 12, 2018

| Item Description | | Date | Price | Qty | Ext. Price |
|---|---|---|---|---|---|
| Green Fee | Member Guest Legend | 29-Aug-2018 | 85.00 | 1 | 85.00 |

| Payment | Notes | Date | Amount |
|---|---|---|---|
| CASH | T:100(USD) C:15(USD) E:1 | 29-Aug-2018 | 85.00 |

| | |
|---|---|
| **Total** | **$ 85.00** |
| **Payments** | **$ 85.00** |
| **Balance** | **$ 0.00** |

**Cart Rental Agreement**

Account/Room #: _____

Customer Signature: _____

EXHIBIT
8
Abolafia
PENGAD 800-631-6989

www.lacosta.com

1

C-129

# La Costa Golf

2100 Costa Del Mar Rd.
Carlsbad, CA, 92009
P: (800) 854-5000

# INVOICE

568931

**Invoice**

**Abolafia, Allen**
1780 Blackbird Circle
Carlsbad, CA, 92011-5008
T: 702.595.2332

Monday, November 12, 2018

| Item Description | | Date | Price | Qty | Ext. Price |
|---|---|---|---|---|---|
| Green Fee | Member Round Legend | 29-Aug-2018 | 0.00 | 1 | 0.00 |

| Payment | Notes | Date | Amount |
|---|---|---|---|
| POST | Posted to Club Folio:  226 | 29-Aug-2018 | 0.00 |

| | |
|---|---|
| **Total** | **$ 0.00** |
| **Payments** | **$ 0.00** |
| **Balance** | **$ 0.00** |

**Cart Rental Agreement**

Account/Room #: _____

Customer Signature: _____

www.lacosta.com

1

C-130

Nﬤ
la costa

## La Costa Golf

2100 Costa Del Mar Rd.,
, CA  92009
Tel: (800) 8

### Golf

**Receipt**

Printed On:                          08/29/2018 - 8:13 am
Printed By:                          '-      GAVINP (393)

**Abolafia, Allen**                  Folio:  **588922**
**Member #: 071100**

| Item | | Price | Disc | Qty | Ext. Price |
|------|--|-------|------|-----|-----------|
| Member Guest Legend | | | | 1 | 85.00 |
| Legends Course | 8:44 am | | | | |
| | **Subtotal** | | | | **85.00** |
| | **Total** | | | | **$ 85.00** |

| Payment | Notes | | Date | Amount |
|---------|-------|--|------|--------|
| | Payments | | | $ 85.00 |
| | Balance | | | $ 0.00 |

### Cart Rental Agreement

Omni La Costa **Resort and** Spa hereby, lease Golf Cart to the above ("Lessee") for use while playing golf on the Omni La Costa Resort and Spa course. Lessee agrees to keep the Golf Cart in the same condition as when received and shall immediately return said Golf Cart upon completion of play. Lessee acknowledges that he/she is familiar with and fully understands the safe operation the Golf Cart and can operate it in such a manner. Lessee agrees to pay Omni La Costa Resort and Spa upon return of the leased Golf Cart, all charges incidental to damage or breakage, ordinary wear accepted, to the leased Golf Cart during the term of this lease. Lessee agrees to release and hold harmless Omni La Costa Resort and Spa, from any and all liability, claims, damages, actions and causes of action whatsoever Lessee might state as a result of physical injury, including death, or property damage or loss sustained in connection with the use of the Rental Golf Cart.



EXHIBIT
9
Abolafia

PENGAD 800-631-6989

| Date | Type | Col1 | Col2 | Col3 | Col4 |
|---|---|---|---|---|---|
| 15-Dec-2018 8:2... | LEG | Oas, David | Menante, Dean | Abolafia, Allen | LaChance, Ran... |
| 13-Dec-2018 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | |
| 30-Aug-2018 10:... | CHA | Fernandez, Eddie | Yahr, James | Dean, Tommy | Abolafia, Allen |
| 29-Aug-2018 8:4... | LEG | Hale, John | Abolafia, Allen | Abolafia, Allen | Hardin, Gary |
| 28-Aug-2018 10:... | LEG | Abolafia, Allen | Fernandez, Eddie | | |
| 25-Aug-2018 8:2... | LEG | Coleman, William | Coffman, Brian | Abolafia, Allen | |
| 23-Aug-2018 10:... | CHA | Fernandez, Eddie | Yahr, James | Abolafia, Allen | Voss, Steve |
| 21-Aug-2018 10:... | LEG | Abolafia, Allen | Hochman, Bruce | Baker, Doug | |
| 16-Aug-2018 10:... | CHA | Fernandez, Eddie | Yahr, James | Hochman, Bruce | Abolafia, Allen |
| 12-Aug-2018 8:2... | CHA | Plotkin, Jim | Miller, Nick | Brown, Daniel | Abolafia, Allen |
| 09-Aug-2018 10:... | LEG | Fernandez, Eddie | Dean, Tommy | Yahr, James | Abolafia, Allen |
| 07-Aug-2018 9:3... | CHA | Fernandez, Eddie | Abolafia, Allen | Kring, Jerry | |
| 31-Jul-2018 10:0... | CHA | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | |
| 28-Jul-2018 8:28... | LEG | Abolafia, Allen | Welch, Matt | MacDonald, Ken | Hale, John |
| 26-Jul-2018 10:0... | LEG | Fernandez, Eddie | Yahr, James | Dean, Tommy | Abolafia, Allen |
| 25-Jul-2018 8:36... | CHA | Stephenson, Kirt | Stephenson, Kirt | Abolafia, Allen | Simpson, Robert |
| 19-Jul-2018 10:2... | CHA | Abolafia, Allen | | | |
| 18-Jul-2018 8:44... | LEG | Hale, John | Yahr, James | Simpson, Robert | Abolafia, Allen |
| 17-Jul-2018 9:24... | CHA | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | Yahr, James |
| 12-Jul-2018 10:0... | CHA | Fernandez, Eddie | Dean, Tommy | Yahr, James | Abolafia, Allen |
| 11-Jul-2018 8:44... | CHA | Simpson, Robert | Abolafia, Allen | Stanley, Lisa | Chandler, Earleen |
| 10-Jul-2018 10:1... | CHA | Fernandez, Eddie | Hochman, Bruce | Abolafia, Allen | Hale, John |
| 07-Jul-2018 8:20... | CHA | Clar, Mike | Abolafia, Allen | Barnett, Nick | Miller, Nick |
| 05-Jul-2018 11:0... | CHA | Fernandez, Eddie | Kring, Jerry | Abolafia, Allen | Dean, Tommy |
| 04-Jul-2018 8:28... | CHA | Abolafia, Allen | Kring, Jerry | Tadder, Timothy | |
| 03-Jul-2018 9:40... | CHA | Dean, Tommy | Fernandez, Eddie | Abolafia, Allen | Yahr, James |
| 28-Jun-2018 10:... | LEG | Fernandez, Eddie | Yahr, James | Dean, Tommy | Abolafia, Allen |
| 27-Jun-2018 7:4... | CHA | Stephenson, Kirt | Kain, Dale | Abolafia, Allen | |
| 26-Jun-2018 10:... | CHA | Fernandez, Eddie | Yahr, James | Dean, Tommy | Abolafia, Allen |
| 23-Jun-2018 9:2... | CHA | Stewart, Scott | Abolafia, Allen | LaChance, Ran... | Minasian, Aram |
| 21-Jun-2018 10:... | CHA | Fernandez, Eddie | Dean, Tommy | Yahr, James | Abolafia, Allen |
| 15-Jun-2018 12:... | CHA | Schwarzmann, ... | Lebron, Agustin | Brown, Daniel | |
| 14-Jun-2018 10:... | CHA | Fernandez, Eddie | Yahr, James | Dean, Tommy | Abolafia, Allen |
| 12-Jun-2018 9:2... | LEG | Fine, Ted | Abolafia, Allen | Fernandez, Eddie | |
| 07-Jun-2018 10:... | CHA | Abolafia, Allen | | | |
| 05-Jun-2018 10:... | LEG | Dean, Tommy | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce |
| 02-Jun-2018 8:2... | LEG | Stewart, Scott | Baker, Doug | Abolafia, Allen | LaChance, Ran... |
| 01-Jun-2018 8:2... | CHA | Abolafia, Allen | | | |
| 31-May-2018 10:... | LEG | Abolafia, Allen | Hochman, Bruce | Yahr, James | Dean, Tommy |
| 29-May-2018 10:... | LEG | Fine, Ted | Abolafia, Allen | | |
| 27-May-2018 11:... | LEG | Abolafia, Allen | Abolafia, Adam | Dean, Tommy | |
| 25-May-2018 9:0... | LEG | Abolafia, Allen | Abolafia, Allen | | Abolafia, Allen |
| 24-May-2018 10:... | CHA | Fernandez, Eddie | Hochman, Bruce | Dean, Tommy | Abolafia, Allen |
| 23-May-2018 8:5... | LEG | Coleman, William | Abolafia, Allen | Learned, Scott | Bailey, Wes |
| 15-May-2018 9:0... | LEG | Avazian, Doug | Astor, Scot | Abolafia, Allen | Baker, Doug |



EXHIBIT
10
Abolafia

| Date | Type | | | | |
|---|---|---|---|---|---|
| 12-May-2018 8:4... | CHA | Hardin, Gary | Baker, Doug | Stewart, Scott | Abolafia, Allen |
| 10-May-2018 10:... | CHA | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen | Yahr, James |
| 08-May-2018 10:... | CHA | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen | |
| 06-May-2018 8:2... | CHA | Abolafia, Allen | Baker, Doug | | |
| 05-May-2018 8:4... | LEG | Abolafia, Allen | Baker, Doug | | |
| 03-May-2018 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Yahr, James |
| 01-May-2018 10:... | LEG | Fernandez, Eddie | Yahr, James | Dean, Tommy | Abolafia, Allen |
| 26-Apr-2018 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Yahr, James | Dean, Tommy |
| 24-Apr-2018 10:... | CHA | Fernandez, Eddie | Dean, Tommy | Fleming, Larry | Abolafia, Allen |
| 20-Apr-2018 1:2... | CHA | Abolafia, Allen | Abolafia, Allen | Abolafia, Allen | Abolafia, Allen |
| 19-Apr-2018 10:... | LEG | Fernandez, Eddie | Hochman, Bruce | Yahr, James | Abolafia, Allen |
| 17-Apr-2018 10:... | LEG | Abolafia, Allen | | | |
| 14-Apr-2018 8:4... | CHA | Clar, Mike | Abolafia, Allen | Schmitz, Richard | Learned, Scott |
| 13-Apr-2018 1:2... | CHA | Brown, Daniel | Abolafia, Allen | Labrum, Jason | Welch, Matt |
| 12-Apr-2018 10:... | CHA | Fernandez, Eddie | Yahr, James | Hochman, Bruce | Abolafia, Allen |
| 10-Apr-2018 10:... | CHA | Fernandez, Eddie | Dean, Tommy | Fleming, Larry | Abolafia, Allen |
| 04-Apr-2018 9:0... | CHA | Bolton, Matthew | Miller, Nick | Abolafia, Allen | |
| 03-Apr-2018 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Yahr, James | Hochman, Bruce |
| 30-Mar-2018 1:2... | LEG | Brown, Dan | Elpers, David | Abolafia, Adam | Abolafia, Allen |
| 29-Mar-2018 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Fleming, Larry | Dean, Tommy |
| 27-Mar-2018 11:... | LEG | Fernandez, Eddie | Dean, Tommy | Fleming, Larry | Abolafia, Allen |
| 24-Mar-2018 7:0... | LEG | Abolafia, Allen | Baker, Doug | Boyajian, William | Charapp, Daniel |
| 23-Mar-2018 1:1... | CHA | Coleman, William | Abolafia, Allen | Schwarzmann, ... | |
| 22-Mar-2018 10:... | LEG | Fernandez, Eddie | Yahr, James | Abolafia, Allen | Dean, Tommy |
| 21-Mar-2018 8:5... | CHA | Bailey, Wes | Stephenson, Kirt | Learned, Scott | Abolafia, Allen |
| 17-Mar-2018 8:0... | CHA | Abolafia, Allen | Kain, Dale | Hale, John | Miller, Nick |
| 14-Mar-2018 8:2... | LEG | Bailey, Wes | Kain, Dale | Ward, Craig | Abolafia, Allen |
| 13-Mar-2018 10:... | CHA | Fernandez, Eddie | Hochman, Bruce | Yahr, James | Abolafia, Allen |
| 10-Mar-2018 8:4... | CHA | Abolafia, Allen | Stewart, Scott | Miller, Nick | Pennington, Jeff |
| 08-Mar-2018 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Yahr, James |
| 07-Mar-2018 9:0... | CHA | Abolafia, Allen | Dean, Tommy | Stephenson, Kirt | Bailey, Wes |
| 06-Mar-2018 10:... | LEG | Fernandez, Eddie | Dean, Tommy | Yahr, James | Abolafia, Allen |
| 01-Mar-2018 8:4... | CHA | Hale, John | Hardin, Gary | Abolafia, Allen | Avazian, Doug |
| 28-Feb-2018 9:0... | LEG | Abolafia, Allen | Oas, David | Learned, Scott | |
| 27-Feb-2018 9:4... | CHA | Abolafia, Allen | Hochman, Bruce | Fernandez, Eddie | Fernandez, Eddie |
| 23-Feb-2018 12:... | CHA | Strazzeri, Mark | Abolafia, Allen | Clar, Mike | Welch, Matt |
| 22-Feb-2018 10:... | CHA | Abolafia, Allen | Fernandez, Eddie | Hochman, Bruce | Yahr, James |
| 20-Feb-2018 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | Yahr, James |
| 16-Feb-2018 11:... | LEG | Baker, Doug | Polansky, Andrew | Abolafia, Allen | |
| 15-Feb-2018 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | Yahr, James |
| 14-Feb-2018 9:0... | LEG | Bailey, Wes | Abolafia, Allen | | |
| 13-Feb-2018 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | Yahr, James |
| 08-Feb-2018 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Fleming, Larry |
| 06-Feb-2018 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Hochman, Bruce |
| 01-Feb-2018 10:... | CHA | Fernandez, Eddie | Yahr, James | Abolafia, Allen | |
| 31-Jan-2018 9:0... | LEG | Stephenson, Kirt | Bailey, Wes | Abolafia, Allen | Learned, Scott |
| 30-Jan-2018 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Yahr, James |
| 26-Jan-2018 9:4... | CHA | Ravreby, Richard | Abolafia, Allen | | |
| 25-Jan-2018 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Fleming, Larry |
| 24-Jan-2018 8:5... | CHA | Stephenson, Kirt | Ward, Craig | Abolafia, Allen | Hardin, Gary |
| 23-Jan-2018 10:... | LEG | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen | Fleming, Larry |
| 17-Jan-2018 9:0... | LEG | Abolafia, Allen | Bailey, Wes | | |
| 16-Jan-2018 10:... | CHA | Fernandez, Eddie | Fleming, Larry | Dean, Tommy | Abolafia, Allen |
| 12-Jan-2018 10:... | LEG | Pennington, Jeff | Astor, Scot | Polansky, Andrew | Abolafia, Allen |
| 11-Jan-2018 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Fleming, Larry | Dean, Tommy |
| 10-Jan-2018 8:5... | CHA | Hardin, Gary | Hale, John | Ward, Craig | Abolafia, Allen |
| 05-Jan-2018 11:... | LEG | Abolafia, Allen | Park, Jeff | | |
| 04-Jan-2018 10:... | CHA | Dean, Tommy | Hochman, Bruce | Abolafia, Allen | Yahr, James |
| 03-Jan-2018 9:0... | LEG | Abolafia, Allen | Simpson, Robert | Lynn, Fred | Paolino, Sean |
| 02-Jan-2018 10:... | CHA | Fernandez, Eddie | Hochman, Bruce | Abolafia, Allen | |

| Date | Type | | | | |
|------|------|------|------|------|------|
| 29-Dec-2017 9:1... | CHA | Hardin, Gary | Abolafia, Allen | Learned, Scott | Avazian, Doug |
| 28-Dec-2017 10:... | LEG | Fernandez, Eddie | Yahr, James | Abolafia, Allen | Dean, Tommy |
| 27-Dec-2017 9:4... | CHA | Stephenson, Kirt | Abolafia, Allen | Simpson, Robert | |
| 26-Dec-2017 9:3... | LEG | Oas, David | Nosewicz, Jerry | Abolafia, Allen | Hull, Michael |
| 21-Dec-2017 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Yahr, James |
| 20-Dec-2017 8:3... | LEG | Stephenson, Kirt | Abolafia, Allen | Simpson, Robert | Connors, Tim |
| 19-Dec-2017 10:... | CHA | Abolafia, Allen | | | |
| 15-Dec-2017 8:2... | CHA | Coleman, William | Baker, Doug | Abolafia, Allen | Learned, Scott |
| 14-Dec-2017 10:... | LEG | Hochman, Bruce | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen |
| 13-Dec-2017 8:3... | CHA | Stephenson, Kirt | Abolafia, Allen | Simpson, Robert | Miller, Nick |
| 12-Dec-2017 10:... | LEG | Fernandez, Eddie | Polansky, Andrew | Abolafia, Allen | Hochman, Bruce |
| 08-Dec-2017 11:... | LEG | Oas, David | Park, Geoff | Abolafia, Allen | Abolafia, Adam |
| 07-Dec-2017 10:... | LEG | Abolafia, Allen | Fernandez, Eddie | Dean, Tommy | Hochman, Bruce |
| 06-Dec-2017 8:5... | CHA | Abolafia, Allen | Simpson, Robert | Look, Peter | Coleman, William |
| 30-Nov-2017 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Hochman, Bruce |
| 29-Nov-2017 8:4... | CHA | Abolafia, Allen | Ward, Craig | | |
| 28-Nov-2017 10:... | LEG | Abolafia, Allen | Fernandez, Eddie | Hochman, Bruce | Polansky, Andrew |
| 25-Nov-2017 8:4... | CHA | Kain, Dale | Hardin, Gary | Abolafia, Allen | Schwarzmann, ... |
| 24-Nov-2017 10:... | LEG | Clar, Mike | Abolafia, Allen | Tadder, Timothy | Learned, Scott |
| 22-Nov-2017 8:3... | CHA | Stephenson, Kirt | Abolafia, Allen | Simpson, Robert | |
| 21-Nov-2017 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Hochman, Bruce |
| 19-Nov-2017 7:0... | CHA | Said, Boris | Abolafia, Allen | Simpson, Robert | Minasian, Aram |
| 16-Nov-2017 10:... | CHA | Abolafia, Allen | Hochman, Bruce | | |
| 15-Nov-2017 8:5... | LEG | Simpson, Robert | Abolafia, Allen | Learned, Scott | |
| 14-Nov-2017 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | |
| 09-Nov-2017 10:... | LEG | Fernandez, Eddie | Hochman, Bruce | Yahr, James | Abolafia, Allen |
| 04-Nov-2017 8:3... | CHA | Hull, Michael | Minasian, Aram | Abolafia, Allen | |
| 02-Nov-2017 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | Learned, Scott |
| 31-Oct-2017 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Yahr, James | Hochman, Bruce |
| 24-Oct-2017 10:... | LEG | Polansky, Andrew | Abolafia, Allen | Nichols, Aaron | Yahr, James |
| 22-Oct-2017 7:0... | CHA | Abolafia, Allen | Amthor, Gil | Astor, Scot | Avazian, Doug |
| 21-Oct-2017 7:0... | CHA | Abolafia, Allen | Amthor, Gil | Astor, Scot | Avazian, Doug |
| 20-Oct-2017 12:... | LEG | Brown, Daniel | Killion, Brandon | Tadder, Timothy | Abolafia, Allen |
| 20-Oct-2017 7:4... | CHA | Abolafia, Allen | Baker, Doug | Learned, Scott | Smith, Eric |
| 17-Oct-2017 10:... | CHA | Fernandez, Eddie | Polansky, Andrew | Abolafia, Allen | Hochman, Bruce |
| 10-Oct-2017 9:4... | CHA | Abolafia, Allen | Laubach, Andrew | Astor, Scot | Baker, Doug |
| 07-Oct-2017 9:2... | CHA | Abolafia, Allen | Bailey, Wes | Baker, Doug | Brown, Daniel |
| 05-Oct-2017 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | Yahr, James |
| 04-Oct-2017 8:1... | CHA | Stephenson, Kirt | Abolafia, Allen | Oas, David | Stewart, Scott |
| 03-Oct-2017 10:... | CHA | Abolafia, Allen | Fernandez, Eddie | Hochman, Bruce | Yahr, James |
| 28-Sep-2017 10:... | CHA | Fernandez, Eddie | Dean, Tommy | Yahr, James | Abolafia, Allen |
| 26-Sep-2017 8:3... | CHA | Abolafia, Allen | Yahr, James | Hochman, Bruce | Dean, Tommy |
| 23-Sep-2017 8:4... | CHA | Abolafia, Allen | Clar, Mike | Kain, Dale | Hale, John |
| 21-Sep-2017 10:... | CHA | Fernandez, Eddie | Fine, Ted | Abolafia, Allen | Hochman, Bruce |
| 20-Sep-2017 8:1... | CHA | Stanley, Lisa | Stanley, Lisa | Abolafia, Allen | |
| 19-Sep-2017 8:2... | CHA | Fernandez, Eddie | Abolafia, Allen | Yahr, James | |
| 14-Sep-2017 11:... | LEG | Abolafia, Allen | Dean, Tommy | Hochman, Bruce | Fleming, Larry |
| 12-Sep-2017 10:... | LEG | Dean, Tommy | Yahr, James | Abolafia, Allen | Fernandez, Eddie |
| 09-Sep-2017 8:3... | LEG | Minasian, Aram | Hale, John | Abolafia, Allen | Clar, Mike |
| 07-Sep-2017 10:... | LEG | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen | Yahr, James |
| 05-Sep-2017 10:... | LEG | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen | Hochman, Bruce |
| 03-Sep-2017 10:... | CHA | Abolafia, Adam | Abolafia, Adam | Abolafia, Allen | |
| 31-Aug-2017 10:... | LEG | Abolafia, Allen | Dean, Tommy | Yahr, James | Fine, Ted |
| 30-Aug-2017 8:2... | CHA | Baker, Doug | Polansky, Andrew | Lynn, Fred | Abolafia, Allen |
| 29-Aug-2017 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | Yahr, James |
| 26-Aug-2017 9:0... | CHA | Abolafia, Allen | Hull, Michael | Avazian, Doug | Minasian, Aram |
| 25-Aug-2017 1:2... | CHA | Abolafia, Allen | Nosewicz, Jerry | Hull, Michael | Minasian, Aram |
| 24-Aug-2017 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Yahr, James |
| 22-Aug-2017 10:... | CHA | Polansky, Andrew | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy |
| 17-Aug-2017 10:... | LEG | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen | Yahr, James |

| | | | | |
|---|---|---|---|---|
| 15-Aug-2017 10:... | LEG | Abolafia, Allen | Voss, Steve | | |
| 13-Aug-2017 9:5... | CHA | Schwarzmann, ... | Nosewicz, Jerry | Abolafia, Allen | Abolafia, Adam |
| 12-Aug-2017 8:0... | CHA | Abolafia, Allen | Polansky, Andrew | Morris, Richard... | Yearous, Jeff |
| 10-Aug-2017 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | Dean, Tommy |
| 09-Aug-2017 7:5... | LEG | Hardin, Gary | Hardin, Mina | Abolafia, Allen | Hale, John |
| 08-Aug-2017 10:... | CHA | Dean, Tommy | Abolafia, Allen | Yahr, James | Fernandez, Eddie |
| 05-Aug-2017 8:4... | LEG | Bailey, Wes | Hale, John | Learned, Scott | Abolafia, Allen |
| 03-Aug-2017 11:... | LEG | Fernandez, Eddie | Abolafia, Allen | Yahr, James | Fleming, Larry |
| 02-Aug-2017 8:1... | CHA | Hale, John | Hale, Debbie | Avazian, Doug | Abolafia, Allen |
| 01-Aug-2017 10:... | LEG | Hochman, Bruce | Fernandez, Eddie | Yahr, James | Abolafia, Allen |
| 29-Jul-2017 8:28... | CHA | Hardin, Gary | Hale, John | Abolafia, Allen | |
| 28-Jul-2017 12:5... | CHA | Leposky, Mark | Leposky, Julie | Abolafia, Allen | Abolafia, Allen |
| 27-Jul-2017 10:0... | CHA | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Yahr, James |
| 26-Jul-2017 8:12... | LEG | Stephenson, Kirt | Hale, Debbie | Abolafia, Allen | |
| 25-Jul-2017 10:0... | CHA | Fernandez, Eddie | Kring, Jerry | Abolafia, Allen | Dean, Tommy |
| 23-Jul-2017 8:28... | CHA | Abolafia, Allen | Said, Boris | Yahr, James | |
| 21-Jul-2017 12:0... | CHA | Abolafia, Allen | Abolafia, Allen | Abolafia, Allen | Abolafia, Allen |
| 18-Jul-2017 10:0... | LEG | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Yahr, James |
| 18-Jul-2017 8:36... | LEG | Abolafia, Allen | Abolafia, Allen | Abolafia, Allen | Abolafia, Allen |
| 14-Jul-2017 11:5... | LEG | Severson, Tho... | Abolafia, Allen | Miller, Nick | Hale, John |
| 12-Jul-2017 8:20... | CHA | Stephenson, Kirt | Simpson, Robert | Hale, John | Abolafia, Allen |
| 11-Jul-2017 10:0... | CHA | Fernandez, Eddie | Hochman, Bruce | Abolafia, Allen | Yahr, James |
| 08-Jul-2017 12:2... | LEG | Abolafia, Allen | Abolafia, Allen | Abolafia, Allen | |
| 08-Jul-2017 8:20... | LEG | Coffman, Brian | Hale, John | Beatty, Rob | Abolafia, Allen |
| 06-Jul-2017 10:0... | CHA | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | Yahr, James |
| 05-Jul-2017 8:36... | CHA | Stephenson, Kirt | Hale, John | Hardin, Gary | Abolafia, Allen |
| 04-Jul-2017 10:1... | CHA | Fernandez, Eddie | Abolafia, Allen | Yahr, James | Hochman, Bruce |
| 04-Jul-2017 8:28... | CHA | Oas, David | Abolafia, Allen | Paolino, Sean | LaChance, Ran... |
| 03-Jul-2017 9:24... | CHA | Abolafia, Allen | Hull, Michael | Minasian, Aram | Nosewicz, Jerry |
| 01-Jul-2017 7:00... | CHA | Abolafia, Allen | Paolino, Sean | Dirks, Bruce | Connors, Tim |
| 27-Jun-2017 10:... | CHA | Fernandez, Eddie | Hochman, Bruce | Dean, Tommy | Abolafia, Allen |
| 26-Jun-2017 9:0... | CHA | Baker, Doug | Hartley, Donald | Abolafia, Allen | Laubach, Paul |
| 22-Jun-2017 10:... | LEG | Fernandez, Eddie | Hochman, Bruce | Dean, Tommy | Abolafia, Allen |
| 21-Jun-2017 8:2... | LEG | Hale, John | Hardin, Gary | Coleman, William | Abolafia, Allen |
| 20-Jun-2017 10:... | LEG | Fernandez, Eddie | Yahr, James | Dean, Tommy | Abolafia, Allen |
| 15-Jun-2017 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | Yahr, James |
| 13-Jun-2017 10:... | CHA | Neborsky, Robert | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy |
| 10-Jun-2017 8:5... | LEG | Schwarzmann, ... | Paolino, Sean | Abolafia, Allen | Kring, Jerry |
| 08-Jun-2017 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Hochman, Bruce | Yahr, James |
| 06-Jun-2017 9:2... | CHA | Hochman, Bruce | Yahr, James | Dean, Tommy | Abolafia, Allen |
| 03-Jun-2017 8:4... | LEG | Brown, Daniel | Schwarzmann, ... | Abolafia, Allen | Kring, Jerry |
| 01-Jun-2017 10:... | LEG | Abolafia, Allen | | | |
| 30-May-2017 10:... | LEG | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen | Yahr, James |
| 29-May-2017 9:3... | LEG | Baker, Doug | Learned, Scott | Abolafia, Allen | Abolafia, Adam |
| 25-May-2017 10:... | LEG | Abolafia, Allen | Roston, Michael | | |
| 24-May-2017 8:3... | CHA | Hale, John | Simpson, Robert | Abolafia, Allen | Stephenson, Kirt |
| 16-May-2017 10:... | CHA | Dean, Tommy | Abolafia, Allen | Mutch, John | |
| 13-May-2017 8:4... | LEG | Paolino, Sean | Abolafia, Allen | Tadder, Timothy | Morgan, Jesse |
| 11-May-2017 12:... | LEG | Polansky, Andrew | Yahr, James | Hochman, Bruce | Abolafia, Allen |
| 06-May-2017 8:3... | CHA | Nosewicz, Jerry | Severson, Tho... | Abolafia, Allen | |
| 04-May-2017 10:... | CHA | Fernandez, Eddie | Dean, Tommy | Yahr, James | Abolafia, Allen |
| 02-May-2017 10:... | CHA | Fernandez, Eddie | Yahr, James | Dean, Tommy | Abolafia, Allen |
| 27-Apr-2017 7:2... | LEG | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen | Yahr, James |
| 25-Apr-2017 10:... | LEG | Abolafia, Allen | Fernandez, Eddie | Yahr, James | |
| 20-Apr-2017 10:... | CHA | Fernandez, Eddie | Dean, Tommy | Yahr, James | Abolafia, Allen |
| 18-Apr-2017 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Mutch, John | |
| 15-Apr-2017 8:4... | LEG | Nosewicz, Jerry | Clar, Mike | Abolafia, Allen | LaChance, Ran... |
| 13-Apr-2017 9:5... | CHA | Fernandez, Eddie | Dean, Tommy | Yahr, James | Abolafia, Allen |
| 11-Apr-2017 10:... | CHA | Bliss, Mark | Polansky, Andrew | Mutch, John | Abolafia, Allen |
| 11-Apr-2017 10:... | CHA | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen | Yahr, James |

| | | | | |
|---|---|---|---|---|
| 06-Apr-2017 10:... | CHA | Polansky, Andrew | Abolafia, Allen | | |
| 06-Apr-2017 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Fleming, Larry | Yahr, James |
| 05-Apr-2017 8:2... | LEG | Abolafia, Allen | Baker, Doug | Polansky, Andrew | Lynn, Fred |
| 04-Apr-2017 10:... | LEG | Hochman, Bruce | Abolafia, Allen | Yahr, James | |
| 01-Apr-2017 8:4... | LEG | Clar, Mike | Learned, Scott | Abolafia, Allen | Stewart, Scott |
| 30-Mar-2017 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Fleming, Larry | Yahr, James |
| 28-Mar-2017 10:... | LEG | Fleming, Larry | Abolafia, Allen | Fernandez, Eddie | Dean, Tommy |
| 25-Mar-2017 7:1... | CHA | Abolafia, Allen | Abolafia, Adam | Pardieu, John | DiPentino, Daniel |
| 24-Mar-2017 8:2... | CHA | Kreysar, Rick | O'Hara, Tom | Abolafia, Allen | |
| 23-Mar-2017 10:... | LEG | Fernandez, Eddie | Dean, Tommy | Yahr, James | Abolafia, Allen |
| 21-Mar-2017 1:2... | LEG | Colson, Edwar... | Ravreby, Richard | Pardieu, John | Abolafia, Allen |
| 21-Mar-2017 10:... | LEG | Abolafia, Allen | Yahr, James | | |
| 19-Mar-2017 8:4... | LEG | Abolafia, Allen | Abolafia, Adam | Abolafia, Allen | |
| 17-Mar-2017 9:0... | LEG | Matalon, Jason | Hull, Michael | Morgan, Jesse | Abolafia, Allen |
| 16-Mar-2017 10:... | CHA | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen | |
| 14-Mar-2017 10:... | CHA | Abolafia, Allen | Yahr, James | Fleming, Larry | |
| 11-Mar-2017 8:4... | LEG | Schmitz, Max | Abolafia, Allen | | |
| 10-Mar-2017 9:0... | CHA | Stephenson, Kirt | Abolafia, Allen | Baker, Doug | Laubach, Paul |
| 09-Mar-2017 10:... | LEG | Fernandez, Eddie | Hochman, Bruce | Abolafia, Allen | Fernandez, Eddie |
| 02-Mar-2017 10:... | CHA | Fernandez, Eddie | Yahr, James | Dean, Tommy | Abolafia, Allen |
| 23-Feb-2017 10:... | LEG | Fernandez, Eddie | Abolafia, Allen | Yahr, James | Dean, Tommy |
| 21-Feb-2017 9:3... | LEG | Abolafia, Allen | Oas, David | | |
| 20-Feb-2017 9:0... | CHA | Abolafia, Allen | Morgan, Jesse | Abolafia, Adam | Miller, Nick |
| 16-Feb-2017 10:... | LEG | Fernandez, Eddie | Dean, Tommy | Abolafia, Allen | Polansky, Andrew |
| 15-Feb-2017 9:0... | LEG | Abolafia, Allen | Hardin, Gary | Coleman, William | |
| 14-Feb-2017 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Yahr, James | Fleming, Larry |
| 12-Feb-2017 1:4... | CHA | Abolafia, Allen | Abolafia, Adam | Stylin, Chris | |
| 10-Feb-2017 12:... | CHA | Morgan, Jesse | Abolafia, Allen | | |
| 08-Feb-2017 9:0... | CHA | Hardin, Gary | Stephenson, Kirt | Hale, John | Abolafia, Allen |
| 02-Feb-2017 10:... | CHA | Fernandez, Eddie | Abolafia, Allen | Dean, Tommy | Yahr, James |

# OMNI ✦ HOTELS & RESORTS

## Incident Report

Property: LaCosta

Report #: 180829-0015

☐ Supplement

| Type of Incident | Location of Incident | Condition of Area | Routing | |
|---|---|---|---|---|
| Injury - Patron | Legends 7th hole | See Narrative | ☐ | Corporate Risk Management |

| Date of Incident | Time of Incident | Date Reported | Time Reported |
|---|---|---|---|
| 08/29/2018 | 1023 | 08/29/2018 | 1023 |

## Subject

| Subject Name (last) | (first) | (middle) | Subject Address (street) | (city) | (state) | (zip) |
|---|---|---|---|---|---|---|
| Abolafia | Allen | | 1780 Blackbird Cir | Carlsbad | CA | 92011 |

| Age | Primary Phone | Secondary Phone | Subject Type |
|---|---|---|---|
| | (702)595-2332   Cell | | Member |

| Speak directly with Subject? | Describe Subject Attitude/ Concerns |
|---|---|
| YES | Calm |

## Property

| Loss/Damage to Property | Subject Estimate of Loss/Damage |
|---|---|
| NO | |

| Describe (quantity, brand, style, color, model #, serial #, etc) | **Attach separate Property Report Form as needed** |
|---|---|

## Injury

| If injury, nature of injury | First Aid Offered | First Aid Accepted |
|---|---|---|
| Misstep | YES | YES |

| Type of First Aid Administered | Administered by |
|---|---|
| Ice packs | Bejarano |

| Transported to Dr/Hospital (Name) | Transported by |
|---|---|
| | |

## Witness

| Witness Name (last) | (first) | (middle) | Witness Address (street) | (city) | (state) | (zip) |
|---|---|---|---|---|---|---|
| Ohaks | Sami | | 2100 Costa Del Mar Rd | Carlsbad | CA | 92009 |

| Primary Phone | Secondary Phone | Witness Type |
|---|---|---|
| (760)438-9111 | (760)438-9111 | Employee |

| Speak directly with Witness? | Describe Witness Attitude/ Concerns |
|---|---|
| YES | Calm |

## Police/Fire/EMS

| Responding Agency |
|---|
| N/A |

| Notification Date/Time | Case # | Unit # | Badge # |
|---|---|---|---|
| | | | |

## Additional Documentation

☐ Photos - Description
☐ Guest Folio - Description
☐ Police Report - Description
☐ Diagram - Description
☐ Room Access Log - Description
☒ Witness Statement - Description    Statement from Sami Ohaks
☐ Other - Description

## Narrative Summary

**Please see Narrative Page for details**

| Prepared By | Date/Time Prepared | |
|---|---|---|
| Roman Bejarano | 08/29/2018 | 1356 |
| Reviewed By | Date/Time Reviewed | |
| Joe Busic | 08/29/2018 | |

Incident Report V1.1 Mar 2011



EXHIBIT
11
Abolafia
C-137

# OMNI 🏨 HOTELS & RESORTS

## INCIDENT REPORT
☐ Supplement

**REPORT #:** 180829-0015

NARRATIVE

1.
2. **Assignment:** Guest Injury
3.
4. **Narrative:** At approx. 1023 8/29/18, Loss Prevention received a radio call from Sami Ohaks (Golf
5. Snack Bar), stating that a golfer had fallen and was not getting up. I arrived to Legends 7th hole and
6. spoke to the golfer (Allen Abolafia, Member #711000). He said that he was exiting out of his golf cart,
7. when he did not see the gap near the ramp and ended up falling down landing his weight onto his left
8. ankle. I asked Mr. Abolafia if he needed further medical attention, he declined and wanted to continue
9. golfing. I provided him with some ice packs and completed this assignment at 1030, 8/29/18.
10.
11.
12. **Guest Information:**
13.
14. Name: Allen Abolafia
15. Address: 1780 Blackbird Cir, Carlsbad, CA 92011
16. Phone: (702) 595-2332
17.
18.
19. **Guest Statement:** See Narrative
20.
21. **Timeline:** At 1023, Loss Prevention received radio call about member injury. At 1027, Loss Prevention
22. arrived at Legends 7th hole. At 1030, information collected, ice packs were provided, and assignment
23. completed.
24.
25.
26. **Investigation:** Mr. Abolafia was exiting his golf cart by Legends 7th ramp, when he fell off to the side
27. of ramp landing his entire weight on his left ankle.
28.
29. **Attachments:** Photo & Statement
30.
31.
32. **Notifications:** Betsy Miringoff, Brian Hughes, Thomas Kermabon, Joe Busic, Steve White, Dustin
33. Irwin, Katie Gilles
34.
35. **Disposition:** Closed
36.
37.
38.
39.
40.
41.
42.
43.
44.
45.
46.
47.
48.

| Prepared By | Date/Time Prepared | |
|---|---|---|
| Roman Bejarano | 08/29/2018 | |
| Reviewed By | Date/Time Prepared | ☐ Corporate Risk Management |
| Joe Busic | 08/29/2018 | |

REVISED 5/3/2007



| CASE NAME: | **ABOLAFIA v. OMNI LA COSTA RESORT** | |
|---|---|---|
| **EXHIBIT** | **DESCRIPTION OF DOCUMENTS** | |
| **EXHIBIT A:** | **PHOTOS OF LOCATION/** **PHOTOS OF LOCATION FIXED** | |
| **EXHIBIT B:** | **VALLEY RADIOLOGY REPORT** **& CD** | **$758.00** |
| **EXHIBIT C:** | **SCRIPPS CLINIC** **BATES # 1 – 22** | **$755.00** |
| **EXHIBIT D:** | **URGENT CARE 3D** **BATES # 1 – 4** | **$230.00** |
| **EXHIBIT E:** | **SCRIPPS MEMORIAL HOSPITAL** **ENCINITAS BATES # 1 – 43** | **$474.00** **$584.00** **$1,192.02** **$232.02** |
| **EXHIBIT F:** | **OMNI HOTELS CORRESPONDENCE** | |
| **EXHIBIT G:** | **HEALTHCARE CORRESPONDENCE** | |
| **EXHIBIT H:** | **MEDICARE/UNITEDHEALTHCARE** **IDENTIFICATION CARDS** | |

EXHIBIT
13
Abolafia

**EXHIBIT A**





# EXHIBIT D

1  **ROBERT J. PECORA, SBN 106167**
2  **Attorney at Law**
   **7855 Ivanhoe Avenue, Suite 408**
3  **La Jolla, California 92037**
   **Telephone:    (858)454-4014**
4  **Facsimile:    (858)454-3548**

5
6  **Attorney for Plaintiff:** ALLEN ABOLAFIA

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11 ALLEN HARVEY ABOLAFIA                )   Case No.: 19-cv-01923-W-KSC
12        Plaintiff,                    )
                                        )   PLAINTIFF, ALLEN ABOLAFIA'S
13        vs.                           )   NOTICE OF DEPOSITON OF
   OMNI HOTELS MANAGEMENT              )   PERSON(S) MOST KNOWLEDGEABLE
14 CORPORATION,  and                   )   AT HOAGLAND & SONS CONCRETE
   DOES 1 TO 20,                        )
15                                      )
          Defendants.                   )
16                                      )
                                        )
17 _____  )

18 TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD

19        PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 30(b)(6),
20 Plaintiff ALLEN ABOLAFIA through his attorneys of record, Brian Cline and Robert J. Pecora, will
21 take the deposition of the following Person(s) Most Knowledgeable at HOAGLAND & SONS
22 **JULY 22, 2020, starting at 9:00 A.M.** at the Law Office of Robert J. Pecora at 7855 Ivanhoe
23 Avenue, Suite 408, La Jolla, California 92037 before a qualified court reporter.

24        Said deposition will be taken upon oral examination before a qualified Notary Public and
25 Reporter  authorized to administer oaths, with a written record made thereof, and may be videotaped
26 to be used at the time of trial.  If for any reason the deposition cannot be completed on the
27 aforementioned date, at the option of the party noticing this deposition it shall either be continued
28 from day to day, Saturdays, Sundays, and holidays excluded, or continued until a date certain as
29 determined by the party noticing this deposition.

30
31                                    Page 1
32           Plaintiff ALLEN ABOLAFIA'S NOTICE OF DEPOSITION OF PERSON(S)
33                MOST KNOWLEDGEABLE AT HOAGLAND & SONS                    D-2

YOU ARE FURTHER NOTIFIED that Defendant OMNI HOTELS MANAGEMENT CORPORATION is hereby requested and required to "designate and produce at the deposition the person at HOAGLAND & SONS as to those matters described in "**Exhibit A**" hereto known or reasonably available to the deponent.

YOU ARE FURTHER NOTIFIED that pursuant to Federal Rules of Civil Procedure, Rule 34, Plaintiff ALLEN HARVERY ABOLAFIA hereby requests  that you produce for inspection and copying the documents described and set forth in "**Exhibit B**" hereto.

Said documents are within the possession, custody or control of Defendant OMNI HOTELS MANAGEMENT CORPORATION agents or attorneys, are relevant to the subject matter of this action or reasonably calculated to lead to discovery of admissible evidence, and are not priviledged.

Said documents shall be produced for inspection and copying at the above location .

Said documents to be produced shall be originals thereof, unless said originals are destroyed or unavailable, in which case true, correct and legible copies thereof may be produced in lieu of said originals.

If an interpreter is required to translate testimony, notice that an interpreter is needed must be given at least three (3) days before the deposition date, including the specific dialect needed.

## **DEFINITIONS AND INSTRUCTIONS**

1. The term "YOU," "YOUR," and "DEFENDANT" shall mean OMNI HOTELS MANAGEMENT CORPORATION and any and all agents, representatives, assigns, successors, dealerships, individuals, and/or businesses who represent themselves to be affiliated with, or work for OMNI HOTELS MANAGEMENT CORPORATION.

2. The term "DOCUMENT" shall be interpreted in accordance with Califronia Evidence Code Section 250 and/or Federal Rules of Evidence/Documents 1001 also to include electronic mails and electronically stored information.

3. The term "PERSON" means and includes natural persons, corporations, partnerships, associations, or any type of entity, and agents, servants, employees and representatives.

4.  The term "LOCATION OF INCIDENT" means "where the Plaintiff ALLEN HARVEY ABOLAFIA fell August 29, 2018 as described in the Omni Hotels & Resorts Incident Report, including but not limited to the golf cart bridge that leads from the Legends 6th hole to the Legends 7th hole, the gap near the ramp of the golf cart bridge that leads from the Legend 6th hole to the Legends 7th hole, "the side of the ramp" where the incident took place, the golf cart bridge between the Legends 6th hole and 7th hole, the golf cart path near the Legends 7th hole, the curb for the bridge leading to the Legends 7th hole, the curb for the golf cart path between the bridge and the Legends 7th hole tee box, the golf cart path and curb leading from the bridge to the Legends 7th hole, the grass area between the bridge and the Legends 7th hole tee box, the location of the INCIDENT, and the area depicted in Exhibit 1, the Incident Report and Photograph)

5.  The term "INCIDENT" shall include the circumstances and events surrounding the alleged occurrence giving rise to this action or proceeding which occurred on AUGUST 29, 2018 at approximately 10:20 a.m.

## EXHIBIT A

## MATTERS ON WHICH THE DEPONENT IS TO BE EXAMINED

1.  Questions relating to the design of the golf cart bridge at or near the LOCATION OF THE INCIDENT.

2.  Questions relating to the construction of the concrete golf cart bridge at or near the LOCATION OF THE INCIDENT.

3.  Questions relating to the golf cart bridge that Plaintiff's golf cart was parked on at the time of the INCIDENT.

Plaintiff ALLEN ABOLAFIA'S NOTICE OF DEPOSITION OF PERSON(S)

MOST KNOWLEDGEABLE AT HOAGLAND & SONS

D-4

4. Questions relating to the plans for the golf cart bridge at or near the LOCATION OF THE INCIDENT.

5. Questions relating to the plans for the junction of the golf cart bridge and the golf cart path at or near the LOCATION OF THE INCIDENT.

6. Questions relating to the as built construction of the golf cart bridge at or near the LOCATION OF THE INCIDENT at the time of the INCIDENT.

7. Questions relating to the as built construction of the golf cart path at or near the LOCATION OF THE INCIDENT at the time of the INCIDENT.

8. Questions relating to the cause of the hole next to the curb on the golf cart bridge at or near the LOCATION OF THE INCIDENT.

9. Questions relating to the cause of the hole next to the curb on the golf cart path at or near the LOCATION OF THE INCIDENT.

10. Questions relating to the cause of the hole at the junction of the golf cart path and golf cart bridge at or near the LOCATION OF THE INCIDENT.

11. Questions relating to the design of the golf cart path curb at or near the LOCATION OF THE INCIDENT.

12. Questions relating to the design of the golf cart path curb at or near the LOCATION OF THE INCIDENT.

## EXHIBIT B
## DOCUMENTS TO BE PRODUCED

1. All DOCUMENTS that evidence the plans for the golf cart bridge, the golf cart path, and the junction of the golf cart path and golf cart bridge at or near the LOCATION OF THE INCIDENT.

2.  All DOCUMENTS that evidence the design for the golf cart bridge, the golf cart path, and the junction of the golf cart path and golf cart bridge at or near the LOCATION OF THE INCIDENT.

3.  All DOCUMENTS that evidence the construction of the golf cart bridge, the golf cart path, and the junction of the golf cart path and golf cart bridge at or near the LOCATION OF THE INCIDENT.

4.  All DOCUMENTS that evidence there was a gap near the ramp at the LOCATION OF THE INCIDENT.

5.  All DOCUMENTS that evidence the as built construction of the golf cart bridge, the golf cart path, and the junction of the golf cart path and golf cart bridge at or near the LOCATION OF THE INCIDENT.

Dated:   6/12/2020

ROBERT J. PECORA
Attorney For Plaintiff
ALLEN HARVEY ABOLAFIA

### DECLARATION OF SERVICE

I, the undersigned say:  I am over the age of 18 years, employed in the County of San Diego and not a party to the above-entitled action; that affiant's business address is: 7855 Ivanhoe Avenue, Suite 408, La Jolla, CA  92037; that on the date set forth below, the affiant served the within copies:

**PLAINTIFF, ALLEN HARVEY ABOLAFIA'S NOTICE OF DEPOSITION OF PERSON(S) MOST KNOWLEDGEABLE AT HOAGLUND & SONS CONCRETE**

addressed to:

| | |
|---|---|
| Robert J. Hanna | Counsel for Defendant, Omni Hotels Management |
| Matthew L. Green | Corporation |
| Whitney R. Blackhurst | |
| Best Best & Krieger LLP | |
| 655 West Broadway, 15th Floor | |
| San Diego, CA 92101 | |
| Phone: (619) 525-1300 | |
| Fax:    (619) 233-6118 | Assistant: Jannine South |

__XX__   (By Mail) I placed each such sealed envelope, with postage thereon fully prepaid for first-class mail, for collection and mailing at La Jolla, San Diego, California, following ordinary business practices,  I am familiar with the practice of our office for collection and processing of correspondence, said practice being that in the ordinary course of business, correspondence is deposited in the United States Postal Service the same day as it is placed for collection.

___   (By Personal Service) I caused each such envelope to be delivered by hand to the addressee(s) above at:

__XX__   (By facsimile)  I transmitted all documents to all parties in this action by facsimile at the telephone number(s) indicated above and thereafter placed each such sealed envelope, with postage thereon fully prepaid for first-class mail, for collection and mailing at La Jolla, California.

__XX__   (By Email Service) I provided a true copy of each document to the following email addresses: Whitney.Blackhurst@bbklaw.com; Matthew.Green@bbklaw.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

June 12, 2020

ALAN D. RIEDLER

Proof of Service

D-7